**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | |
|---|---|
| WILL MCLEMORE, MCLEMORE AUCTION COMPANY, AARON MCKEE, PURPLE WAVE, INC., AND THE INTERSTATE AUCTION ASSOCIATION, | ) ) ) ) ) |
| PLAINTIFFS, | ) ) |
| v. | ) Case No. _____ ) |
| ROXANA GUMUCIO, GLENN KOPCHAK, JOHN THORPE, RONALD COYLER, JEFF MORRIS, ADAM LEWIS, RANDY LOWE, IN THEIR OFFICIAL CAPACITY, | ) ) ) ) ) |
| DEFENDANTS. | ) |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiffs bring this civil rights lawsuit against the Defendants who are all persons charged with the enforcement of Tennessee's auctioneering licensing laws, now made applicable to online auctions.

### I.
### Introduction

Tennessee is poised to require an auctioneer license for online auctions. This case challenges Tennessee's recent enactment, 2019 Tenn. Pub. Ch. 471 (the Act, or the online auction license) (Ex. 1), which swept online auctions under the statutory definition, thereby requiring an auctioneer license. Online auctions have flourished since 2006 when Tennessee enacted an exemption for "timed listings that allow bidding on an internet website," Tenn. Code Ann. § 62-19-103(9), that had the practical effect of leaving almost all online auctions free from licensure

regardless of bidding format. The Act is aimed at including online auctions under the definition of auctions.

This is a free speech case. Auctioneering is entirely speech. People do not forfeit their free speech rights just because their speech is an occupation. The license applies to websites based on *content, speaker, and medium*, and cannot survive any level of constitutional scrutiny. The online auction license also violates the Commerce Clause. It licenses a well-established and reliable means of e-Commerce, the embodiment of interstate commerce, even as it exempted many businesses based on arbitrary bidding characteristics. An individual operating an online auction website cannot avoid "act[ing] as, advertis[ing] as, or represent[ing] to be," an auctioneer (Ex. 1 at § 5(a)(1)), thus requiring a Tennessee license, even if the website has minimal or non-existent Tennessee contacts. Plaintiffs face an imminent choice on July 1, 2019: obtain auctioneer licenses for everyone who conducts online auctions, or face civil and criminal enforcement.

Plaintiffs include licensed and unlicensed persons who arrange, act as, and conduct online auctions from physical locations, both in and out-of-state. They wish to continue to speak, use unlicensed persons to arrange and operate online auctions, pay a portion of commissions to persons who identify online auction opportunities, and continue to operate in interstate commerce. Plaintiffs seek injunctive relief barring enforcement against "electronic" communications, as well as declaratory relief that the Act is unconstitutional, both facially and as-applied.

## II.
## Jurisdiction and Venue

1.      Plaintiffs bring this civil rights lawsuit under the United States Constitution, the Civil Rights Act of 1871, 42 U.S.C. § 1983 and the Declaratory Judgment Act, 28 U.S.C. § 2201.

2.      This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343 because the matter in controversy arises under the Constitution of the United States.

3. This Court has supplemental jurisdiction over claims arising under the Tennessee Constitution pursuant to 28 U.S.C. § 1367(a) because those claims are so related to claims within this Court's original jurisdiction that they form part of the same case or controversy under Article III.

4. Venue is proper in this Court under 28 U.S.C. § 1391(b)(1) and (2) because any defendants resides in this District and all defendants are residents of the State, and because a substantial part of the acts or events giving rise to this Complaint occurred or will occur in this District.

5. This Court has authority to enter a declaratory judgment and to provide preliminary and permanent injunctive relief under Rules 57 and 65 of the Federal Rules of Civil Procedure, and 28 U.S.C. §§ 2201, 2202.

### III.
### The Parties

6. **Will McLemore** is a U.S. citizen who resides in Tennessee. He is the president of McLemore Auction Company, LLC, and its sole member. He also organized the Interstate Auction Association in June of 2019 even though he is a licensed auctioneer.

7. **McLemore Auction Company, LLC,** is a Tennessee limited liability company in good standing. McLemore Auction has a physical location in Nashville, TN.

8. **Aaron McKee** is a U.S. citizen who resides in Kansas. He is the President and CEO of Purple Wave, Inc.

9. **Purple Wave, Inc.** is a privately held corporation, incorporated in Delaware and has headquarters physically located in Manhattan, KS.

10. **Interstate Auction Association (IAA)** is an unincorporated association with members who are dedicated to online auctioneer freedom. It was organized by Will as a direct response to the Act, and is made up primarily of online auctioneers, licensed and unlicensed.

11. The Tennessee Auctioneer Commission (Commission) has been granted legal authority to enforce Title 62, Chapter 19 of the Tennessee Code, which will upon implementation of the Act, restrict acting as, advertising as, or representing to be an auctioneer, or arranging auctions by or through a principal auctioneer by means of electronic communications, exclusively to individuals who are licensed by the Commission.

12. By law, the Commission has the power to enact and enforce rules and regulations that it considers necessary that are not inconsistent with this Chapter or other laws of the state.

13. By law, four of the five members of the Commission shall be licensed auctioneers.

14. **Roxana Gumucio** is the executive director for the Commission. She is sued in her official capacity only.

15. **Glenn Kopchak** is the assistant director for the Tennessee Auction Commission. He is sued in his official capacity only.

16. **John Thorpe, Ronald Coyler, Jeff Morris, Adam Lewis, and Randy Lowe** are presently the members of the Commission. They are sued in their official capacity only.

17. Defendant Gumucio is vested by statute with the power and duties of the Commission, including implementation and enforcement of the Act and rules promulgated by the Commission.

18. Defendant Gumucio may delegate those powers and duties to Defendant Kopchak, who shall work in collaboration with Defendant Gumucio.

4

19.     Defendants thus share ultimate responsibility for implementing and enforcing the statutes and regulations that will prohibit Plaintiffs, from holding, organizing, advertising, arranging or conducting auctions online, or employing unlicensed individuals to do the same, or rebating a portion of a commission resulting from such activity to an unlicensed person. At all relevant times, Defendants acted and will act under color of law.

## IV.
### Factual Background

**A.     McLemore Auction Company, an extended-time online auction company.**

20.     Will McLemore is a 43-year-old entrepreneur who opened McLemore Auction Company, LLC, in 2007.

21.     McLemore Auction is a small business located in Nashville, Tennessee.

22.     McLemore Auction conducts auctions of real estate and personal property mostly, but not entirely, in Tennessee via its internet platform, https://www.mclemoreauction.com.

23.     In addition to Will, McLemore Auction employs one full time employee and four independent contractors, Blake Kimball, Wilson Land, Jamie Boyd, and Dwayne Smith.

24.     Blake, Wilson, and Jamie do not hold any license under Tennessee's auctioneer laws.

25.     McLemore Auction nearly always sells on consignment and very rarely owns the goods or real estate it sells.

26.     McLemore Auction sells the goods and real estate of a particular client and collects a commission from the proceeds of the total sales.

27.     Will directly manages and will manage all real estate auctions himself, or, on occasion, in conjunction with another cooperating company..

28.    For personal property auctions, Will has four auction managers who evaluate the opportunity, negotiate a deal with the property owner, catalog the assets, manage the inspection, oversee the removal of the assets from the owner's premises; this includes Blake, Wilson and Jamie.

29.    McLemore Auction has operated and will operate online auctions; that is, McLemore Auction conducts sales transactions through electronic exchanges between the website, as operated by employees of McLemore Auction, and members of an audience.

30.    Those exchanges consist of a series of invitations for offers to members of the audience to purchase goods or real estate, culminating in the acceptance of the highest or most favorable offer made by a member of the participating audience.

31.    Last year, only one of the 109 auctions performed by McLemore Auctions was an outcry auction. The rest were all online auctions

32.    McLemore Auction exclusively uses an auction format where the time of the auction closing extends based on bidding activity (extended-time format).

33.    Will uses the extended-time format because it removes any arbitrary advantage granted to the last bidder and allows the best, truest market price to be reflected in the final bid for any asset.

34.    Will has held a Tennessee an auctioneer license since Aug. 30, 1999.

35.    Will is also a licensed real estate broker and auctioneer in Mississippi.

36.    McLemore Auction holds a Tennessee real estate firm license and a Tennessee auctioneer firm license.

37.     Will has never required individuals working at McLemore Auction acquire a license issued by the Commission because, based on the definition of "timed sales" in the auction law, online auctions are exempted from regulations.

