IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

WILL MCLEMORE, et al.,                    )
                                          )
     Plaintiffs,                     )
                                          )    No. 3:19-cv-00530
v.                                        )
                                          )    JUDGE RICHARDSON
ROXANA GUMUCIO, et al.,                   )
                                          )
     Defendants.                     )

## MEMORANDUM OPINION

Pending before the Court is Plaintiffs' Motion for a Preliminary Injunction. (Doc. No. 3). Via the motion, Plaintiffs request that the Court preliminarily enjoin the State from enforcing its licensure regime on auctioneers that conduct online extended-time auctions. The Court has considered the motion and its accompanying memorandum of law (Doc. Nos. 3 & 5), Defendants' response (Doc. No. 43), each party's court-ordered supplemental brief, (Doc. Nos. 18 & 20), and the arguments and evidence received at the July 10, 2019 hearing on the motion. For the reasons discussed below, Plaintiffs' motion will be **GRANTED**.

## BACKGROUND

### I. Factual Background[1]

In 1967, Tennessee created the Tennessee Auction Commission ("the Commission") with the goal of regulating the profession of auctioneering. (Doc. No. 4 at ¶ 54). In 2006, as e-commerce began to emerge, Tennessee amended its auctioneering regulatory statutes and created an

---

[1] The facts (as opposed to legal conclusions) alleged in the Verified Complaint (Doc. No. 4) will be accepted as true for purposes of this motion, both because they are of some evidentiary value (having been made under oath) and because they are not inherently far-fetched and they have not thus far been discredited in any way.

exemption for "fixed price or timed listings that allow bidding on an Internet website but that does not constitute a simulcast of a live auction." *See* Tenn. Code Ann. § 62-19-103(9). By including this exemption, which was known as the "eBay law," Tennessee placed (non-simulcast) online auctions outside its regulatory purview. (Doc. No. 4 at ¶ 65; Doc. No. 4-5 at 23, 25; Doc. No. 4-11 at 25).

In 2016, the Commission proposed a rule that would have excluded extended-time auctions (*i.e.*, auctions whereby the ending time can be extended based on bidding activity) from the eBay exemption. (Doc. No. 4 at ¶ 86; Doc. No. 4-3). Tennessee's Joint Government Operations Committee rejected the proposed rule, and the Tennessee Auctioneers Association[2] proposed a similar rule in 2017. (*Id*. at ¶ 98). After that bill failed, the issue was again raised in 2018. (*Id*. at ¶ 105). The 2018 bill was amended to create a Task Force to study the question of online auction regulation. (*Id*. at ¶ 114). The Task Force analyzed three years of complaint data which revealed very few complaints for online auctions in general (11 overall in three years) and even fewer for extended-time auctions—three overall and none in 2018. (*Id*. at ¶¶ 155-57). The Task Force then recommended, among other things, that "electronic" exchanges be added to the definition of an auction for the purpose of requiring auctioneers participating in online extended-time auctions to be licensed. (*Id*. at ¶¶ 159-161).

Consistent with this recommendation, a bill was introduced to amend Tennessee's statutes regulating auctions and the licensing requirements for those who conduct "auctions." *See* 2019 Tenn. Pub. Ch. 471 (hereinafter "PC 471"). Specifically, the bill amends the definition of "auction" to include "electronic" exchanges. (*Id*. at § 4). The bill further stated that it is unlawful for any

---

[2] The Tennessee Auctioneers Association (TAA) describes itself on its publicly available website as a professional organization supporting the auction industry, at http://www.tnauctioneers.com/ (Doc. No. 4 ¶ 91).

person to "[a]ct as, advertise as, or represent to be an auctioneer without holding a valid license issued by the commission." (*Id*. at § 5). The bill further narrowed the exemption (*i.e.*, the exemption from otherwise applicable licensing requirements) for so-called "timed listings" that allow bidding on an Internet website; the bill carved out from this exemption extended-time auctions. (*Id*. at § 6(9)).

Also included in the bill are numerous exemptions to the requirement that an auctioneer conducting an online extended-time auction must be licensed. These exemptions include, among others, "[a]n auction conducted by or under the direction of a governmental entity"; "[a]n auction conducted on behalf of a political party, church, or charitable corporation or association"; "[a]n auction conducted for the sale of livestock"; "an auction for the sale of tobacco"; "[a]ny fixed price or timed listings that allow bidding on an Internet website, but do not constitute a simulcast of a live auction"; "[a]n in person or simulcast auction whose primary business activity is selling nonrepairable or salvage vehicles in this state"; and "[a]n individual who generates less than twenty-five thousand dollars ($25,000) in revenue a calendar year from the sale of property in online auctions." (*Id*. at § 6). On May 24, 2019, Tennessee Governor Bill Lee signed PC 471 into law. (*See* Doc. No. 4-2 at 8). The law was to go into effect on July 1, 2019. (*Id*. at 7).

Plaintiff McLemore Auctions Company, LLC ("McLemore Auction"), is a Tennessee limited liability company with a physical location in Nashville, Tennessee. (Doc. No. 4 at ¶ 7). Plaintiff Will McLemore is the president of McLemore Auction. (*Id*. at ¶ 6). McLemore Auction has operated, and plans to continue to operate, online extended-time auctions of real estate and personal property in Tennessee. (*Id*. at ¶¶ 22 & 29). McLemore Auction employs one full-time employee, Will McLemore, and four independent contractors—Blake Kimball, Wilson Land, Jamie Boyd, and Dwayne Smith—who act as McLemore's auction managers. (*Id*. at ¶ 23).

Kimball, Land, and Boyd do not hold any license under Tennessee's auctioneer laws, and McLemore relies on these unlicensed auction managers to conduct the auctions on McLemore Auction's website. (*Id*. at ¶¶ 24, 267). McLemore Auction exclusively uses the extended-time auction format, whereby (as noted above) the time of the auction closing extends based on bidding activity. (*Id*. at ¶ 32). McLemore Auction generates, and anticipates that it will continue to generate, more than $25,000 in sales revenue per calendar year from the sale of goods or real estate through online auctions. (*Id*. at ¶ 53). McLemore contends he and his company will suffer injury if the new law is enforced because the company would have to break contracts, which would threaten its business and cost it goodwill and customers. (Doc. No. 18-1 at 2-3). McLemore also avers that it would forever mar his reputation as a credible auctioneer. (*Id*.).

Plaintiff Purple Wave, Inc., is a privately held corporation, incorporated in Delaware and physically located in Manhattan, Kansas. (Doc. No. 4 at ¶ 9). Plaintiff Adam McKee is the president and CEO of Purple Wave. (Doc. No. 48-2 at ¶ 4). Via its website, Purple Wave conducts auctions of agricultural and construction equipment, and industrial, fleet, and government assets. (*Id*. at ¶ 5). Purple Wave's website uses an extended-time auction format and has already sold over $99,000 worth of goods in Tennessee during 2019. (*Id*. at ¶¶ 9-10, 12). No person employed by Purple Wave holds any license issued by the Tennessee Auctioneer Commission. (Doc. No. 4 at ¶ 216).