38.     Will represents and advertises on McLemore Auction's website that it has and will conduct online auctions, all of which close based on bidding activity.

39.     When Will auctions goods, he, Wilson, Jamie, Blake, Dwayne posts pictures and displays them on the website listing.

40.     For an online auction, the audience is not physically present to see the goods or real estate and so it is necessary for the listing to include images.

41.     For instance, Will is presently auctioning online a "golf ball wall hanging display" with photographs of the particular golf balls.

42.     When Will auctions goods, he or one of his employees may include a description on the website listing.

43.     For instance, Will is presently auctioning online "golf bag with clubs" that includes the item description: "featuring Ping Eye2n Berilium 5-9 +W, Taylormade R540XD driver, odyssey White Hot Putter. Clubs may have been left in the elements. A little TLC recommended."

44.     The images and descriptions are designed to influence bidding activity by informing the audience about unique conditions and characteristics of the goods and real estate.

45.     Will has auctioned and will auction goods online that may have historic value, or may be collector's items, or have value based on who owned them.

46.     When Will auctions goods online that he or one of his employees believes has such significance, the webpage will include a narrative intended to convey that significance.

7

47.     If origin or ownership of the items is of significance, he or one of his employees will detail where they came from and why that is significant on the website listing.

48.     For instance, when Will auctioned off the art of Paul Penczner for the University of Tennessee Foundation in 2014, he or one of his employees included descriptions of the artwork and artist on the website listing.

49.     Local media, including a magazine that covers art, did stories on this auction.

50.     McLemore Auction recently listed:

McLemore Auction Company will conduct the complete liquidation of Thiel Audio Products Company, LLC for Bankruptcy Trustee, T. Larry Edmondson, in Case #18-0710. Long known as one of the preeminent manufacturers of speakers for hi-fi enthusiasts and audiophiles, Thiel closed in 2018 after 40 years in business. This auction includes more than 500 lots of high performance speakers and audio equipment, speaker components, stage lights, instruments, electronics, furniture, art and tools. The auction also features more than 1,100 Aurora by Thiel Lifestream Home battery powered bluetooth speakers.

51.     The website listing included this description because to some high-end enthusiasts, these goods may have significance and value beyond their commercial value because they were used by Jim Thiel, a revered speaker designer, in his lab before his death.

52.     Absent these depictions and descriptions on McLemore Auction's website, the invitation for audience members to purchase would be less informative, less interesting, and less enticing, thus affecting the offers from the audience.

53.     McLemore Auction has generated and will generate more than twenty-five thousand dollars ($25,000) in sales revenue per calendar year from the sale of goods or real estate in online auctions.

**B.      The Tennessee Auctioneer Commission and Tennessee's licensure of auctioneers.**

54.     Tennessee enacted the Tennessee Auctioneer Commission in 1967 (the Commission).

55.     The Commission issues all licenses created under Title 62, Chapter 19.

56.     By law, an administrative director and investigator are authorized on behalf of the Commission to issue citations against persons for engaging in unlicensed activity.

57.     Prior to the enactment of the Act, (Ex. 1; 2019 Tenn. Pub. Ch. 471), an auction was defined to mean a sales transaction conducted by means of oral or written exchange between an auctioneer and members of an audience, which exchange consists of a series of invitations of offers for purchase of goods or real estate made by the auctioneer and offers to purchase made by members of the audience culminating in the acceptance by the auctioneer of the highest or most favorable offer made by a member of the participating audience.

58.     An auctioneer was defined as any individual who, for a fee, commission or any other valuable consideration, or with the intention or expectation of receiving a fee, commission or any other valuable consideration, by the means or process of auction or sale at auction, offers, negotiates or attempts to negotiate a listing contract, sale or purchase of goods.

59.     The Commission actively enforces, and will continue to enforce, its own rules and Title 62, Chapter 19.

60.     A violation of the auctioneer laws or regulations is a crime, punishable as a Class C misdemeanor.

61.     Defendants are also empowered to issue citations for unlicensed auctioneering, level civil fines and assess the costs of any administrative proceeding.

62.     Defendants are empowered to assess civil penalties of up to $1,000 per day for unlicensed activity, or for violating a Commission rule or order.

63.     Defendants may issue citations against persons acting in the capacity of engaging in the auction business without a license.

64. Defendants are empowered to penalize citations against persons engaging in the capacity of engaging in the auction business without a license in an amount of not less than $50 and not more than $2,500 for each violation.

65. In 2006, the Tennessee General Assembly passed an exemption to the auctioneering laws for "fixed price or timed listings that allow bidding on an Internet web site but that does not constitute a simulcast of a live auction."

66. Since 2006, the Commission has not enforced a licensing requirement on online auctions, whether the timing of the auction resets based on bidding activity or not, so long as they do not constitute a simulcast of a live auction.

67. By regulation, the Commission prohibits any person licensed under Tennessee's auctioneer laws from rebating any part of his or her commission to any person not holding a real estate, auctioneer, or apprentice auctioneer license.

**C.      Will defeats a complaint that he paid a rebate.**

68. In 2012, Will received a call from Barbara Womack.

69. Barbara Womack is a woman whose primary source of income is social security.

70. Barbara called Will after she saw a liquor store, J. Barleycorn, that was going out of business.

71. Barbara negotiated with J. Barleycorn to have Will auction off its assets in a liquidation sale.

72. After Will conducted a successful online auction of J. Barleycorn's assets, he paid Barbara 20% of the commission.

73. Will began posting on McLemore Auction's website that he would pay anyone for referrals that resulted in a successful auction.

74. On September 25, 2015, Will received notice of a complaint filed against McLemore Auction Company. A true and accurate copy of this complaint is attached as Exhibit 2.

75. The basis for the complaint was that Will posted on his website that he paid referrals to individuals who were not licensed.

76. Will immediately took down the posting on his website that he paid for referrals.

77. Will contested the proceedings administratively to the Tennessee Auction Commission on August 1, 2016.

78. Relying on the exemption for timed online auctions, Will successfully argued that any goods that derived from the referrals were sold online and thus, did not constitute an auction within the Commission's purview.

79. The Commission found that Will operated almost exclusively sales by a fixed price or timed listing that allow bidding on a website but do not constitute a simulcast of a live auction.

80. The Commission found that timed online sales are not regulated by the Commission.

81. The Commission found that paying for leads for timed online sales was not prohibited.

82. The Commission further found that Will posted an advertisement for leads for timed online sales.

83. By agreement, the charges were dismissed, but Will paid the administrative costs and fees for the action.

84. McLemore Auction's website presently reads "[f]or personal property leads resulting in successful online auctions (timed listings only – not simulcast or outcry auctions) we

pay a 20% referral. Please let us know if you know of anyone who may have a need for our services. Contact Will McLemore at (615) 636-9602."

85. On June 21, 2019, Will rebated a portion of a commission from an online auction to a person holding a real estate license in the amount of $353.42.

**D.    Tennessee moves to license online auctions.**

86. In 2016, the Tennessee Auction Commission proposed a rule change that would have had the effect of regulating extended-time online auctions – that is listings that are extended or those in which a bidder has an opportunity to increase a bid beyond the original deadline; the definition of a "timed" online auctions would not include extended-time format as a "timed" auction." A true and accurate copy of Rule 0160-01-.028 is attached as Exhibit 3.

87. On December 15, 2016, the Joint Committee for Government Operations pulled this rule out for specific review before it became effective.

88. Will was present and spoke out against the proposed rule.

89. A true and accurate copy of a transcript of the relevant portion of the December 15, 2016 hearing is attached as Exhibit 4. This is a transcription of the proceedings that were retrieved from the Tennessee General Assembly's website at: http://tnga.granicus.com/MediaPlayer.php?view_id=315&clip_id=12457 (last visited June 20, 2019).

90. David Allen, then the Vice President of the Tennessee Auctioneer's Association (TAA), testified in support of the rule.

91. The Tennessee Auctioneers Association (TAA) describes itself on its publicly available website as a professional organization supporting the auction industry at: http://www.tnauctioneers.com/ (last viewed June 20, 2019).

92.    Mr. Allen explained that an extended-time auction was indistinguishable from a live auction because the bidding reset the auction's close.