Plaintiff Interstate Auction Association (IAA) is an unincorporated association with members who are dedicated to online auctioneer freedom. (*Id*. at ¶ 10). It was organized by McLemore as a direct response to the proposed amendment, and is made up primarily of online auctioneers, both licensed and unlicensed. (*Id*.). Kimball, Land, and Boyd are members of the IAA. (*Id*. at ¶ 206).

## II. Procedural Background

On June 26, 2019, Plaintiffs filed their Complaint in this Court, asserting that the provisions of the amended statute that require licensure for extended-time online auctions violate their rights to free speech under the First Amendment and Fourteenth Amendment of the United States Constitution and Article I, Section 19 of the Tennessee Constitution; burden interstate commerce in violation of the Commerce Clause of the United States Constitution; and violate the Privileges or Immunities Clause of the United States Constitution. (*See* Doc. No. 4). On June 27, 2019, Plaintiffs filed their Motion for Temporary Restraining Order and a Preliminary Injunction requesting the Court to enjoin the State from enforcing its licensure regime on online websites prior to the date the law was to go into effect—July 1, 2019. (Doc. No. 3). On June 28, 2019, the Court entered a temporary restraining order ("TRO") that enjoined the State from applying Tennessee's auctioneering laws and licenses to "electronic" exchanges, or online auction websites, or against Plaintiffs. (Doc. No. 14). The TRO went into effect on June 28, 2019 and was to expire on July 11, 2019 at 12:00 p.m. (*Id*.). On July 10, 2019, the Court held a hearing on Plaintiffs' motion for preliminary injunction. At the hearing, the Court indicated that it would extend the duration of the TRO by 14 days pursuant to Federal Rule of Civil Procedure 65(b)(2). Accordingly, the Court therefore issued a written order extending the TRO until July 26, 2019 at 12:00 p.m. (Doc. No. 26).

## LEGAL STANDARD

Federal Rule of Civil Procedure 65(a) authorizes a district court to issue a preliminary injunction prior to a trial on the merits. Wright & Miller, *Federal Practice and Procedure* § 2947 (2d ed. 1995). A preliminary injunction is an extraordinary remedy requiring the party seeking such relief to demonstrate a clear entitlement to the injunction under the given circumstances.

*Overstreet v. Lexington–Fayette Urban Cnty. Gov't.*, 305 F.3d 566, 573 (6th Cir. 2002). The purpose of a preliminary injunction is to preserve the status quo until the district court can hold a trial on the merits. *United States v. Edward Rose & Sons*, 384 F.3d 258, 261 (6th Cir. 2004).

Four factors must be considered and balanced when deciding whether to issue a preliminary injunction: (1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable harm without the injunction; (3) whether issuance of the injunction would cause substantial harms to others; and (4) whether the public interest would be served by issuance of the injunction. *Bonnell v. Lorenzo*, 241 F.3d 800, 809 (6th Cir. 2001). "No single factor is a prerequisite to the issuance of a preliminary injunction; rather the Court must balance all four factors." *Young v. Giles Cnty. Bd. of Edu.*, 181 F. Supp. 3d 459, 463 (M.D. Tenn. 2015) (citing *Neveux v. Webcraft Tech., Inc.*, 921 F. Supp. 1568, 1570–71 (E.D. Mich. 1996)). However, a plaintiff must always demonstrate an irreparable injury before a preliminary injunction may issue. *Id.* (citing *Neveux*, 921 F. Supp. 3d at 1571).[3]

## ANALYSIS

### I. Likelihood of Success on the Merits

Plaintiffs assert that they are likely to prevail on the merits of their Dormant Commerce Clause claim because the amended statute, which requires a Tennessee license to conduct an extended-time online auction, impermissibly regulates interstate commerce. The Commerce Clause provides the United State Congress a vehicle with which to regulate aspects of interstate commerce. *See* U.S. Const. art. I, § 8, cl. 3. Congress has the authority to regulate the channels and instrumentalities of interstate commerce as well as economic activities that have a substantial

---

[3] The Court realizes that if this proposition is true—and the Court will proceed as if it is—then the proposition in the prior sentence is inexact inasmuch as there is one factor—irreparable injury—that actually *is* a prerequisite to the issuance of a preliminary injunction.

effect on interstate commerce. *See, e.g., Hodel v. Virginia Surface Min. & Reclamation Ass'n, Inc.*, 452 U.S. 264, 275-77 (1981); *Perez v. United States*, 402 U.S. 146, 150-52 (1971). The Tenth Amendment to the United States Constitution states that all powers not granted to the United States, nor prohibited to the states, are reserved to the states or the people and, therefore, acts as a limit on Congressional power. *See* U.S. Const. amend. X; *S. Pac. Co. v. Arizona ex rel. Sullivan*, 325 U.S. 761, 767 (1945) ("[I]n the absence of conflicting legislation by Congress, there is a residuum of power in the state to make laws governing matters of local concern which nevertheless in some measure affect interstate commerce or even, to some extent, regulate it.").

Nevertheless, a state or local law may be held unconstitutional if it places an undue burden on interstate commerce. *See C & A Carbone, Inc. v. Town of Clarkstown*, 511 U.S. 383, 390 (1994). Courts have long held that the Commerce Clause "limits the power of the [s]tates to erect barriers against interstate trade." *Dennis v. Higgins*, 498 U.S. 439, 446 (1991) (quoting *Lewis v. BT Inv. Managers, Inc.*, 447 U.S. 27, 35 (1980)). The doctrine analyzed below, the Dormant Commerce Clause, has been inferred by the Supreme Court to represent the negative implications—the above-referenced negating (or at least limitation) of states' power—of the Commerce Clause. *See, e.g., Wickard v. Filburn*, 317 U.S. 111, 123–24 (1942).

The Sixth Circuit has adopted a two-step analysis to evaluate challenges based on the Dormant Commerce Clause. *Am. Beverage Ass'n v. Snyder*, 735 F.3d 362, 370-71 (6th Cir. 2013) (citing *Int'l Dairy Foods Ass'n v. Boggs*, 622 F.3d 628, 644 (6th Cir. 2010)). First, the court must determine whether the state regulation is *per se* invalid. *Int'l Dairy Foods Ass'n*, 622 F.3d at 645. "[A] state regulation is 'virtually *per se* invalid' if it is *either* extraterritorial or discriminatory in effect." *Id*. A state statute is discriminatory if it "directly regulates or discriminates against interstate commerce, or [whether] its effect is to favor in-state economic interests over out-of-state

interests." *Snyder*, 735 F.3d at 370-71 (quoting *Int'l Dairy Foods Ass'n*, 622 F.3d at 644) (brackets in original). "A [state regulation] can discriminate against out-of-state interests in three different ways: (a) facially, (b) purposefully, or (c) in practical effect." *Id*. (quoting *Int'l Dairy Foods*, 622 F.3d at 648). The plaintiff bears the initial burden of proof to show that the state regulation is discriminatory. *Id*. "If the plaintiff satisfies its burden, then 'a discriminatory law is virtually *per se* invalid and will survive only if it advances a legitimate local purpose that cannot be adequately served by reasonable nondiscriminatory alternatives.'"[4] *Id*. (citation omitted).