93.    At this hearing, Sen. Bell said to Mr. Allen:

But what I want to know is where and why is there the potential to harm the individual selling the chair greater than the time[d] sale what has the extended option versus the person who sells over eBay and in a sale that has a fixed auction. Not that they are different, not that they – not that one could possibly meet the definition of an auction. … I'm having a tough time seeing a difference in how one [auction format] exposes the public to fraudulent behavior and the other one doesn't."

(3:36:40 – 3:37:30; Ex. 4 at 21).

94.    Mr. Allen said:

Once again, speaking on behalf of the TAA, I would -- I would suggest that both situations could potentially create malfeasance and that's why we expressed concerns back in 2006. So the question in my mind is, you know, we could at least give lip service to the idea that there was some difference about people taking in items on behalf of the public and then not being licensed and selling them and not being licensed to do that because there was a semantic decision about what was going on. But I would suggest to you that both situations are equally fraught with the possibility of malfeasance.

(3:37:31 – 3:38:20; Ex. 4 at 21-22).

95.    This Committee voted a negative recommendation to the portion of the rules that would have licensed online auctions.

96.    In 2017, the Tennessee General Assembly considered bills that would have required extended-time, but not fixed-time, online auctions to be licensed.

97.    A true and accurate copy of a transcript of the relevant portion of the House Business and Utilities subcommittee on March 28, 2017 is attached as Exhibit 5. This is a transcription of the hearing that was retrieved from the Tennessee General Assembly's website at: http://tnga.granicus.com/MediaPlayer.php?view_id=354&clip_id=13382&meta_id=285034  (last viewed on June 18, 2019).

98.     Rep. Gravitt said "by the way, this bill comes to us from the Tennessee Auctioneers Association which I am a past president of." (26:13; Ex. 5 at 2).

99.     Rep. Gravitt said that "it is the Tennessee Auctioneer Association's position that with that extension of time you are basically doing an online auction where two or more bidders actively bid against them past the extension rule." (26:40 - 27:32; Ex. 5 at 3).

100.    Rep. Gravitt said that the TAA wanted everyone to "compete on the same level playing field." (*Id.*).

101.    Rep. Gravitt stated that the bill contained exemptions for private online auction companies, who he named (*Id.*).

102.    Rep. Gravitt explained, "eBay would be exempted, Copart, they would be exempt. And from my understanding, the -- Copart is licensed so therefore this bill would not apply to them." (26:30 - 26:38; Ex. 5 at 3).

103.    Copart Auto Auctions describes itself on its publicly available website at https://www.copart.com/ (last viewed June 20, 2019) as a "global leader in online car auctions, and a premier destination for the resale and remarketing of vehicles."

104.    These bills did not pass.

105.    In 2018, the General Assembly again considered bills that would have required extended-time, but not fixed-time, online auctions to be licensed.

106.    During the session, the Commission continued to meet and provide legislative updates on pending legislation, including on February 12, 2018.

107.    A true and accurate copy of a transcript of the relevant portion of the February 12, 2018 hearing is attached as Exhibit 6. This is a transcription of the hearing that was posted by the

14

Commission's at: https://www.youtube.com/watch?v=nmucK0ZEu8E&feature=youtu.be (last viewed on June 20, 2019).

108.    At this meeting, Mr. Allen, now president of the TAA, addressed the Commission to speak about the pending bills that proposed to license online auctions. (28:00 – 28:19; Ex. 6 at 26).

109.    Mr. Allen said he wanted to provide "background" and there has been a lot of "handwringing about the direction of the auction industry, as it particularly relates to online auctions." (28:19 – 28:40; Ex. 6 at 27).

110.    Mr. Allen stated that the consensus of the TAA was that the regulation of online auctions was a "must." (29:05 - 29:14; Ex. 6 at 27).

111.    Mr. Allen stated "the elephant in the room is online auction and the regulation of it by the auction industry and Tennessee Auction Commission and our goal is to try to ultimately get some understanding about who can conduct an auction and who can't." (31:15 – 31:27; Ex. 6 at 29).

112.    Mr. Allen then introduced the lobbyist for the TAA to further explain the bills. (31:30; Ex. 6 at 28-29).

113.    Defendant Morris, sitting on the Commission, said "the bill does exactly what we're trying to get done and I applaud the TAA for doing it and hiring you to get it done." (34:02; Ex. 6 at 31).

114.    At the Senate Commerce and Labor Committee on March 6, 2018, the senate bill (SB2081) was amended to create an Auctioneer Modernization Task Force to study the need to amend the law.

115.    A true and accurate copy of a transcript of the relevant portion of the hearing is attached as Exhibit 7. This is a transcription of the hearing that was retrieved from the Tennessee General Assembly's website at:

http://tnga.granicus.com/MediaPlayer.php?view_id=354&clip_id=14580&meta_id=324984 (last viewed June 18, 2019)

116.    Senator Yager said the original bill was brought at the request of the TAA and the Commission to "modernize" aspects of the auction law. (1:28:50 – 1:29:08; Ex. 7 at 2).

117.    While the Task Force was pending, the Commission met on August 20, 2018 for one of its regularly scheduled meetings.

118.    At the August 20, 2018 meeting, the Commission received updates on the Task Force.

119.    A true and accurate copy of a transcript of the relevant portion of the meeting is attached as Exhibit 8. This is a transcription of the meeting that was posted by the Commission's at: https://www.youtube.com/watch?v=hMMe69RpEt8&feature=youtu.be (last viewed on June 19, 2019).

120.    During the meeting, Defendant Morris said "one of the things that we are talking about doing with it from the TAA side – you know, they're looking – they're the ones that really kind of caused this task force to happen." (1:20:08 – 1:20:19; Ex. 8 at 2).

121.    During the meeting, Defendant Morris said the Task Force was "still wrestling with this online in terms of trying to define what that is," and "if it extended by any length of time, one second on, then it becomes a live auction and comes under the licensing purview of the Commission. That is also the position of the TAA. They would like to see that." (1:20:58 – 1:21:30; Ex. 8 at 2-3).

122.     Will was a member of the Auctioneer Modernization Task Force.

123.     Will was present at all meetings.

124.     The Task Force met on August 27, 2018.

125.     A true and accurate copy of a transcript of the relevant portion of the August 27, 2018 hearing is attached as Exhibit 9. This is a transcription of the publicly available hearing that was posted by the Task Force at: https://youtu.be/UpDp7OBc0Wc (last viewed June 26, 2019).

126.     At the August 27, 2018 Task Force meeting, members publicly stated that they did not know how consumers had been harmed by online auctions.

127.     For example, Mr. Allen said that until online auctions were regulated, "I don't think you can necessarily point to statistics in the state of Tennessee and say, we haven't had any problem with this." (Ex. 9 at 26).

128.     For example, when Will asked for proof a demonstrated harm over the last 12 years, Mr. Allen responded, "we don't know if there's been pushback. Rhessa's [of the Nashville Auction School] is letting us know she's hearing complaints every week." (2:02:21 –2:02:50; Ex. 9 at 91).

129.     At the Task Force meeting, members publicly stated that online auctions needed to be regulated because it was a growing model for auctions and they needed to be licensed if other auction business did.

130.     For example, Mr. Allen stated "I think there's a real need to look at oversight for online auctions because we can all agree that's not going to diminish in its activity." (34:25 – 34:32; Ex. 9 at 26).

131.     For example, Mr. Allen stated:

we're talking about a business that is growing, not diminishing. And the, the task before us is are we going to concern ourselves with figuring out how to fit them into the educational model that we require of current auctioneers, the oversight model that we require of auctioneers,  and the licensing model that we require of

auctioneers. Or do we just say we aren't going to require this of people who conduct online auctions because in that case you really have just said that we don't need any auction law.

(1:31:10 – 1:31:51; Ex. 9 at 66-67).

132.    Mr. Allen also said that a substantial portion of the auction community was concerned about the "disparity" between online auctions and regular auctions. (1:42:07 – 1:42:22; Ex. 9 at 75).

133.    The Task Force met on November 5, 2018.

134.    A true and accurate copy of a transcript of the relevant portion of the November 5, 2018 hearing is attached as Exhibit 10. This is a transcription of the publicly available hearing that was posted by the Task Force at: https://youtu.be/_JRUrRJgPA8. (last viewed on June 26, 2019).