As indicated above, a statute that is a direct regulation of interstate conduct (*i.e.*, controls extraterritorial conduct) is also a *per se* violation the Dormant Commerce Clause. *Int'l Dairy Foods Ass'n*, 622 F.3d at 645. This is because "a statute that directly controls commerce occurring wholly outside the boundaries of a State exceeds the inherent limits of the enacting State's authority." *Healy v. Beer Inst., Inc.*, 491 U.S. 324, 336 (1989). "Most critical to this inquiry is the issue of 'whether the practical effect of the regulation is to control conduct beyond the boundaries of the State.'" *Int'l Dairy Foods*, 622 F.3d at 645 (quoting *Healy*, 491 U.S. at 337). "Circuits outside the Sixth Circuit have recognized that, '[b]ecause the [I]nternet does not recognize geographic boundaries, it is difficult, if not impossible, for a state to regulate Internet activities without project[ing] its legislation into other States.'" *Backpage.com, LLC v. Cooper*, 939 F. Supp. 2d. 805, 841 (M.D. Tenn. 2013) (quoting *Am. Booksellers Found. v. Dean*, 342 F.3d 96, 103 (2d Cir. 2003)). If a "statute has an impermissible extraterritorial effect, [a court has] no need to consider whether the state has some legitimate local purpose or whether there is a reasonable nondiscriminatory alternative." *Snyder*, 735 F.3d at 376.

---

[4] Here, the law is not discriminatory to out-of-state actors, as it requires in-state auctioneers, to the same extent as out-of-state auctioneers, to obtain a license before conducting an extended-time online auction.

Second, "[w]hen a state regulation is neither extraterritorial nor discriminates against out-of-state actors, it may still violate the Commerce Clause if its burden on interstate commerce is 'clearly excessive in relation to the putative local benefits.'" *Id.* (quoting *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970)) Under this balancing test:

> If a legitimate local purpose is found, then the question becomes one of degree. And the extent of the burden that will be tolerated will of course depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities.

*Id.* (citing *Pike*, 397 U.S. at 142).

### i.      The Scope of the Statute

Unsurprisingly, the parties offer very different interpretations of the scope of the statute's geographical limits of the extended-time online auction licensing requirement. Plaintiffs interpret the statute broadly. Noting that the statutory language regarding the licensing of online auctioneers contains no qualifications or geographical limitations, Plaintiffs argue that the new law imposes a licensing requirement on any auctioneer who conducts online extended-time auctions in which a Tennessee resident may bid—which, in the context of online auctions, apparently is virtually every auction. By contrast, the State interprets the statute narrowly, maintaining that the statute imposes a licensing requirement only on auctioneers who conduct extended-time online auctions while physically located in Tennessee. The success of Plaintiffs' Commerce Clause claim turns on the statutory interpretation of the online licensing statute. Therefore, the Court will first interpret the scope of the statute. *See Dean*, 342 F.3d at 100-01 (determining the "proper construction" of a statute prior to addressing the dormant Commerce Clause issue because the appellants' arguments were based on a narrow construction of the statute); *Cotto Waxo Co. v. Williams*, 46 F.3d 790, 792 (8th Cir. 1995) (determining the scope of the statutory language at issue prior to resolving the Dormant Commerce Clause challenge).

There is no question that a Tennessee statute can be written to have, at least is some sense and under some circumstances, extraterritorial application. *See Fletcher v. Wausau Ins. Co*., No. 03S01-9708-CH-00096, 1998 WL 318750, at \*2 (Tenn. Workers Comp. Panel June 18, 1998) (referring to the Tennessee worker's compensation statute as an "extraterritorial statute")*; Ray v. Aetna Cas. & Sur. Co.*, 517 S.W.2d 194, 196 (Tenn. 1974) (noting that "[t]he Tennessee workmen's compensation statute has extraterritorial application" under certain circumstances). The question here is whether the statute at issue likely should be construed as such a law.

When construing a Tennessee statute, the court must adhere to the rules of construction employed by the courts of Tennessee. *See In re Martin*, 102 B.R. 639, 645 (Bankr. E.D. Tenn. 1989); *see also Bevan & Assoc., LCA, Inc. v. Yost*, ---F.3d---, No. 18-3262, 2019 WL 2912353, at \*5 (6th Cir. July 8, 2019) ("[W]hen interpreting a state statute, we must follow state interpretations of [those] statutes, and must predict how the state Supreme Court would [interpret the statute] if it has not yet done so.") (citation and internal quotation marks omitted). The Tennessee Supreme Court has explained:

> This Court's role in statutory interpretation is to ascertain and to effectuate the legislature's intent. Generally, legislative intent shall be derived from the plain and ordinary meaning of the statutory language when a statute's language is unambiguous. If a statute's language is expressed in a manner devoid of ambiguity, courts are not at liberty to depart from the statute's words.

*Freeman v. Marco Transp. Co.*, 27 S.W.3d 909, 911 (Tenn. 2000) (citations omitted); *see also Metro. Gov't of Nashville v. The Bd. of Zoning Appeals of Nashville*, 477 S.W.3d 750, 756 (Tenn. 2015). "When, however, the language of a statute is ambiguous, we resort to rules of statutory constructionand external sources in order to ascertain and give effect to the legislative intent."

*Wallace v. Metro. Gov't of Nashville*, 546 S.W.3d 47, 53 (Tenn. 2018) (citation omitted). [5] These

external sources include: "the broader statutory scheme, the history and purpose of the legislation,

public policy, historical facts preceding or contemporaneous with the enactment of the statute, and

legislative history." *Id.* Statutory language will be considered "ambiguous when it is subject to

differing interpretations which yield contrary results." *Id.*

The State argues that "[t]he statutory scheme for the regulation of auctioneering makes

clear that it applies only to auctioneers in Tennessee and auctions conducted in Tennessee[.]" (Doc.

No. 20 at 18). In so arguing, the State cites (only) four statutory excerpts. One is the provision that

"[a]ny auctioneer licensed under this chapter may conduct auctions at any time or place *in this*

*state*." Tenn. Code Ann. § 62-19-115 (emphasis added). A second is that "[a] nonresident of this

state may become an auctioneer or apprentice auctioneer *in this state* by conforming to this

chapter." Tenn. Code. Ann. § 62-19-117(a) (emphasis added). A third is that nonresident

auctioneers who choose to become licensed in Tennessee "shall maintain an escrow account for

all funds belonging to others that come into the nonresident auctioneer's possession as a result of

an auction sale *in this state*." Tenn. Code Ann. § 62-19-117(c) (emphasis added). And the fourth

is that "[t]he commission has the authority to promulgate rules with regard to advertising auctions

*in this state*." Tenn. Code Ann. § 62-19-118(c)(2) (emphasis added). But none of these provisions

state, or even suggests, that a license is required only for auctioneers or auctions "in this state."