135.    When Will pointed out how few consumer complaints the State had received over extended-time online auctions in the last three years, Mr. Allen responded "[i]t's sort of saying rape doesn't occur on a campus because no one reports it." (32:16-32:22; Ex. 10 at 22 – 25).

136.    Mr. Allen agreed that "leaving the fixed time and leaving the extended time as being different is somewhat problematic." (32:30 - 32:42; Ex. 10 at 25).

137.    Mr. Allen stated that he did not "know there is an answer. I think there is a nice compromise, leave the eBay law in place and define what a timed listing is." (33:04 - 33:20; Ex. 10 at 25).

138.    Defendant Morris said "we have got to either include online auctions or just get rid of the auction law. … an online auction is an auction just like any auction there is, whether you say it's timed or not. I think the compromise is having a timed one is the only one that is excluded is a compromise on our part." (33:35 - 34; Ex. 10 at 26).

139.    Mr. Allen said that he "understand[s] the philosophical argument" Will made about licensing only one type of auction format. (40:50 – 40:57; Ex. 10 at 29).

140.    Mr. Allen explained:

In one sense the difference is an extended time auction is absolutely and unequivocally just like a live auction and a fixed time is not. So if you want to split hairs, that's the hair you can split. So while I – while I see the logic of saying, well, why are we carving it out. Well, one reason we're carving it out is so we don't kick eBay's nest. And what we're trying to do is find a compromise without a lot of disparate groups about what they're wanting and what they're not wanting.

(40:58 – 41:35; Ex. 10 at 30).

141.    Mr. Allen said "the elephant in the room has always been online auctions, are we going to be a state that regulates online auctions. I think we should be. And I think that this format right here is the way we go about doing that." (42:44 – 42:50 ; Ex. 10 at 31).

142.    The Task Force met on November 26, 2018.

143.    A true and accurate copy of a transcript of the relevant portion of the November 26, 2018 hearing is attached as Exhibit 11. This is a transcription of the publicly available hearing that was posted by the Task Force at: https://youtu.be/XCg-YAGTpLw. (last viewed on June 21, 2019).

144.    At the November 26, 2018 meeting, members discussed requiring a license for online auctions specifically based on whether the bidding activity reset the closing of an auction.

145.    For example, Clark Milner, the consumer representing the public on the Task Force, said:

to me, a fixed time auction sounds like the same thing as a not fixed time auction in that, you know, if you're on eBay the bids are escalating and going up as someone is bidding more and more, like you would at an auction that might extend its time. The only difference is there's a hard stop on that eBay auction. So my question would be why would simply because there is a hard time on the auction that not be subject to regulation at all, whereas if it extends time a little bit, then it should be regulated. I don't see why –

(39:02 – 39:33; Ex. 11 at 28).

146.    Task Force members explained that they would like to license all online auctions but that it was not politically possible.

147.    For example, Defendant Morris responded:

Let me help you with that, I don't think we're gonna - we would love to go as far as you've suggested. […] I think we're trying to be politically responsible here and know that there's only so far that we can get with this. And we're willing as auctioneers to settle for this definition so that the TAC will have oversight over online auctions that extend - we'll never get the legislature to allow us to agree to oversee all auctions whether fixed or not fixed.

(39:34 – 40:16; Ex. 11 at 28 -29).

148.    Mr. Milner asked "should there be another reason other than simply it would too difficult politically to regulate these fixed time auctions?" (Ex. 11 at 30).

149.    Mr. Allen said: "Clark, and if you want to try to fix the fixed-time online auctions, that's next year's task force."  (41:25 – 41:32; Ex. 11 at 30).

150.    Mr. Milner said "I'm not saying I do. What I was saying [is] there needs to be a principal reason for treating those two things differently if you're going to regulate one and not the other beyond that it's simply politically more expedient to regulate –" (Ex. 11 at 30).

151.    Mr. Allen responded: "Many of us believe the principal reason is is that in an online soft close auction you are mimicking the exact behavior of an auctioneer." (*Id*.).

152.    As part of its purpose, the Task Force analyzed three years of auctioneer complaints, broken down by consumer-based complaints, and complaints for extended time and fixed time auctions.

153.    The Task Force ultimately produced a table that is publicly available on the Tennessee                 Auctioneer                 Commission's                 website                 at:

https://www.tn.gov/commerce/regboards/auction-law-tf/additional-resources-.html (last viewed June 17, 2019).

154.    This is an image of the table taken from the website on June 2, 2019:

| Online Auction Complaint Data | FY 2016 | FY 2017 | FY 2018 | Total |
|---|---|---|---|---|
| Total number of auctioneer complaints | 37 | 34 | 46 | 117 |
| Total number of consumer-generated complaints | 24 | 29 | 33 | 86 |
| Total number of complaints regarding online auctions | 7 | 4 | 4 | 15 |
| Total number of consumer-generated complaints regarding online auctions | 5 | 3 | 3 | 11 |
| Total Number of complaints regarding online auctions with extended time endings | 2 | 1 | 0 | 3 |

155.    The Task Force identified 11 consumer complaints regarding online auctions over the last three years.

156.    The Task Force identified three consumer complaints pertained to extended-time online auctions over the last three years.

157.    No complaints for extended-time online auctions were recorded in 2018.

158.    The Task Force's finalized recommendations are publicly posted on the Tennessee Auction Commission's website here:

https://www.tn.gov/content/dam/tn/commerce/documents/regboards/auction-tf/posts/Auctioneer-Law-Modernization-Task-Force-Finalized-Recommendations.pdf (last viewed June 26, 2019).

159.    On the fifth page, the Task Force recommended the addition of the word "electronic" to the definition of auction.

160.    The Task Force recommended defining the term "timed listing" as meaning "offering goods for sale with a fixed ending time and date which does not extend based on bidding activity."

161.    The Task Force recommended adding an exemption for online auction platforms that sell nonrepairable or salvage vehicles.

162.    In 2019, the Tennessee General Assembly debated and ultimately passed bills based on these recommendations (HB797/SB1361), thereby enacting 2019 Tenn. Pub. Ch. 471 (the Act) (Ex. 1).

163.    While these bills were pending, the Commission met on February 25, 2019 where it heard legislative updates on bills that were based on the Task Force recommendations.

164.    A true and accurate copy of a transcript of the relevant portion of the February 25, 2019 meeting is attached as Exhibit 12. This is a transcription of the meeting that was posted by the Commission at: https://www.youtube.com/watch?v=UHtn6xXJmVc&feature=youtu.be (last viewed June 26, 2019).

165.    Defendant Morris discussed the concern held by National Association of License Law Officials of America (NALLOA) over online auctions.

166.    NALLOA is an organization for licensing board members and associate members in different states.

167.    Defendant Morris is the president of NALLOA.

168.    For example, Defendant Morris said:

the big trend is trying to figure out this thing about internet. And everybody is really interested in what we are doing with the change in our law that we're proposing here that we did through the task force last fall and the recommendation that we made in January. And everybody's trying to get their arms around this internet and auctions.

(11:01 - 11:23; Ex. 12 at 3).

169. Defendant Morris said "other states are taking notice what we're doing here. And NALLOA is really a great organization where all these states can share information and that sort of thing." (11:44-11:55; Ex. 12 at 4).

170. The Senate discussed SB1349, a bill that licensed online auctions per the Task Force recommendations, at a March 12, 2019 Senate Commerce and Labor Committee hearing.

171. A true and accurate copy of a transcript of the relevant portion of the hearing is attached as Exhibit 13. This is a transcription of the hearing that was retrieved from the Tennessee General Assembly's website at: http://tnga.granicus.com/MediaPlayer.php?view_id=414&clip_id=16696&meta_id=387625 (last viewed June 24, 2019).

172. At the March 12, 2019 hearing, the senators discussed the exemptions that will allow private online auction companies to avoid the licensure requirement

173. For example, Senator Yager, the bill's sponsor, was asked by Senator Johnson to clarify whether the bill exempted Copart and Ritchie Bros. (9:02 – 9:24; Ex. 13 at 3).