The State thus essentially argues that the above-referenced language, somehow as if by

osmosis, places the "[physically] in this state" qualification into the extended-time online auction

_____

[5] The "presumption against extraterritoriality" is a canon of statutory construction that limits the application of *federal* law on an international level and does not apply to construction of state law. *Kiobel v. Royal Dutch Petroleum Co.*, 569 U.S. 108, 115 (2013); *Sheehan v. Ash*, 574 B.R. 585, 593 (N.D.W. Va. 2017), *aff'd*, 889 F.3d 171 (4th Cir. 2018) ("[A]lthough states are analogous to international sovereigns, the presumption against extraterritorial application remains a canon of construction confined to the international context[.]").

licensing section. Therefore, the State asserts that this language unambiguously makes clear that only auctioneers physically located in Tennessee are subject to the licensing requirements of the statute, even if auctioneers located outside of Tennessee conduct online extended-time auctions that attract Tennessee bidders (and perhaps, ultimately, Tennessee purchasers). (Doc. No. 20 at 18). The Court declines to adopt the State's narrow construction of the statutory language at issue, given what it actually says (and does not say). *See Backpage.com*, 939 F. Supp. 2d at 842 (declining to read the overall jurisdictional provisions of the state criminal code into a specific state criminal statute that criminalized conduct occurring on the Internet because of "the territorial issues unique to . . . the Internet").

As noted above, under Tennessee law, when statutory language is unambiguous the Court should derive legislative intent from the plain and ordinary meaning of the statutory language. *Freeman*, 27 S.W.3d at 911. The statute states that "it is unlawful for a person to [a]ct as, advertise as, or represent to be an auctioneer without holding a valid license issued by the commission." Tenn. Code Ann. § 62-19-102(a)(1). This statutory licensing requirement by its terms contains no qualifications, no geographical limitations, and no explanation of what it means to "act as, advertise as, or represent to be an auctioneer" in the context of online auctions, and the Court declines to write such an explanation or qualification into the statutory language where it simply does not exist. *See United States v. M/V Big Sam*, 693 F.2d 451, 455 (5th Cir. 1982) ("[I]t is simply not part of our function as judges to re-write, in the guise of statutory construction, unambiguous statutory language in order to cure what to us seems to be statutory deficiencies."). Further, the State has not identified any legislative history to support its purported interpretation of the statute as including "in this state." *Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 108 (1980) ("Absent a clearly expressed legislative intention to the contrary, that language must

ordinarily be regarded as conclusive."). In short, the Court will not geographically limit the licensure requirement to online auctioneers and auctions "in this state [Tennessee]."[6]

Even if the Court were inclined to read into the statute this geographical limitation, it would not necessarily entail what the State, in an effort to surmount the Dormant Commerce Clause challenge, is claiming it would entail. That is, if inserted as the State would have it, "in this state" would not carry the limited meaning suggested by the State. The Court finds that the phrase "act[ing] as, advertis[ing] as, or represent[ing] to be an [online] auctioneer [in this state]" does not necessarily and unambiguously exclude such acting, advertising, or representing by a person not physically present in the State. *See Wallace*, 546 S.W.3d at 53 (statutory language will be considered "ambiguous when it is subject to differing interpretations which yield contrary results."). For example, in the Court's view, if an auctioneer is physically present in Alaska and initiates an extended-time online auction from there, he might reasonably be construed as representing himself to be an auctioneer "in" Tennessee, given that his website would reach Tennessee residents. Thus, arguably per the statute's language (supplemented with "in this state"), this hypothetical auctioneer would be required to be licensed as an auctioneer by the State of Tennessee or face civil penalties.

At the hearing, the State was not clear, and in fact equivocated, on the meaning of "in this state" in the context of the online auctions. The Court asked the State: "[I]f people that are quote not in this state end quote are exempted from this licensure requirement, who qualifies as not being

---

[6] The State also argues that the Court should not construe the statutory language to have an extraterritorial effect because "it is a well settled rule in this State . . . that all statutes are presumed to be constitution." (Doc. No. 13 at 9 (quoting *Smithson v. State*, 438 S.W.2d 61, 67 (Tenn. 1969)). The Court agrees that Tennessee courts' rules of statutory construction require such a presumption, but nevertheless the Court cannot read a geographical scope into the statute when the statutory language is plainly devoid of any such geographical limitation. *See Backpage.com*, 939 F. Supp. 2d at 842 (interpreting a Tennessee statute as having an extraterritorial effect because "[n]owhere in the language of the statute is there any limit on the statute's geographic scope that specifies what conduct, if any, must take place in Tennessee.").

quote in this state? So for example . . . if you're [] based [in] Mississippi, are you necessarily not quote in this state automatically or does it depend on whether you reach out to Tennessee consumers? Does it depend on whether you consummate sales transactions with Tennessee consumers? How do we define what is quote not in this state." (Tr. 57:5-17) (emphasis added). Conceding that the "Internet makes it trickier", the State responded: "With an auction conducted in Tennessee, generally I think that's *probably* going to be yes, the auctioneer, the business, that is conducting the auction is located in Tennessee." (Tr. 58:8-11).

The Court then asked "[S]o for online, does that mean . . . if you're . . . [a] Mississippi auctioneer and . . . you're traveling and you spend the night in Memphis and you click a couple buttons as part of your auctioning, does that make you in state in connection with that auction business?" The State responded: "It does not *seem* that it would. Certainly, the Dormant Commerce Clause has protections. Substantial nexus is required. Merely passing through Tennessee *probably* wouldn't be sufficient. If the auctioneering business is located in Mississippi, that's *probably* Mississippi's jurisdiction to regulate or not regulate." (Tr. 58:25-57:6) (emphasis added). Despite the State's guesswork as to what the statutory language would mean if supplemented with "in this state," the State did not point to any case law, language from elsewhere in the statutory scheme, or indeed anything else to support its strict construction of the phrase in this context. Nor did the State provide any legislative history that clarified that the licensing requirement would affect only auctioneers physically located in Tennessee. *See Wallace*, 546 S.W.3d at 53 ("When . . . a statute is ambiguous" a court should consider external sources to ascertain legislative intent, including "the broader statutory scheme, the history and purpose of the legislation, public policy, historical facts preceding or contemporaneous with the enactment of the statute, and legislative history."). By urging the Court to read the licensing statute (as supplemented with "in this state") as limiting

online extended-time auctioneer licensing only to auctioneers physically present in Tennessee, the State puts the Court in the position of having to draw a line that is not really there. *See M/V Big Sam*, 693 F.2d at 455; s*ee also Backpage.com*, 939 F. Supp. 2d at 844 ("[A] legislature must make the narrow geographic scope of its law explicit to stay within the confines of the Dormant Commerce Clause when regulating Internet activity."). In short, for purposes of the instant motion, the Court can say that its likely final interpretation will be that the licensing statute, with or without the inclusion of "in this state," applies to at least a substantial amount of out-of-state conduct.