174. Ritchie Bros. Auctions publicly describes itself on its website at https://www.rbauction.com/aboutus (last viewed June 26, 2019) as:

> a global asset management and disposition company, offering customers end-to-end solutions for buying and selling used heavy equipment, trucks and other assets. We help thousands of people around the world appraise, sell, inspect, buy, refurbish, ship and finance heavy equipment, trucks, and other assets every month. With our multiple onsite and online selling platforms and commitment to first-class customer service, Ritchie Bros. is trusted worldwide because we make buying and selling easy, efficient, fair, and transparent.

23

175. Senator Yager responded that the bill does not exempt anyone "by name" but that "to answer your question, the result is the same as --. you're correct. Just -- that's right." (9:24 – 9:36; Ex. 13 at 3).

176. Senator Nicely asked why the bill was structured to exempt "these few companies. Why are they special?" (9:41 – 9:51; Ex. 13 at 3).

177. Senator Yager responded:

Well, there is no one special. We just – you know, the – I will try to answer your question and then I can – we also have someone here who can testify and gave you a more specific answer. But, you know, when these bills were written 70 years ago, we weren't – we didn't have computers. And with the advent of the digital age, we've had to – we have developed a body of rules that govern online auctions. And so, I mean, just – and which would affect the industries. We've made it possible to have online auctions for the first time under certain circumstances in this bill. But I wouldn't characterize that we've done anything special for an industry. Although I'm mindful – appreciate your, you know, comment in light of the leader's request about a specific industry.

(9:51 – 10:48; Ex. 13 at 3-4).

178. Senator Johnson added that "these are publicly traded companies that are – deal in multiple states and they're under … significant other licensing and registration and other things that they do. …" (10:54 – 11:32; Ex. 13 at 4-5).

179. Tennessee's governor signed the Act into law on May 24, 2019. A publicly available copy of the Act (Ex. 1) is posted on the Tennessee Secretary of State's website at https://publications.tnsosfiles.com/acts/111/pub/pc0471.pdf (last viewed June 26, 2019).

180. The Act becomes effective on July 1, 2019.

181. The Act presently defines auction as a sales transaction:

conducted by oral, written, or electronic exchange between an auctioneer and members of the audience consisting of a series of invitations by the auctioneer for offers to members of the audience to purchase goods or real estate, culminating in the acceptance by the auctioneer of the highest or most favorable offer made by a member of the participating audience.

*See* 2019 Tenn. Pub. Ch. 471 (Ex. 1 at § 4(2)).

182.     The Act presently creates three categories of auctioneers: principal, bid caller, or public automobile. (*Id*. at § 4(3), (4), (9), (11)).

183.     The Act specifically defines a principal auctioneer to mean an individual who, for a fee, commission or other valuable consideration, or with the intention or expectation of receiving a fee, commission, or any other valuable consideration by the means or process of an auction or sale at auction, offers and executes a listing contract, sale, purchase, or exchange of goods and is responsible for the management and supervision of an auction company, including its wholly owned subsidiary or affiliate company. (*Id*. at § 4(9)).

184.     The Act mandates that all auctions arranged by or through a principal auctioneer must be conducted exclusively by individuals licensed under this chapter. (*Id*. at § 5(b)).

185.     The Act declares that it is unlawful for a person to act as, advertise as, or represent to be an auctioneer without holding a valid license issued by the commission. *d*. at § 5(a)(1)).

186.     The Act includes the following list of exemptions:

   i.    A person acting as a receiver, trustee in bankruptcy, guardian, administrator, executor, or other person acting under order of a court;

  ii.    A trustee acting under a trust agreement, deed of trust or will, or a secured party selling collateral after default by a debtor in accordance with title 47, chapter 9;

 iii.    An auction conducted by or under the direction of a governmental entity or pursuant to a judicial order or decree;

 iv.    An auction conducted by or on behalf of a political party, church, or charitable corporation or association, if the individual conducting the sale receives no compensation and does not, by advertising or otherwise, hold their self out as available to engage in the sale of goods at auction;

  v.    A person performing acts in the regular course of or as an incident to the management of and investment in property owned or leased by the person, if the property was not acquired for the purpose of resale. When a sales tax, as prescribed in title 67, is not levied upon the sale of personal property, there is a presumption that the personal property was purchased for the purpose of resale;

vi.      An auction conducted for the sale of livestock sponsored through or in cooperation with the state department of agriculture or the University of Tennessee extension, or both;

vii.     An auction sale of tobacco at or for a warehouse operated pursuant to title 43, chapter 19;

viii.    A livestock auction sale regulated by the United States department of agriculture packers and stockyards administration, if the sale uses: (A) The shipper's proceeds account required by federal regulations; and (B) An auctioneer licensed under this chapter;

ix.     Any fixed price or timed listings that allow bidding on an internet website, but do not constitute a simulcast of a live auction;

x.      An exclusive online auction whose primary business activity is selling nonrepairable or salvage vehicles in this state and holds the appropriate license issued by the Tennessee motor vehicle commission;

xi.     An in-person or simulcast auction whose primary business activity is selling nonrepairable or salvage vehicles in this state, and holds the appropriate license issued by the Tennessee motor vehicle commission and that uses a licensed auctioneer;

xii.     An individual who generates less than twenty-five thousand dollars ($25,000) in revenue a calendar year from the sale of property in online auctions.

(*Id*. at § 6).

187.    The Act will change the "timed listing" exemption to exclude extended-time online auctions; it will define "timed listing" to mean offering goods for sale with a fixed ending time and date that does not extend based on bidding activity. (*Id*. at § 4(12)).

188.    On June 4, 2019, Will emailed Defendant Kopchak with questions about the online auction licensing law. A true and accurate copy of the email exchange is attached as Exhibit 14.

189.    Will asked if his employees who manage the online auctions that Will arranged need to be licensed. (*Id*.).

190.    Will asked if out-of-state online auction companies using extended-time format may advertise, accept bids or clients, or sell assets in Tennessee without a license. (*Id*.).

191.    Will asked if he could continue to pay referrals to unlicensed persons who bring him leads. (*Id*.).

192.    On June 6, 2019, Defendant Kopchak responded that the new laws go into effect on July 1. (*Id.*).

193.    Defendant Kopchak said, "[c]oncerning the remaining questions, we are not authorized to provide legal advice or engage in answering and responding to hypotheticals," and suggested Will consult a private attorney. (*Id.*).

194.    Defendant Kopchak added, "[k]eep in mind that we will be sending out an email blast detailing the changes in law and steps of transition prior to the effective date on July 1st." (*Id.*).

195.    On June 11, 2019, Will responded with a question "that is not hypothetical" about the listing on his website offering to rebate a portion of a commission to any unlicensed person who provides leads resulting in successful online auctions. (*Id.*).

196.    Will asked if he was required to remove the language from his website before July 1, 2019. (*Id.*).

197.    On June 12, 2019, Defendant Kopchak responded that they "typically avoid telling licensees what they can and cannot do with their business," but if Will was concerned about what he had said on the website "I would recommend removing the language or consulting with your attorney." (*Id.*)

198.    Defendant Kopchak also said that "nothing" in the new law addressed leads or referrals. (*Id.*)

199.    On June 14, 2019, Will received the email from Defendant Kopchak that went out to all licensees that "provided a brief overview" of the changes. A true and accurate copy of the email notification is attached as Exhibit 15.

200.     Regarding online auctions, the email notification detailed the exemptions for the sale of nonrepairable or salvage vehicles online. (Ex. 15).

201.     In a part headed, "online auction exemption," the email notification related that one exemption includes online auction activity for an "individual" who generates less than twenty-five thousand dollars ($25,000.00) in revenue in a calendar year. (*Id.*)

202.     The email notification did not mention either the inclusion of "electronic" communications, or the revisions to the definition of a "timed listing" that would exclude extended-time format. (*Id.*)

203.     Will organized and formed the Interstate Auction Association (IAA) in June 2019.

204.     IAA is an unincorporated association formed and organized by Will after the enactment of the online auction license.

205.     The organizational purpose of the IAA is to protect the constitutional right to earn a living as an auctioneer and to freely engage in professional auctioneer speech; to protect the freedom of auctioneers, auction professionals, auction firms and referrers alike to practice auctioneering without intrusive and protectionist measures; to protect those who seek to develop and innovate new approaches to auctioneering; to protect the rights and freedoms of all auctioneers, regardless of whether they conduct outcry or online auctions; to make it easier for auctioneers to conduct business across state lines; to maximize consumer choice for auction services; and: to reduce the costs of auction services to consumers by eliminating or minimizing rent-seeking.