Accordingly, the Court will adopt the Plaintiffs' suggested interpretation of the statutory language and finds that because the statute contains no qualifications or geographical limitations, the new law likely imposes a licensing requirement on any auctioneer who conducts online extended-time auctions, from wherever the auctioneer may be located, in which a Tennessee resident may potentially bid.[7]

### ii.  The Statute is Extraterritorial

Thus, the Court finds that a reading of the statute reveals its extraterritorial effect. In *Backpage.com v. Cooper*, 939 F. Supp. 2d 805 (M.D. Tenn. 2013), the court issued an injunction barring enforcement of a state law that criminalized the advertising or publishing of a commercial sex act of a minor. 939 F. Supp. 2d at 844-45. The court held that the law was extraterritorial because it projected a Tennessee law out-of-state by prohibiting online advertisements with no geographical limit. *Id*. at 841-42. The court rejected the state's invitation to narrowly construe the law by limiting its application to within Tennessee when no such limit appeared in the text itself

---

[7] As for the qualification the Court has added in the last eight words of the sentence (after the last comma), the Court realizes that it is debatable whether the statute should be credited with implying even this limited, typically inconsequential, qualification. But the Court embraces it here *arguendo*, thus actually enhancing the statute's ability to pass constitutional muster. But it does not pass, even with this qualification, as discussed below.

or was evident from any legislative proceedings. *Id*. at 842. The court also discussed the "inherent challenge in crafting a local regulation of Internet advertising" and explained that the Internet "made it difficult, if not impossible" to regulate the Internet without running afoul of the Dormant Commerce Clause. *Id*. at 843-44 (quoting *Dean*, 342 F.3d at 103). The court further explained that the law at issue was extraterritorial because "the Tennessee law could impose liability for an online advertisement that appears to promote a sex act with a minor in Tennessee (or the offer to publish the advertisement), if no sale or publication took place in Tennessee." *Id*. at 841. The Court noted its concern that "[b]ased on the law's text, liability could be imposed when no party has a connection to Tennessee whatsoever." *Id*. at 841. These same concerns are present here. The statute at issue, as written, contains no geographical limit and therefore threatens liability for auctioneers located outside of Tennessee even when the auctioneer "has no connection to Tennessee whatsoever." *Id*. As *Backpage* explained, such a statute is in clear violation of the Dormant Commerce Clause.

The Court additionally finds another recent district court decision persuasive. In *Publius v. Boyer-Vine*, 237 F. Supp. 3d 997 (E.D. Cal. 2017), the court analyzed whether the plaintiffs were likely to succeed on their Dormant Commerce Clause claim for purposes of determining whether a preliminary injunction should be issued. At issue in *Publius* was whether Cal. Gov't Code § 6254.21(c)(1)(A)—which prohibited any "person, business, or association [from] publicly post[ing] or publicly display[ing] on the Internet the home address or telephone number of any elected or appointed [California] official"—was extraterritorial. 237 F. Supp. 3d at 1022-23. The court explained that "'[a]lthough the Ninth Circuit has not reached this issue, courts in several circuits have invalidated state laws regulating the [I]nternet' where the statute regulates conduct occurring outside the borders of the state." *Id*. at 1023 (quoting *Nat'l Fed'n of the Blind v. Target*

*Corp.*, 452 F. Supp. 2d 946, 958 (N.D. Cal. 2006) (collecting cases)). The court compared these decisions with several cases where "courts have upheld state regulation of the Internet where application of the law has been limited to only local conduct, or where '[a] state would enforce the law only against conduct occurring within the state.'" *Id.* (quoting *Target Corp.*, 452 F. Supp. 2d at 958).

The court found that the statute at issue fell into the former category and held that the statute was extraterritorial, meaning the plaintiffs were likely to succeed on their Dormant Commerce Clause claim. *Id.* at 1025. The court explained that if "[a] person outside [California] posts information on a website or on an electronic discussion group . . . for the intended benefit of other people [outside California], that person must assume that someone from [California] may also view the material." *Id.* (quoting *Dean*, 342 F.3d at 103). "As a result, posters outside of California must comply with § 6254.21(c) or risk subsequent litigation and attorney's fees. California therefore has projected § 6254.21(c) 'onto the rest of the nation.'" *Id.* (quoting *Dean*, 342 F.3d at 103).

Similar to the statute at issue in *Publius*, the statute here likely regulates more than mere "local conduct." *Id.* at 1023. As discussed above, the law as written and interpreted by the Court requires a Tennessee license whenever anyone "[a]ct[s] as, advertise[s] as, or represent[s]" to be an auctioneer even if the auctioneer and the products being auctioned are "wholly outside of the State's borders." *Healy*, 491 U.S. at 336. In the context of online auctions, the mere existence of an online auction website results, in the most probable correct interpretation of the statutory language, in the auctioneer "represent[ing]" to be an online auctioneer in Tennessee because Tennessee residents will have access to the website even if the physical location of the auctioneer is outside of the state. Further, if a Tennessee resident wins (or even merely bids in) an online

auction, the online auctioneer likely is properly deemed to be "act[ing]" as an auctioneer in Tennessee. Such likely interpretation would subject the auctioneer to regulation by Tennessee authorities that would be impermissible under the Commerce Clause. *See id.* at 337 ("[T]he Commerce Clause dictates that no State may force an out-of-state merchant to seek regulatory approval in one State before undertaking a transaction in another.") (citing *Brown–Forman*, 476 U.S. at 582); *Berman v. City of New York*, No. 09CV3017ENVCLP, 2012 WL 13041996, at *18 (E.D.N.Y. Oct. 3, 2012) ("[T]he in-state presence of one party to the transaction cannot be used as justification [for the state] to regulate the other party[.]") (citing *A.S. Goldmen & Co. v. N.J. Bureau of Sec.*, 163 F.3d 780, 782-83 (3d Cir. 1999)).