206.     Members of the IAA include Will, Barbara Womack, Aaron McKee, Chris Rasmus, Philip Gableman, Jacquie Denny, Jamie Boyd, Wilson Land and Blake Kimball.

**Aaron McKee and Purple Wave**

207.    Aaron is the president and CEO of Purple Wave, Inc.

208.    Purple Wave has headquarters physically located in Kansas.

209.    Purple Wave conducts auctions of agriculture equipment, construction equipment, industrial, fleet, and government assets via its internet platform, www.purplewave.com.

210.    Purple Wave's website is an open online platform where anyone may bid on goods listed on the website.

211.    Sellers contact Purple Wave who contract, capture data, and post items to the website.

212.    Purple Wave operates as an agent for the seller, providing full customer service, professional auction advertising, and persons experienced in online auctions.

213.    Purple Wave has conducted and will conduct sales transactions by electronic exchanges between the Purple Wave website, as operated by employees of Purple Wave, and members of an audience consisting of a series of invitations for offers to members of the audience to purchase goods, and culminating in the acceptance by Purple Wave's website of the highest or most favorable offer made by a member of the participating audience.

214.    Purple Wave has operated and will operate auctions online where the auction closing time extends based on bidding activity.

215.    The bidding on Purple Wave closes on a pre-set closing day and time and upon five minutes of no bidding activity.

216.    No person employed by Purple Wave holds any license issued by the Tennessee Auctioneer Commission.

217. Purple Wave operates exclusively online and has had no live auctions for profit since 2009.

218. Purple Wave's website is accessible in all states, including Tennessee.

219. Purple Wave advertises on its website, "we are a true auction company."

220. Purple Wave advertises on its website that selling with Purple Wave is as easy as 1) we list your equipment; 2) we market your equipment; 3) we sell your equipment.

221. Purple Wave advertises online by placing banner ads on Google and other similar forms of electronic advertising that appear on other websites, and are viewable by persons in Tennessee.

222. Banner ads are a form of "electronic advertising" that target particular users based on that user's web behavior.

223. Purple Wave has also placed printed advertisements in local Tennessee publications when they have listings for assets in the area.

224. Purple Wave also regularly runs ads in industry publications with national coverage and subscribers in Tennessee, such as High Plains Journal and Rock & Dirt.

225. All but approximately 1% of the assets sold on Purple Wave are sold from the seller's location, wherever they are located.

226. Purple Wave has had 95 bidders in Tennessee in 2019, and will continue to have more bidders in Tennessee.

227. Purple Wave has had 12 buyers in Tennessee in 2019, and will continue to have buyers in Tennessee.

228. Purple Wave has had five sellers who sold goods from Tennessee in 2019, and will continue to have sellers in Tennessee.

229. Purple Wave has had six items sold from Tennessee in 2019, and will continue to have items sold from Tennessee.

230. Purple Wave has generated and will generate more than twenty-five thousand dollars ($25,000) in sales in a calendar year from the sale of goods in online auctions.

**Chris Rasmus and Rasmus Auctions**

231. Chris Rasmus is the CEO of Rasmus Auctions

232. Through Rasmus Auction, Chris organizes and conducts auctions online at https://rasmus.com/.

233. Rasmus Auction describes itself on its website as having "innovated an online-only solution combining the benefits of traditional liquidating techniques and the efficiency and affordability of online auctions."

234. Rasmus Auction states on its website that it "brings you a piece of every aspect of the auction buying experience."

235. Rasmus Auction operates online auctions as an event.

236. Rasmus Auction will provide staff and/or materials necessary to provide a detailed inventory of the items to be auctions.

237. The identification process can be completed by either Rasmus staff or the seller.

238. Rasmus Auction prepares the event details and inventory for posting to the web. Each event is featured by a closing sale date and has unique terms of sale.

239. Once the event is posted to the web, the inventory is fully searchable for preview and immediate bidding.

31

240.     Rasmus Auction also uses a marketing plan that utilizes a combination of direct mail, online newsletters, telemarketing, web promotion, online advertising, social media, and press releases immediately upon posting.

241.     Rasmus Auction uses a dynamic closing system which automatically extends the closing time on any  item which is being actively bid upon.

242.     Chris Rasmus is a member of the Virginia Auctioneers Association Hall of Fame, former Governor for the Auction Marketing Institute, and an Instructor for the Certified Auctioneers Institute.

243.     Chris Rasmus holds no license issued by the Commission.

244.     None of the employees at Rasmus Auctions holds a license issued by the Commission.

245.     Rasmus Auction has accepted and will continue to accept bids from Tennessee.

246.     Rasmus Auctions has conducted and will continue to conduct auctions for clients from Tennessee.

247.     Rasmus Auction has sold and will continue to sell items from Tennessee.

248.     Rasmus Auction will continue to hold online auctions using the extended-time format.

249.     Rasmus Auction states on its website that they accept referrals and that "we are proud to pay a 20% referral fee."

250.     Rasmus Auction has a submission page on its website that allows individuals to inform them about leads.

251.     Rasmus Auctions does not require that an individual to whom that they pay a referral fee hold a license issued by the Commission.

252. Rasmus Auction has paid and will continue to pay referral fees.

**Philip Gableman**

253. Philip Gableman is an auctioneer and personal property coordinator who works for Absolute Auction & Realty (AAR).

254. Philip is a certified auctioneer, a current President for the New York State Auctioneer's Association, and serves on committees for the National Auctioneer's Association.

255. Philip holds no licenses issued by the Commission.

256. Absolute Auction & Realty is an online auction company located in Pleasant Valley, NY.

257. AAR organizes and conducts auctions on their website at http://www.aarauctions.com.

258. AAR states on its website: "Today, our clientele spans the globe, but we still consider each person we meet to be an important member of our AAR family. From specialty collections to real estate to antique & estate to vehicles, we auction it all – for people just like you!"

259. AAR states on its website:

Ｗhen setting up our Internet auctions, we have several choices available to us. We can use any combination of the following: static internet bidding (the auction has a defined start and end time, and bidders place bids until the auction ends); live real-time Internet bidding (bidders participate live via the Internet at the same time the crowd in the Auction Center is bidding); dynamic-ending Internet bidding (the auction has a start and end time, but if someone leaves a bid at the very end of the auction, the ending time will automatically be extended by a predetermined number of minutes to give other bidders a chance to counterbid).

260. AAR states on the website that each piece of a collection is professionally photographed, lotted and cataloged. The photos and catalogs will be posted to AAR's website, and

direct-mail and email notices will be sent to AAR's database of thousands of loyal buyers inviting them to preview the auction online.

261.    None of the individuals Philip has managed or supervised at AAR holds a license issued by the Commission.

262.    Philip has conducted and will continue to conduct online auctions using all three of the formats offered by AAR.

263.    AAR's website is accessible to anyone with internet access, including in Tennessee.

264.    AAR has conducted no sales in the recent past in TN.

265.    AAR accepts bids from people all around the world, including Tennessee.

266.    Individuals from TN have purchased items from auctions listed on AAR.

**Injury to Plaintiffs**

267.    Will and McLemore Auction face the imminent threat of civil and criminal enforcement if they continue under their existing model, whereby unlicensed persons continuously conduct extended-time online auctions of goods arranged by or under Will. *See* Ex. 1 at § 5(b)).

268.    Blake, Wilson, and Jamie – unlicensed auction managers who work for McLemore Auction – now face the imminent threat of civil and criminal enforcement if they continue to conduct extended-time online auctions of goods arranged by or under Will.

269.    On June 26, 2019, following a discussion about the imminent enforcement of the Act, Wilson told Will that if the Commission was able to enforce a licensure requirement on him for conducting online auctions, then he would quit conducting online auctions and/or obtain a license.

270.    To obtain a license, Wilson would need to pay fees, continuing education, and subject himself to the Commission's jurisdiction.

271.    To fire his independent contractors and hire licensed ones would impose economic and personal costs on Will, who does not wish to terminate independent contractors who have so reliably worked for him for a long time.

272.    If Will switched to fixed-time format, he would recoup less profit for his sellers and himself because he is paid a percentage.

273.    But for the Defendants' enforcement of the Act, Will would continue to be able to rely upon unlicensed independent contractors like Blake, Wilson, and Jamie to arrange, operate, and manage online auctions.