In this case, Purple Wave states on its website, which is accessible by Tennessee residents, that it is a "true auction company," and as Plaintiffs aptly point out, Purple Wave cannot simply turn off its website at the Tennessee border. (Doc. No. 4 at ¶¶ 219-20; Doc. No. 18 at 16). The likely (as the Court has found) regulation of an auctioneer acting wholly outside of Tennessee (*i.e.*, extraterritorial conduct) is a *per se* violation the Dormant Commerce Clause. *Int'l Dairy Foods Ass'n*, 622 F.3d at 645; *see also Sam Francis Found. v. Christies, Inc.*, 784 F.3d 1320, 1324-25 (9th Cir. 2015) (holding that a statute's regulation of out-of-state art sales was "an impermissible regulation of wholly out-of-state commerce); *Dean*, 342 F.3d at 103 (holding that Vermont statute that directly regulated speech on the Internet outside of Vermont was a "*per se* violation of the dormant Commerce Clause"); *Backpage.com, LLC v. McKenna*, 881 F. Supp. 2d 1261, 1268 (W.D. Wash. 2012); *Midwest Title Loans, Inc. v. Ripley*, 616 F. Supp. 2d 897, 908 (S.D. Ind. 2009).[8]

---

[8] "[C]ourts in several circuits have invalidated state laws regulating the internet on the grounds that *any* regulation of the [I]nternet regulates conduct occurring outside the borders of the state." *Target Corp.*, 452 F. Supp. 2d at 958 (collecting cases from the Second, Fourth, and Tenth Circuits); *see also Dean*, 342 F.3d at 104 ("We think it likely

Wittingly or unwittingly, Tennessee has projected its legislation into other states and directly regulated commerce therein. Perhaps the State could change the result via statutory amendments inserting express, specific geographical limitations, but it cannot change the results by insisting that the statute obviously contains geographic limitations that in fact manifestly are not there. Accordingly, the Court finds that the statute is likely an impermissible *per se* violation of the Dormant Commerce Clause.[9] Plaintiffs are therefore likely to succeed on the merits of their Dormant Commerce Clause claim.

### iii.    *Pike Balancing*

The Court finds alternatively that even if the statute is not a *per se* violation of the Dormant Commerce Clause, it creates burdens on interstate commerce that significantly outweigh any putative benefits. *See Pike*, 397 U.S. at 142. In *Pike*, the Supreme Court recognized that "[w]here [a] statute regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is *clearly excessive* in relation to the putative local benefits." *Id*. (citing *Huron Portland Cement Co. v. City of Detroit*, 362 U.S. 440, 443 (1960)) (emphasis added). In other words, the Court must examine (1) whether any incidental burden is placed on interstate commerce by the

----

that the Internet will soon be falling within the class of subjects that are protected from State regulation because they 'imperatively demand[] a single uniform rule.'") (quoting *Healy*, 491 U.S. at 334); *Am. Libraries Ass'n v. Pataki*, 969 F. Supp. 160, 173 (S.D.N.Y. 1997) ("The Internet, like the rail and highway traffic at issue in the cited cases, requires a cohesive national scheme of regulation so that users are reasonably able to determine their obligations."). Here, the Court does not need (at least not yet) to decide whether *any* Internet regulation *necessarily* is an impermissible *per se* violation of the Dormant Commerce Clause. The Court's holding at the current preliminary injunction stage is limited to the statutory language at issue that the Court interprets as having an extraterritorial effect.

[9] As noted above, when a state statute has "an impermissible extraterritorial effect," a court need not "consider whether the state had some legitimate local purpose or whether there is a reasonable nondiscriminatory alternative." *Snyder*, 735 F.3d at 376.

statute, (2) the nature of the local benefits advanced by the statute, and (3) whether the incidental burden is "clearly excessive" when weighed against these benefits. *Id.*

As evident in the requirement that any burdens on interstate commerce "clearly outweigh" the local benefits of a statute, the *Pike* analysis is a "permissive" one from the State's perspective. *See United Hailers Ass'n, Inc. v. Oneida-Herkimer Solid Waste Mgmt. Auth.*, 550 U.S. 330, 347 (2007). Considerable deference must be given to the legislature's policy determinations as to the local benefits of the challenged legislation. *See City of New Orleans v. Dukes*, 427 U.S. 297, 303 (1976) ("[T]he judiciary may not sit as a superlegislature to judge the wisdom . . . of legislative policy determinations."). Nonetheless, the court must assess whether the purported local benefits of a statute are legitimate or illusory. *See Norfolk S. Corp. v. Oberly*, 632 F. Supp 1225, 1243 n.31 (D. Del. 1986) ("The *Pike* Court's use of the phrase 'putative local benefits' does not mean this Court must accept at face value the Delaware legislature's assertion of benefits accruing under the statute. . . . However, if plaintiffs wish to challenge the Delaware General Assembly's goals stated in the [challenged statute] as pretextual they 'must come forward to show that the claimed benefits are illusory.'") (citations omitted); *see also Town of Southold v. Town of East Hampton*, 477 F.3d 38, 52 (2d Cir. 2007) (criticizing the district court for failing to "engage in any meaningful examination of the claimed local benefits" of the town's enactment); *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. Abrams*, 720 F. Supp. 284, 290 (S.D.N.Y 1989) (collecting Supreme Court cases striking down state statutes under the Commerce Clause because "the states' asserted safety rationales were illusory").

Therefore, in determining the benefits and burdens of the statute, the "Court is not bound by '[t]he name, description or characterization given by the legislature or the courts of the State,' but will determine for itself the practical impact of the law." *Hughes v. Oklahoma*, 441 U.S. 322,

336 (1979) (quoting *Lacoste v. Louisiana Dept. of Conservation*, 263 U.S. 545, 550 (1924)); *see also McNeilus Truck and Mfg., Inc., v. Ohio*, 226 F.3d 420, 443 (6th Cir. 2000). The Sixth Circuit has instructed that "the party challenging the law bears the responsibility of proving that the burdens placed on interstate commerce outweigh the law's benefits[.]" *Garber v. Menendez*, 888 F.3d 839, 845 (6th Cir. 2018) (citing *LensCrafters, Inc. v. Robinson*, 403 F.3d 798, 805 (6th Cir. 2005)).

### 1. Burdens

Plaintiffs contend that the burdens imposed by the statute are "tremendous" because any online auctioneer who conducts extended-time online auctions, regardless of where they are physically located, must obtain an individual Tennessee auctioneer license. (Doc. No. 5 at 22). For would-be licensees who manage an online auction company (*i.e.*, a principal auctioneer), this requires completing a six-month period under the supervision of another licensed auctioneer. Tenn. Code. Ann. § 62-19-111(c). For such person, presumably this generally would require traveling to and staying in Tennessee for six months to work under a sponsoring auctioneer. Additionally, to be licensed as an affiliate auctioneer, Tennessee requires an applicant to submit an application accompanied by a non-refundable examination fee, complete thirty-four hours of classroom or online instruction at an auction school accredited by the Commission, and pass an examination. Tenn. Code. Ann. § 62-19-111(b), (e)-(g). The statute also requires an out-of-state auction company to set up and maintain an escrow account for all funds belonging to others for an auction in Tennessee and requires every nonresident applicant to "file an irrevocable consent that suits and actions may be commenced against the applicant in the proper court in the county in [Tennessee] in which a cause of action may arise [or] the plaintiff may reside." Tenn. Code Ann. § 62-19-117(c)-(d).