274.    Will, McLemore Auction, and Rasmus also face the threat of civil and criminal enforcement for saying that it will rebate a portion of a commission to unlicensed persons who help arrange an auction.

275.    If they do not self-censor himself by following Defendant Kopchak's "recommend[ation] to remov[e] the language or consult[] with an attorney" by July 1, 2019 (Ex. 15), he faces the threat of enforcement, including criminal and civil penalties.

276.    Will and McLemore Auction have paid and intend to pay rebates from commissions from online auctions to unlicensed persons like Barbara.

277.    Will and McLemore Auction have previously been subject to civil enforcement actions for posting an offer to rebate a portion of a commission.

278.    On July 1, 2019, it will be unlawful for Will or Rasmus to offer to pay an unlicensed person a portion of a commission for arranging an extended-time online auction.

279.    On July 1, 2019, Will, McLemore Auction may no longer pay Barbara or any other unlicensed person a portion from a commission for an extended-time online auction resulting from a referral.

280.     If Will, McLemore Auction or Rasmus pays a person a rebate of a commission they faces the threat of enforcement, including criminal and civil penalties.

281.     Barbara Womack is not licensed by the Commission and holds no real estate license.

282.     On July 1, 2019, Barbara may no longer arrange extended-time online auctions by or through Will or any other principal auctioneer.

283.     On July 1, 2019, Barbara may no longer receive a rebate from a commission from Will or McLemore Auction for an extended-time online auction that she arranges by or through Will.

284.     Purple Wave, Rasmus, and AAR are extended-time online auction websites that are exclusively physically located outside of the state of Tennessee.

285.     Purple Wave, Rasmus, and AAR act as and represent to be auction companies on their websites.

286.     Purple Wave, Rasmus, and AAR are operated by individuals who are not licensed by the Commission, including Aaron, Chris, and Philip.

287.     Purple Wave, Rasmus and AAR have websites that are accessible to users in Tennessee.

288.     Purple Wave, Rasmus, and AAR have and will accept bidding from individuals in and out of Tennessee.

289.     Purple Wave and Rasmus have sold and will sell goods or real estate from Tennessee using an extended-time online auction.

290.     Purple Wave and Rasmus have performed extended-time online auctions for clients from Tennessee.

291. Purple Wave, Rasmus, and AAR have advertised and will continue to advertise in and out of Tennessee.

292. IAA's membership includes persons who hold licenses issued by the Commission.

293. IAA's membership includes persons who do not hold licenses issued by the Commission.

294. IAA's membership includes Blake, Jamie, and Wilson, unlicensed persons who work at McLemore Auction who may no longer conduct online auctions arranged by or through Will.

295. IAA's membership includes persons who offer goods for sale online using the extended-time online auction format as a business.

296. IAA's membership includes Purple Wave and Rasmus, out-of-state persons who operate extended-time online auction websites with no physical presence in Tennessee operated by individuals unlicensed by the Commission but who allow bidders in Tennessee to bid on the platform.

297. If Defendants are allowed to implement and enforce the online auction license, Plaintiffs will have no adequate remedy at law by which to prevent or minimize an immediate and irreparable harm to their rights.

**V.**

**Claims**

A.     **Claim One-Violation of the First, Fourteenth Amendment and Article I, Section 19 of the Tennessee Constitution (Free Speech).**

298.    Plaintiffs hereby repeat all of the preceding allegations and incorporate them here by reference as though fully set forth herein.

299.    Claim One is brought under the First Amendment of the United States Constitution, made applicable to the states through the Fourteenth Amendment, and Article I, Section 19 of the Tennessee Constitution.

300.    The constitutional guarantees of free speech protect the right of professionals to engage in speech.

301.    An online auction is speech because it is an electronic exchange made by a speaker to an audience consisting of a series of invitations for audience members to purchase goods or real estate, culminating in acceptance of the highest or most favorable offer.

302.    The invitation must generate an effect upon the listener of causing them to make a high or favorable bid.

303.    As the term auction is defined under law, an online auction is not an informed consent law.

304.    As the term, auction, is defined under law, it is entirely speech, not conduct, or speech incidental to conduct.

305.    The online auction licensure requirement is a content-based restriction on speech.

306.    In an online auction, the goods or real estate are not physically before the audience to see and inspect the goods or real estate

38

307.  The online auction listing must consist of descriptions, narrations, and photographs designed to make an item more enticing to a bidder.

308.  The series of invitations for an online auction includes depictions and images designed to showcase an item.

309.  The series of invitations for an online auction includes descriptions of the items designed to convey information.

310.  The series of invitations for an online auction of items of historical or collector significance includes descriptions of the item's history or value to a collector.

311.  If the website listing on an online auction did not include images, descriptions, or narratives, then it would generate less bidding activity or none at all.

312.  If the speech was not an "invitation for an offer," but was instead a listing of a price as on a website like Amazon, then it would not be an auction.

313.  The invitation must be to bid on "goods," defined as "chattels, merchandise, real or personal property, or commodities of any form that may lawfully be kept or offered for sale."

314.  If the invitation for an offer was for a commodity that cannot lawfully be kept or offered for sale, or even for a good that could not be legally sold, then it would not be an auction.

315.  The online auction license applies based on the communicative impact of the auctioneers' speech upon listeners. Speech is only an auction if it has the effect of soliciting offers to purchase and culminates in the acceptance of the highest or best offer.

316.  The online auction license is a speaker-based restriction of speech; it allows some speakers, but not others, to speak online without a license.

317.  Extended-time online auction websites will require a license, and fixed-time format websites like eBay, will not.

318. The purpose and effect of this exemption was to allow eBay, a private company, to remain unregulated.

319. Extended-time online auction websites that sell nonrepairable or salvage vehicles in this state and hold the appropriate license issued by the Tennessee motor vehicle commission are another category of speakers who are exempt.

320. The purpose and effect of this exception was also to exempt particular speakers.

321. Political parties, churches, and charitable corporations can hold an extended-time auction, provided they receive no compensation and do not hold themselves out as available to engage in the sale of goods at an auction.

322. The Act draws further speaker-based exemptions for persons who do not make $25,000 in revenue from online auction sales.

323. The online auction licensure requirement also makes medium-based distinctions; websites that use an extended time online auction format will require a license while those that use fixed-time format websites will not.

324. The online auction licensure requirement effects suppression of truthful speech about the sale of lawful items.

325. The online auction licensure requirement is not reasonably related to preventing or correcting any misleading or deceptive speech.

326. Tennessee's interest in licensing online auctions is not legitimate, substantial or compelling.

327. The online auction licensure requirement is not appropriately tailored to any government interest.

328.     The online auction licensure requirement does not directly or materially advance any legitimate government interest.

329.     The online auction licensure requirements are overly extensive and unduly burdensome.

330.     The online auction licensure requirement violates Plaintiffs' rights to free speech guaranteed by the First and Fourteenth Amendments of the United States Constitution, and by Article 1, Section 19 of the Tennessee Constitution.

331.     Unless Defendants are enjoined from enforcing the online licensure requirement discussed above, Plaintiffs will suffer immediate and irreparable harm.

B.    **Claim Two-Violation of the Commerce Clause (Commerce Clause).**

332.     Plaintiffs hereby repeat all of the preceding allegations and incorporate them here by reference as though fully set forth herein.

333.     Article I, Section 8 (the Commerce Clause) affords the power to Congress to regulate commerce among the several states.

334.     The Commerce Clause also prohibits states from impermissibly burdening interstate commerce.

335.     A state can impermissibly burden commerce either by a *per se* violation or through incidental burdens.

336.     The online auction licensure requirement will control conduct occurring wholly outside Tennessee; it prohibits unlicensed persons from acting as, or advertising as, an auctioneer online without any geographic boundary.

337.     It also prohibits unlicensed persons from conducting online auctions that were arranged by or through a principal auctioneer without any geographic boundary.

41

338.    The Act does not explicitly narrow the geographic limitation in the text.

339.    An online auction cannot easily observe a statutorily specified geographic boundary because a website is accessible to anyone with internet access.

340.    Online auction websites must therefore get a Tennessee license, even if they have few or no clients in Tennessee, bidders in Tennessee, or sell goods located in Tennessee.