The Court agrees that these requirements greatly "burden[] the interstate flow of []
commerce." *Byrd v. Tennessee Wine & Spirits Retailers Ass'n*, 883 F.3d 608, 623 (6th Cir. 2018),
*aff'd sub nom. Tennessee Wine & Spirits Retailers Ass'n v. Thomas*, 139 S. Ct. 2449 (2019)
(citation omitted). Further, as discussed above, the mere act of operating an online extended-time
auction likely results in the auctioneer "represent[ing]" herself to be an auctioneer in Tennessee,
even if the auctioneer does everything to conduct the auction from a location entirely outside the
state. In so doing, the statute regulates wholly extraterritorial conduct. This in itself is sufficient to
meet plaintiffs' burden of demonstrating that the statute places some incidental burden on interstate
commerce. *See Martin-Marietta Corp. v. Bendix Corp.*, 690 F.2d 558, 566 (6th Cir. 1982)
(explaining that the extraterritorial effect of a statute was a burden on interstate commerce); *see
also Tetra Techs., Inc. v. Harter*, 823 F. Supp. 1116, 1121 (S.D.N.Y. 1993) (finding that, if out-
of-state contractors were forced to obtain a New York engineering license before operating in the
state, there would be "an obvious adverse—and differentially adverse—effect" on them, as they
"would not be able to enter the market on short notice"). Accordingly, the Court finds that the
statute burdens interstate commerce.

### 2. Benefits

The State contends that it has a substantial governmental interest in promoting the integrity
of competitive auctions, protecting the public from unqualified auctioneers, and preventing
fraudulent or deceptive practices in auctions occurring in Tennessee. (Doc. No. 20 at 16). The
Court agrees that these are appropriate and important state interests. However, when reviewing the
legislative history, these concerns appear to be somewhat illusory. The data collected by the Task
Force revealed that in the past three years only *three* consumer complaints regarding extended-
time online auctions were made to the Committee. (Doc. No. 4-12 at 41). The deputy commissioner

of the Department of Commerce and Insurance, Carter Lawrence, stated at a Task Force meeting that the Department did not turn away complaints regarding online auctions even though they were not regulated. (*Id*. at 41-42). This upends the State's argument that the number of complaints were low because the Department would not accept complaints regarding subject matter the State did not regulate. Therefore, the evidence leads the Court to conclude the reason the number of complaints are slight is more likely because online auctions are not substantially harming Tennessee consumers. Further, the majority of the eleven complaints made regarding online auctions involved fixed-timed auctions, yet the legislature did not amend the statute to regulate this type of online auction. Additionally, at a house hearing on a bill to amend the auctioneer licensing regime, Representative Gravitt described the Committee's position as extended-time online auctions needed to be regulated "so everyone can compete on the same level playing field as someone that goes out here and participated in live auctions" rather than out of a concern for the protection of Tennessee consumers. (Doc. No. 4-6 at 3).

Additionally, the numerous exemptions to the licensing regulation somewhat belies the State's position that the regulation is necessary for the protection of consumers.[10] The statute explicitly exempts "[a]n individual who generates less than twenty-five thousand dollars ($25,000) in revenue a calendar year from the sale of property in online auctions" from the licensing regulation. *Id*. at § 6. However, the Court finds that there is still a risk (and not necessarily a lesser risk) for deception when the auctioneer sells less than $25,000 annually given that small-time

---

[10] As noted above, these exemptions include, among others, "[a]n auction conducted by or under the direction of a governmental entity"; "[a]n auction conducted on behalf of a political party, church, or charitable corporation or association"; "[a]n auction conducted for the sale of livestock"; "an auction for the sale of tobacco"; "[a]ny fixed price or timed listings that allow bidding on an [I]nternet website, but do not constitute a simulcast of a live auction"; "[a]n in person or simulcast auction whose primary business activity is selling nonrepairable or salvage vehicles in this state[.]" Tenn. Code Ann. § 62-19-102.

sellers are not immune from unscrupulousness and may be harder to call to account inasmuch as they are more likely to be "fly by night" operators or individuals making one-off sales. Thus, this exemption undermines the purported protection to consumers. *See Backpage.com*, 939 F. Supp 2d at 844 (exception for free advertisers undermine the benefits of the statute). As a whole, these facts suggest that the State's purported concerns in fact are illusory, thus severely undercutting the State's position. *See Norfolk S. Corp.*, 632 F. Supp at 1243 n.31. There is considerable support for Plaintiffs' contention that the actual purpose of the regulation is likely not consumer protection, and thus the Court does not find the State has a strong local interest in implementing the statute.

### 3. The Burden is Clearly Excessive to the Benefits

That is not to say that there is no legitimate local interest whatsoever in regulating online auctions in which Tennessee residents may participate. But simply because this Court believes the State has some local interest in regulating such online auctioneering , "it does not mean that the State may use a meat cleaver if a scalpel will do." *Churchill Downs Inc. v. Trout*, 979 F. Supp. 2d 746, 755 (W.D. Tex. 2013), *aff'd*, 767 F.3d 521 (5th Cir. 2014). To pass constitutional muster, the burden on interstate commerce must not be "clearly excessive" in relation to the gravity of the State's interest in regulating online auctioneering. The State has implemented a licensing scheme that effectively requires every online auctioneer that does not fall within one of the statutory exceptions to obtain and maintain a Tennessee license. *See Backpage.com*, 939 F. Supp. 2d at 844 (holding that the plaintiff "is likely to prevail on its argument that the burden on interstate commerce clearly exceeds any possible benefit from the law" because "the statute regulates a far-reaching range of print and online advertisements" which "likely poses a serious burden on interstate commerce[.]"). Obtaining a Tennessee license as a principal auctioneer, as noted above, is likely a tedious task that requires an examination, fees, and a six-month apprenticeship. *See*

Tenn. Code. Ann. § 62-19-11. These requirements likely seriously burden interstate commerce. Further, as also described above, the Court finds that the State's purported interest in protecting consumers is somewhat illusory and the numerous exemptions to the statute "undermine[] what benefits . . . the [S]tate would receive from the statute." *Backpage.com*, 939 F. Supp. 2d at 844. Thus, the Court finds that the burdens the statute imposes are likely "clearly excessive in relation to the putative local benefits." *Pike*, 397 U.S. at 142; Therefore, the statute likely fails even the more permissive *Pike* standard. Thus, on this alternative basis also, the Court finds the statue likely violates the Dormant Commerce Clause.[11]

## II. Irreparable Harm

"Perhaps the single most important prerequisite for the issuance of a preliminary injunction is a demonstration that if it is not granted the applicant is likely to suffer irreparable harm before a decision on the merits can be rendered." Wright & Miller, *Federal Practice and Procedure* § 2948.1. The Supreme Court has frequently reiterated that plaintiffs seeking preliminary relief must demonstrate that irreparable injury is *likely* in the absence of an injunction, rather than merely possible. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). "A plaintiff's harm from the denial of a preliminary injunction is irreparable if it is not fully compensable by money damages." *Overstreet*, 305 F.3d at 573.