341.    The online auction license creates burdens on websites that operate in interstate commerce.

342.    To get a license, an out-of-state company would have to have one of its employees serve in an apprentice capacity under a full-time principal or automobile auctioneer for six months, take an examination, pay fees, and undergo continuing education.

343.    Even after getting a license, the auctioneer would have to maintain a place of business in the state, or register as a nonresident, maintain an escrow account that keeps proceeds from auctions in Tennessee, agree to be audited, and file an irrevocable consent to suits and actions in Tennessee courts.

344.    Tennessee's interest in licensing online auctions is not legitimate, substantial or compelling.

345.    The online auction license is not appropriately tailored to any government interest.

346.    The online auction license does not directly or materially advance any legitimate government interest.

347.    The online auction licensure requirement is overly extensive and unduly burdensome.

348.    Unless Defendants are enjoined from enforcing the online licensure requirement discussed above, Plaintiffs will suffer immediate and irreparable harm.

## C. Claim Three-Violation of the Privileges or Immunities Clause of the Fourteenth Amendment.

349. Individual Plaintiffs Will, Aaron, and IAA members hereby repeat all of the preceding allegations and incorporate them here by reference as though fully set forth herein.

350. The Privileges or Immunities Clause of the Fourteenth Amendment to the United States Constitution provides, "No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States ...."

351. Will, Aaron, and members of the IAA are citizens of the United States.

352. Economic liberty, including the right to earn a living, was originally intended to be a "privilege or immunity" protected by this Clause.[1]

353. Auctioneering online is a privilege or immunity enjoyed by Will, Aaron and IAA members as citizens of the United States that no state can abridge.

354. The right to use the instrumentalities of commerce, such as the seaports, "through which all operations of foreign commerce are to be conducted," *The Slaughter-House Cases*, 83 U.S. 36, 79 (1872), is one of the privileges protected by the Privileges or Immunities Clause.

355. The internet is merely a modern iteration of a seaport through which operations of commerce are conducted.

356. By requiring citizens obtain a license before they or their business can act as, advertise as, or represent themselves to be auctioneers, or before they may arrange or conduct

---

[1] *The Slaughter-House Cases* held that the Privileges or Immunities Clause does not protect a general natural right to economic liberty. This holding has been heavily criticized for failing to comport with the original public meaning, and one member of the Supreme Court is "open to reevaluating" the Privileges or Immunities Clause. *Saenz v. Roe*, 526 U.S. 489, 528 (1999) (Thomas, J., dissenting).

online auctions, Defendants are denying citizens, including Will, Aaron and IAA members, the privilege of economic liberty and access to an instrumentality of commerce.

357.    By requiring Barbara obtain a license before she can arrange for online auctions for Will, a principal auctioneer, Defendants are abridging her right to the economic liberty due to its citizens.

358.    By requiring Barbara obtain a license before Will can rebate to her a portion of a commission resulting from an online auction arranged by Barbara, defendants are abridging the economic liberty of citizens, including Will and Barbara.

359.    Defendants have no compelling, substantial, or even legitimate interest in requiring auctioneer licenses to act as, advertise as, or represent themselves to be auctioneers, or to arrange for online auctions.

360.    The online auction license is not narrowly tailored to achieve, nor is it rationally related to, any compelling, substantial, or legitimate governmental interest.

361.    Unless Defendants are enjoined from enforcing the online licensure requirement discussed above, Plaintiffs will suffer an immediate irreparable harm.

## VI.
## Relief Sought

**WHEREFORE,** Plaintiffs request that this Court:

A.    Declare that an auction conducted by electronic communications is constitutionally protected speech;

B.    Declare that the online auction license is an unconstitutional burden on the exercise of free speech.

C.    Declare that licensing online auctions creates impermissible burdens on interstate commerce.

D.     Declare that licensing online auctions imposes a burden on the privileges and immunities of national citizenship.

E.     Declare that requiring a license for online auctions is unconstitutional under both the state and federal constitutions.

F.     Preliminarily and permanently enjoin Defendants, or anyone under their direction, from requiring any license under their jurisdiction for online auctions.

G.     Award Plaintiffs costs, expenses and reasonable attorneys' fees according to 42 U.S.C. § 1988 and any other applicable laws.

H.     Award Plaintiffs any other relief as is appropriate under the circumstances as is just and equitable.

Dated: <u>June 26, 2019</u>.

Respectfully submitted,

BRADEN H. BOUCEK
B.P.R. No. 021399
braden@beacontn.org
BEACON CENTER OF TENNESSEE
201 4th Ave. N. Suite 1820
Nashville, TN 37219
Tel.: 615/383.6431
Fax: 615/383.6432


By:  s/ B. H. Boucek
Counsel for plaintiffs

## CERTIFICATE OF SERVICE

I hereby certify that a true and exact copy of the foregoing was served upon the following, by the following means:

1.     I emailed copies to two defendants, Roxana Gumucio at Roxana.gumucio@tn.gov and Glenn Kopchak at Glenn.Kopchak@tn.gov.

2.      I emailed copies to Herbert H. Slatery III, Tennessee Attorney General, Herbert.Slatery@ag.tn.gov.

3.      I hand delivered copies to: Herbert H. Slatery III, Tennessee Attorney General's Office, War Memorial Building, 201 6th Ave. N., Nashville, TN.

On this date, <u>June 26, 2019</u>.

      s/ B. H. Boucek
BRADEN H. BOUCEK

## VERIFICATION

1.      I, Will McLemore, am the President for McLemore Auction Company, Plaintiff in the above captioned civil action known.

2.      I have personal knowledge regarding my business, McLemore Auction Company; Tennessee's auctioneering laws and regulations; Tennessee's history of regulating online auctions; my referrals with Barbara Womack; the administrative action taken against me; the 2016 proposed rule change; the December 15, 2016 Joint Government Operations Committee; the Auctioneer Modernization Task Force; all meetings of the Task Force; the IAA, its purpose, and how its members will be affected by the new law.

3.      I have read the facts as related foregoing Complaint relating to the subjects above and know the contents thereof.

4.      The statements and the matter are true of my personal knowledge, except as to any matter stated upon information and belief and, as to such matters, I reasonably believe them to be true.

5.      I verify under penalty of perjury under the laws of the United States of America that these factual statements are true. If called upon, I would competently testify as to them.

Executed on June 26th, 2019

_____
Will McLemore

## VERIFICATION

1.      I, Aaron McKee, am the President and CEO of Purple Wave, Inc., Plaintiff in the above captioned civil action known.

2.      I have personal knowledge of the facts regarding me, Purple Wave, Inc. and our involvement in the IAA.

3.      I have read the facts as related foregoing Complaint relating to the subjects above and know the contents thereof.

4.      The statements and the matter are true of my personal knowledge, except as to any matter stated upon information and belief and, as to such matters, I reasonably believe them to be true.

5.      I verify under penalty of perjury under the laws of the United States of America that these factual statements are true. If called upon, I would competently testify as to them.


Executed on June 25 , 2019



_____
Aaron McKee

47

## INDEX OF EXHIBITS

1. 2019 Tenn. Pub. Ch. 471 (the Act);

2. September 25, 2015 notification of Complaint;

3. Proposed Rule 0160-01-.028;

4. Transcript of Dec. 15, 2016 Joint Committee for Government Operations;

5. Transcript of the Mar. 28, 2017 House Business and Utilities subcommittee;

6. Transcript of the Feb. 12, 2018 meeting of the Tennessee Auctioneer Commission;

7. Transcript of the Mar. 6, 2018 Senate Commerce and Labor Committee;

8. Transcript of the Aug. 20, 2018 meeting of the Tennessee Auctioneer Commission;

9. Transcript of the Aug. 27, 2018 meeting of the Auctioneer Modernization Task Force;

10. Transcript of the Nov. 5, 2018 meeting of the Auctioneer Modernization Task Force;

11. Transcript of the Nov. 26, 2018 meeting of the Auctioneer Modernization Task Force;

12. Transcript of the Feb. 25, 2019 meeting of the Tennessee Auctioneer Commission;

13. Transcript of the Mar. 12, 2019 Senate Commerce and Labor Committee;

14. Email exchange between Will McLemore and Glenn Kopchak, June 4, 2019 – June 12, 2019;

15. Email notification from Glenn Kopchak, June 14, 2019.