Plaintiffs demonstrated that they will likely experience irreparable harm if the State begins enforcing the online licensing statute. Mr. McLemore contends that if the law is enforced, his auction managers will not be able to conduct auctions, which will result in the cancellation of

---

[11] Finding that Plaintiffs are likely to succeed on the merits of their Dormant Commerce Clause claim, the Court will refrain from analyzing Plaintiffs' First Amendment claim and makes no findings on the likelihood of success on the merits of that claim. *See Richland/Wilkin Joint Powers Auth. V. U.S. Army Corps of Eng'rs.*, 826 F.3d 1030, 1040 (8th Cir. 2016) (to obtain preliminary injunction, "[t]he plaintiff 'need only establish a likelihood of succeeding on the merits of any one of [its] claims.") (citation omitted).

contracts and potential legal liabilities for breaches of those contracts. (Doc. No. 48-1 at ¶¶ 17, 19). Mr. McLemore argues that this action would threaten his business and cost his business goodwill and customers. (Doc. No. 48-1). The likely loss of business as well as customer goodwill is an immediate and irreparable injury that is not considered to be compensable by money damages. *See S. Glazer's Distrib. Of Ohio v. Great Lakes Brewing*, 860 F.3d 844, 853 (6th Cir. 2017) ("loss of customer goodwill is a prime example of intangible, irreparable harm."); *see also Basicomputer Corp. v. Scott*, 973 F.2d 507, 511 (6th Cir. 1992) ("loss of consumer goodwill often amounts to irreparable injury because the damages flowing from such loses are difficult to compute."); *FirstEnergy Sols. Corp. v. Flerick*, 521 F. App'x 521, 529 (6th Cir. 2013) (same).

Unlicensed IAA members (including McLemore Auction's auction managers Kimball, Land, and Boyd) will be faced with the choice to obtain a license or face potential criminal and civil enforcement actions. (Doc. No. 4 at ¶¶ 60, 268-69). Additionally, out-of-state online auction companies, like Purple Wave, will no longer be able to operate unlicensed in Tennessee without facing an enforcement threat.[12] The choice between threatened enforcement or complying with an unconstitutional law rises to the level of an irreparable injury. *See Condon v. Andino, Inc.*, 961 F. Supp. 323, 331 (D. Me. 1997) (finding irreparable injury where "Plaintiff is faced with the decision of either complying with regulations that are unconstitutional or violating his Town's laws."). In sum, it does not appear that Plaintiffs could obtain a license in time to avoid these effects and even

---

[12] The State offered no evidence at the hearing, or in its briefing, that convinces the Court that the State would not attempt enforcement against out-of-state online auctioneers; at the hearing counsel insisted that this would be the case, but the Court is not satisfied that this necessarily will prove to be the case. There is no way for the State's counsel to know in advance how, or every circumstance in which, the Commission would seek to enforce the new statute (for example by seeking to impose a civil penalty under Tenn. Comp. R. & Regs. 0160-01-.11), particularly in a hypothetical egregious case of an out-of-state auctioneer allegedly systematically taking advantage of Tennessee consumers.

if they could, that possibility would not be an appropriate basis to deny a preliminary injunction as it does not cure the otherwise irreparable injury.

Accordingly, the Court finds that Plaintiffs have demonstrated they would likely suffer immediate and irreparable harm if they were subject to enforcement of the amended statute.

### III. Substantial Harm to Others

The State argues that "[m]embers of the public are likely to be harmed if this Court grants the preliminary injunction" because "members of the public that participate in extended-time online auctions will not be protected from the risks of unregulated auctions[.]" (Doc. No. 20 at 21). Therefore, according to the State, issuance of an injunction would cause substantial harm to Tennessee consumers. Although the Court does not find the State's concerns disingenuous, its concerns are belied somewhat by the evidence. As noted above, in the past three years only *three* consumer complaints regarding extended-time online auctions were made to the Committee. (Doc. No. 4 at ¶¶ 155-57). Thus, online extended-time auctions up until this point have gone unregulated without any substantial harm to Tennessee consumers. Additionally, the record lacks legislative history demonstrating that the State's purpose for implementing the statute was to protect Tennessee consumers. Furthermore, the State does not intend to regulate fixed-time online auctions, even though more complaints were yielded from consumers regarding this type of auction.

In addition, twenty states do not regulate the auctioneering profession, which leads the Court to find that unregulated auctioneering does not pose an obvious and serious threat of harm to consumers. *See* License to Work: A National Study of Burdens from Occupational Licensing, https://ij.org/report/license-work-2/ltw-occupation-profiles/ltw2-auctioneer/ (last visited July 17,

2019). Therefore, the Court concludes that halting the State's regulation of online extended-time auctions will not substantially harm the public.

## IV. Public Interest

Given the likely unconstitutionality of online auction licensing scheme, the public interest is best served by the issuance of a preliminary injunction. "It is hard to conceive of a situation where the public interest would be served by enforcement of an unconstitutional law or regulation." *Condon*, 961 F. Supp. at 331. Additionally, issuance of the injunction would not harm the public interest as unregulated online auctions are not imposing a substantial harm on the public, as indicated above.

## V. Weighing the Factors

Because all of the factors weigh in favor of granting Plaintiffs' Motion for Preliminary Injunction, the Court finds that the issuance of a preliminary injunction is appropriate.

## VI. Security

Because this case involves "constitutional issues affecting the public[,]" the Court finds it unnecessary to require Plaintiffs to post security as a condition of obtaining injunctive relief. *See Stand Up Am. Now v. City of Dearborn*, No. 12-11471, 2012 WL 1145075, at *1 (E.D. Mich. Apr. 5, 2012). Therefore, Plaintiffs are excused from doing so.

## CONCLUSION

The Court finds that Plaintiffs have shown a likelihood of success on the merits of their Dormant Commerce Clause claim, and that the absence of a preliminary injunction would likely result in an immediate and irreparable injury. Based on these findings, and the weighing of the additional applicable factors, the Court will **GRANT** Plaintiffs' Motion for a Preliminary

Injunction (Doc. No. 3).[13] The State will be enjoined from applying Tennessee's auctioneering laws and licenses to "electronic" exchanges, or online auction websites, or against Plaintiffs pending further order of the Court.

A preliminary injunction will be entered.


*Eli Richardson*
ELI RICHARDSON
UNITED STATES DISTRICT JUDGE

---

[13] Of course, as its very name suggests, the preliminary injunction is based on preliminary findings, as well as the applicable standard of likelihood of success on the merits. The Court recognizes that the State is entitled to seek, and is not at this juncture precluded from obtaining, via litigation of this case (including discovery and subsequent briefing based on a more complete record), an ultimate result that is in its favor with respect to Plaintiffs' Commerce Clause claim. On the other hand, Plaintiffs are entitled to pursue, and are pursuing, other claims and forms of relief beyond the scope of the preliminary injunction (Doc. No. 4 at 44-45). Neither this Order, nor the preliminary injunction it approves, speaks to the validity of such claims and requests for relief except to the extent specifically suggested herein.