# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| **WILL MCLEMORE, et al.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | **Case No. 3:19-cv-00530** |
| | ) | |
| **v.** | ) | **JUDGE RICHARDSON** |
| | ) | |
| **ROXANA GUMUCIO, et al.,** | ) | **MAGISTRATE JUDGE BROWN** |
| | ) | |
| **Defendants.** | ) | |

---

## MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS AMENDED COMPLAINT

---

Defendants submit this Memorandum of Law in support of their Motion to Dismiss. For the reasons set forth below, this Court lacks subject matter jurisdiction over the Amended Complaint and the Amended Complaint fails to state a claim upon which relief can be granted. The Court lacks subject matter jurisdiction over all Plaintiffs' state law claims because those claims are barred by the Eleventh Amendment. The Court likewise lacks subject matter jurisdiction over all claims of Plaintiffs Will McLemore, McLemore Auction Company, Aaron McKee, and Purple Wave, Inc., because those Plaintiffs lack standing. All Plaintiffs have failed to state a claim for which relief can be granted under the federal dormant Commerce Clause, the First Amendment, or the Privileges and Immunities Clause. This Court should, therefore, dismiss all of Plaintiffs' claims with prejudice pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6).

## BACKGROUND

In this action, Plaintiffs challenge the constitutionality of 2019 amendments to Tenn. Code Ann. §§ 62-19-101 *et seq.* that were made pursuant to 2019 Tenn. Pub. Acts Ch. 471 ("PC 471"). Plaintiffs seek declaratory and injunctive relief pursuant to 28 U.S.C. § 2201 and 42 U.S.C. § 1983

for purported violations of their rights to free speech under the U.S. and Tennessee Constitutions and for purported violations of the federal dormant Commerce Clause and the Privileges and Immunities Clause.

Since 1967, it has been the public policy of the State of Tennessee to regulate the auctioneering profession and to require auctioneers to be licensed. *See* 1967 Tenn. Pub. Acts Ch. 335. With the growth of electronic communication, in 2001, the Commission promulgated a rule to regulate online auctions, which provides, "Any electronic media or computer-generated auction originating from within Tennessee shall conform to the requirements of Tennessee Code Annotated, Title 62, Chapter 19 et seq. (Auctioneer Licensing Law) and the Rules of the Tennessee Auctioneer Commission." Tenn. Comp. R. & Regs. 0160-01-.18 ("Rule 18").

In 2006, the State added a new statutory exemption to the auctioneer licensing requirement for "[a]ny fixed price or timed listings that allow bidding on an internet website, but do not constitute a simulcast of a live auction."[1] 2006 Tenn. Pub. Acts Ch. 533, § 1. The 2006 Public Act did not define timed listing.

---

[1] In 2006, the Tennessee Attorney General opined that Internet drop-off stores, which assist individuals in selling items through sites such as eBay, did not fall under the regulatory authority of the Tennessee Auctioneer Commission. *See* Op. Tenn. Att'y Gen. 06-053 (Mar. 27, 2006). In reaching that conclusion, the Attorney General opined that while eBay and similar Internet sites "perform some of the functions of an auctioneer, they do not fall within a literal reading of that term as defined in Tenn. Code Ann. § 62-19-101(3)." First, the Attorney General reasoned that "auctioneers" must be individuals, but "[c]omputers, not individuals, conduct Internet 'auctions.'" *Id.* at 3.

> More significantly, eBay's transactions do not fit the definition of "auction," although they often accomplish many of the same goals as a traditional auction. "Audience" and "participating audience" evoke the limited, definable, physically present group of people one associates with a traditional auction. The eBay "auction" is unlimited and not similarly identifiable. eBay does not so much make invitations for offers as notify purchasers as to the status of their bids. An eBay "auction" does not culminate in the

2

In 2019, the General Assembly significantly revised the auctioneer licensing statutes. These revisions included *inter alia* adding a statutory definition of timed listing to clarify the scope of that statutory exemption: "'Timed listing' means offering goods for sale with a fixed ending time and date that does not extend based on bidding activity." PC 471, § 4(12). These revisions also added the word "electronic" to the statutory definition of "auction," so that "auction" now means

> a sales transaction conducted by oral, written, or electronic exchange between an auctioneer and members of the audience, consisting of a series of invitations by the auctioneer for offers to members of the audience to purchase goods or real estate, culminating in the acceptance by the auctioneer of the highest or most favorable offer made by a member of the participating audience.

*Id.* § 4(2). Other than adding the word "electronic," PC 471 did not substantially change the pre-2019 definition of "auction." *See* Tenn. Code Ann. § 62-19-101(2) (2009 & 2018 Supp.).

PC 471 also created new classifications of auctioneers and made it easier to become a licensed auctioneer. PC 471 created the bid caller auctioneer license. An applicant for a bid caller auctioneer license must be at least eighteen years of age and have completed sixteen hours of classroom or online instruction on the basic fundamentals of auctioneering at an accredited auction school. PC 471, § 10(a). PC 471 also replaced the apprentice auctioneer license with the affiliate auctioneer license. An applicant for an affiliate auctioneer license must be at least eighteen years of age and have successfully completed an additional thirty-four hours of classroom or online instruction on the basic fundamentals of auctioneering at an accredited

---

> acceptance of the highest or most favorable bid in the traditional sense, but rather in the highest bid that has been registered within a specified period.

*Id.* at 4.

3

auction school. *Id.* § 10(b). PC 471 also eliminated the auctioneer firm license and defined the responsibilities of a principal auctioneer to include "the management and supervision of an auction company, including its wholly owned subsidiary or affiliate company." *Id.* § 4(9). An applicant for a principal auctioneer license must be at least eighteen years of age; have served as an affiliate auctioneer under the supervision of a licensed, full-time principal auctioneer for at least six months; and have a high school diploma, general equivalency diploma, or HiSET® diploma. *Id.* § 10(c).

PC 471 further provides that it is unlawful for any person to "[a]ct as, advertise as, or represent to be an auctioneer without holding a valid license issued by the commission." PC 471, § 5(a)(1). The previous law contained similar prohibitions. *See* Tenn. Code Ann. § 62-19-102(a)(1) (2009). PC 471 also provides that "[a]ll auctions arranged by or through a principal auctioneer must be conducted exclusively by individuals licensed under this chapter." PC 471, § 5(b). The previous law likewise contained a similar requirement. *See* Tenn. Code Ann. § 62-19-102(b) (2009).

Before 2019, Plaintiffs conducted so-called online extended-time auctions without a Tennessee auctioneer license or employed others to conduct online extended-time auctions without a Tennessee auctioneer license. According to Plaintiffs, an extended-time auction is an auction in which the time of the auction closing extends based on bidding activity. (*See* Amended Compl. ¶ 32). Plaintiffs avoided the preexisting regulation of online auctions under Rule 18 by relying on the statutory exemption for timed listings. Plaintiffs intend to continue to conduct online extended-time auctions without a license or to employ others to do so. PC 471 makes clear, however, that online extended-time auctions are not timed listings and that an auctioneer license is required to conduct online extended-time auctions originating in Tennessee.

4

For the reasons stated below, Plaintiffs' Amended Complaint fails to state a claim upon which relief can be granted, because the State's regulatory scheme for auctioneers, including the amendments made pursuant to PC 471, constitutes reasonable regulation of in-state professional conduct, which in no way violates the dormant Commerce Clause, the First Amendment, or the Privileges and Immunities Clause. Additionally, this Court lacks jurisdiction over all Plaintiffs' state law claims and the federal claims made by Plaintiffs Will McLemore, McLemore Auction Company, Aaron McKee, and Purple Wave, Inc., who fail to allege standing.

## STANDARD OF REVIEW

"A Rule 12(b)(6) motion tests whether a cognizable claim has been pleaded in the complaint." *Scheid v. Fanny Farmer Candy Shops, Inc.*, 859 F.2d 434, 436 (6th Cir. 1988). "Rule 8(a) sets forth the basic federal pleading requirement that a pleading 'shall contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief.'" *Id.* "Though decidedly liberal, this standard does require more than bare assertions of legal conclusions." *LULAC v. Bredesen*, 500 F.3d 523, 527 (6th Cir. 2007). "[A] Plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). The factual allegations, assumed to be true, must do more than create speculation or suspicion of a legally cognizable cause of action; they must show entitlement to relief. *Id.* "To state a valid claim, a complaint must contain either direct or inferential allegations respecting all the material elements to sustain recovery under some viable legal theory." *LULAC*, 500 F.3d at 527 (citing *Twombly*, 550 U.S. at 562).

Upon a facial attack asserting lack of subject matter jurisdiction under Rule 12(b)(1), all allegations in the complaint must be taken as true, much as with a Rule 12(b)(6) motion. *Carrier*

*Corp. v. Outokumpu Oyj*, 673 F.3d 430, 440 (6th Cir. 2012). For a complaint to allege jurisdiction adequately, it must contain non-conclusory facts which, if true, establish that the district court has jurisdiction over the dispute. *Id.*

<u>**ARGUMENT**</u>

I.      **PLAINTIFFS' CLAIMS UNDER 28 U.S.C. § 2201 AND 42 U.S.C. § 1983 SHOULD BE DISMISSED.**

"To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988); *accord Mezibov v. Allen*, 411 F.3d 712, 716-17 (6th Cir. 2005). "If a plaintiff fails to make a showing on any essential element of a § 1983 claim, it must fail." *Redding v. St. Eward*, 241 F.3d 530, 532 (6th Cir. 2001). As discussed in detail below, Plaintiffs have not been deprived of any right secured by the United States Constitution. Accordingly, Plaintiffs' § 1983 claims must be dismissed for failure to state a claim upon which relief can be granted. Plaintiffs' claims under 28 U.S.C. § 2201 must likewise be dismissed for failure to state a claim upon which relief can be granted, because they seek a declaration that Tennessee's statutory scheme for regulating the auctioneering profession violates rights secured by the Constitution, which it does not.

     A.      **Plaintiffs Fail to State a Claim Upon Which Relief Can Be Granted Under the Dormant Commerce Clause.**

The U.S. Constitution grants Congress the power "[t]o regulate Commerce . . . among the several States." U.S. Const., Art. I, § 8, cl. 3. "Although the Commerce Clause is written as an affirmative grant of authority to Congress, [the Supreme] Court has long held that in some instances it imposes limitations on the States absent Congressional action." *South Dakota v. Wayfair*, --- U.S. ---, 138 S.Ct. 2080, 2089 (2018). "Modern precedents rest upon two primary

principles that mark the boundaries of a State's authority to regulate interstate commerce. First, state regulations may not discriminate against interstate commerce; and second, States may not impose undue burdens on interstate commerce." *Id.* at 2090-91. For the reasons detailed below, the State's auctioneering regulations, including the amendments of PC 471, neither discriminate against interstate commerce, nor impose undue burdens upon it. Accordingly, Plaintiffs fail to state a claim upon which relief can be granted under the Commerce Clause.

### 1. The State's Auctioneering Regulations Do Not Apply Extraterritorially.

Plaintiffs' dormant Commerce Clause claims are premised primarily on the flawed presumption that, by merely adding the term electronic to the statutory definition of auction, the State's auctioneering regulations now apply extraterritorially. They do not. The amendments included in PC 471 fit into an existing statutory scheme that, by its express terms, applies only to auctions conducted in Tennessee. At least since 2001, the State has regulated online auctions. Rule 18, adopted by the Auctioneer Commission that year, expressly provides, "Any electronic media or computer-generated auction *originating from within Tennessee* shall conform to the requirements of Tennessee Code Annotated, Title 62, Chapter 19 et seq. (Auctioneer Licensing Law) and the Rules of the Tennessee Auctioneer Commission." (emphasis added). The addition of the word "electronic" by PC 471 merely confirms this longstanding rule.[2] This rule explains what the Auctioneer Commission deems to be an auction "in this State" and makes crystal clear that Tennessee's licensing requirement applies only to auctions "originating from within Tennessee." The Commission's interpretation and application of the statutes it administers are entitled to considerable deference. *See Consumer Advocate Div. v. Greer*, 967 S.W.2d 759, 761

---

[2] Some online auctioneers sought to evade the regulation by relying on the exemption for timed listings, even though the ending time could be extended. The new statute closes this loophole by specifying that it applies to online auctions and that the ending time for an exempt timed listing cannot be extended.

(Tenn. 1998). This establishes that there is no threat of an attempt to regulate auctions that do not originate from within the State.[3] The Commission would not and could not violate its own rule by attempting to reach auctions originating from locations outside of Tennessee.

This resolves any ambiguity in the statutes themselves. Construing the prohibition against "[a]ct[ing] as, advertis[ing] as, or represent[ing] to be an auctioneer without holding a valid license issued by the commission," PC 471, § 5(a)(1), to apply extraterritorially is a forced reading that ignores that the Commission's authority is limited to issuing licenses that grant the privilege to conduct auctions only in this State. *See* Tenn. Code Ann. § 62-19-112(a). The statute thus prohibits acting as, advertising as, or representing to be a *Tennessee* auctioneer without the required license. The statute does not prohibit an auction company that conducts online auctions from Kansas from stating on its website that it is a "true auction company." (Amended Compl. ¶ 219). Furthermore, construing any of PC 471's provisions to apply extraterritorially is inconsistent with the required presumptions of constitutionality, *Mitchell v. Mitchell*, 594 S.W.2d 699, 702 (Tenn. 1990), and against extraterritoriality, *BMW Stores, Inc. v. Peugeot Motors of America, Inc.*, 860 F.2d 212, 215 n.1 (6th Cir. 1988). That being the case, there is no threat of a Commerce Clause violation. Auctioneers located outside of Tennessee have no need of a Tennessee license, even if Tennessee residents can bid on items they offer online. Tennessee can regulate auctioneers located here, whether they conduct their business in person or over the internet.

---

[3] The State has a longstanding legitimate interest in regulating auctions conducted in the State and a longstanding policy of confining its regulations to in-state conduct. There is no reason to conclude that the State's regulations apply to out-of-state online auctions any more than they apply to out-of-state in-person auctions, since an auction is defined as "a sales transaction conducted by *oral, written, or electronic* exchange between an auctioneer and members of the audience." PC 471, § 4(2) (emphasis added).

8

2. **The State's Auctioneering Regulations Do Not Impermissibly Burden Interstate Commerce.**

State laws that "regulat[e] even-handedly to effectuate a legitimate local public interest . . . will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits." *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970). Here, the State regulates auctions conducted in the State to effectuate the legitimate local public interest of promoting the integrity of competitive auctions, protecting sellers and consumers from unqualified auctioneers, and preventing fraudulent or deceptive practices in auctions conducted in the State. The State is regulating purely in-state conduct—*i.e.,* auctions conducted from within Tennessee. The State's scheme for regulating in-state auctions did not become an undue burden on interstate commerce merely because the State added the term electronic to the statutory definition of auction. Indeed, the State had already regulated online auctions originating from within Tennessee for eighteen years before the statutory change. *See* Rule 18. The burdens on interstate commerce, if any, are negligible, and they are certainly not clearly excessive in relation to the local benefits of regulating in-state auctions.

Plaintiffs mischaracterize the nature of the regulations by asserting that they license and regulate an instrumentality of commerce. The State is regulating auctions conducted within the State; it is not regulating the internet. The dormant Commerce Clause does not render otherwise regulable transactions unregulable simply because they are connected to the internet. *See Ford Motor Co. v. Tex. Dep't of Transp.*, 264 F.3d 493, 505 (5th Cir. 2001). To allow in-state auctioneers to escape the State's valid regulations by connecting their auctions to the internet would be an absurd result that is not mandated or supported by the dormant Commerce Clause. *Id.*

9

**B.     Plaintiffs Fail to State a Claim Upon Which Relief Can Be Granted Under the First Amendment.**

The State's regulatory and licensing scheme for auctioneers, codified at Tenn. Code Ann. §§ 62-19-101 *et seq.* and amended by PC 471, regulates professional conduct, not speech. As such, this Court should apply rational basis scrutiny to uphold these statutes, because they are rationally related to a legitimate government purpose. *See Bevan & Assocs., LPA, Inc. v. Yost*, 929 F.3d 366, 374-75 (6th Cir. 2019); *Liberty Coins, LLC v. Goodman*, 748 F.3d 682, 692-94 (6th Cir. 2014), *cert. denied*, 135 S.Ct. 950 (2015).

An auction is first and foremost "a sales transaction," PC 471, § 4(2), which falls squarely within the State's authority to regulate business conduct and economic activity, *see Liberty Coins*, 748 F.3d at 697. Auctioneers' conduct and activity with respect to sellers, including "offer[ing] and execut[ing] a listing contract, sale, purchase, or exchange of goods" in exchange "for a fee, commission, or any other valuable consideration, or with the intention or expectation of receiving a fee, commission, or any other valuable consideration," PC 471, § 4(9), likewise fall squarely within the State's authority to regulate business conduct and economic activity. At most, the State's regulation of the auctioneering profession only incidentally burdens speech, which is permissible under the First Amendment. *See Nat'l Inst. of Family & Life Advocates v. Becerra*, --- U.S. ---, 138 S.Ct. 2361, 2372 (2018) ("*NIFLA*"). The State is not relying on a professional speech exception to the First Amendment, which the Supreme Court specifically rejected in *NIFLA*. *See id.* at 2371. Rather, the State is relying on longstanding Supreme Court precedent, cited in *NIFLA*, holding that "States may regulate professional conduct, even though that conduct incidentally involves speech." *Id.* at 2372 (citing *Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 456 (1978) and *Planned Parenthood of Southeastern Pa. v. Casey*, 505 U.S. 833, 884 (1992) (opinion of O'Connor, Kennedy, and Souter, JJ.)).

10

The First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech." U.S. Const., Amend. I. The First Amendment is applicable to the States through the Fourteenth Amendment. *See NIFLA*, 138 S.Ct. at 2371. Under the Supreme Court's precedents, "restrictions on protected expression are distinct from restrictions on economic activity or, more generally, on nonexpressive conduct. . . . [T]he First Amendment does not prevent restrictions directed at commerce or conduct from imposing incidental burdens on speech." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 567 (2011). "[T]he State does not lose its power to regulate commercial activity deemed harmful to the public whenever speech is a component of that activity." *Ohralik*, 426 U.S. at 456. "Numerous examples could be cited of communications that are regulated without offending the First Amendment, such as the exchange of information about securities, corporate proxy statements, the exchange of price and production information among competitors, and employers' threats of retaliation for the labor activities of employees." *Id.* (internal citations omitted). "[A]nd professionals are no exception to this rule." *NIFLA*, 138 S.Ct. at 2373 (citing *Ohralik*, 436 U.S. at 456). *See also Casey*, 505 U.S. at 884 (holding that state's informed consent requirement for abortions did not violate First Amendment; "[t]o be sure, the physician's First Amendment rights not to speak are implicated, but only as part of the practice of medicine, subject to reasonable licensing and regulation by the State.") (internal citations omitted).

### 1. The State's Requirements for Auctioneers Are Reasonable Regulations of Business Conduct and Economic Activity, Not Speech.

In *Liberty Coins*, the Sixth Circuit applied rational basis scrutiny to conclude that unlicensed precious metals dealers were unlikely to prevail on the merits of their First Amendment challenge to Ohio's Precious Metals Dealers Act ("PMDA") and therefore reversed the district court's order granting a preliminary injunction. The PMDA required persons acting

11

as precious metals dealers to be licensed by the state and prohibited unlicensed individuals from holding themselves out as precious metals dealers. *Liberty Coins*, 748 F.3d at 686-88. Much like an auctioneer, holding oneself out as a precious metals dealer included advertisements and solicitations of customers for the purchase of precious metals. *Id.* at 687. The Court found that the PMDA was a valid business regulation. The Court explained that the PMDA was, "first and foremost, a licensing statute. It is a statute calculated to regulate individuals and entities that hold themselves out to the public as willing to purchase precious metals." *Id.* at 691. The Court further explained that "the PMDA uses 'holding oneself out' to distinguish those who Defendants wish to regulate and those who should and must remain free from regulation by nature of the infrequency and informality of their precious metals transactions." *Id.* at 692.

The Court determined that rational basis review applied to the PMDA. "Long ago, the Supreme Court recognized that '[t]he power of the state to provide for the general welfare of its people authorizes it to prescribe all such regulations as in its judgment will secure or tend to secure them against the consequences of ignorance and incapacity, as well as of deception and fraud.'" *Id.* at 692 (quoting *Dent v. West Virginia*, 129 U.S. 114, 122 (1889)). "[W]here a regulatory scheme neither implicates a fundamental right, nor creates a suspect classification, rational basis review applies." *Id.* at 693. The Court determined that the PMDA was a statute that neither burdened a fundamental right, nor created a suspect classification. *Id.* The PMDA "merely constitutes a regulatory scheme meant to protect the safety and welfare of the public through the regulation of professional conduct. Rational basis review therefore applies." *Id.*

> Under rational basis review, a law is upheld so long as it is rationally related to a legitimate government purpose. There is a strong presumption of constitutionality and the regulation will be upheld so long as its goal is permissible and the means by which it is designed to achieve that goal are rational.

12

*Id.* at 694.  "[U]nder rational basis review, the government has no obligation to produce evidence to sustain the rationality of its action; its choice is presumptively valid and may be based on rational speculation unsupported by evidence or empirical data."  *Id.* (quoting *TriHealth, Inc. v. Bd. of Comm'rs*, 430 F.3d 783, 790 (6th Cir. 2005) (quoting *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 315 (1993)) (internal quotation marks omitted).

Applying rational basis review, the Court found that Ohio had a legitimate government purpose "to protect consumers and the public from theft, fraud, money laundering, fencing, to restrict the flow of stolen goods, and to prevent terrorism."  *Id.*  The Court further found that the state's licensing requirement was rationally related to that legitimate government purpose.  *Id.* at 694-95.  The Court held that "it was reasonable for the Ohio legislature to have distinguished between businesses that hold themselves out to the public as formally, frequently, or routinely dealing in precious metals and those who merely purchase precious metals informally, infrequently, and for their own personal use."  *Id.* at 695.  The Court further held that "[i]t was reasonable for the legislature to have believed that a licensing requirement and the close monitoring of those who are licensed would curtail the amount of stolen goods in the marketplace and aid the police in their attempt to recover stolen goods in a timely manner."  *Id.* Because the PMDA was a rational method for achieving the government's legitimate interest in protecting the public from theft or fraud, the Court held that the plaintiffs were unlikely to prevail on the merits and were thus not entitled to a preliminary injunction in their favor.  *Id.*

The Court expressly declined to apply the test laid out in *Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York*, 447 U.S. 557 (1980), for burdens on commercial speech.  The Court concluded that the PMDA "proscribes business conduct and economic activity, not speech."  *Liberty Coins*, 748 F.3d at 697.  The Court held that the PMDA "does not

burden the commercial speech rights of unlicensed precious metals dealers because such dealers do not have a constitutional right to advertise or operate an unlicensed business that is not in compliance with the reasonable requirements of Ohio law." *Id.*

> Such dealers cannot "hold themselves out" to the public without a license, regardless of whether they advertise. This case does not turn on advertising or solicitation, it turns on whether the business in question holds itself out to the public, which can occur by posting a sign, placing goods in an open window, simply conducting business in a manner that is visible to the public, or otherwise making its wares available to the public.

*Id.* Accordingly, the Court held that it was appropriate to apply rational basis review to conclude that the PMDA did not violate the plaintiffs' First Amendment rights. *Id.*

For First Amendment purposes, there is no meaningful difference between the statutes at issue in *Liberty Coins* and the statutes at issue in the instant case. As in *Liberty Coins*, Tennessee's statutes regulating the auctioneering profession, including the amendments contained in PC 471, are valid business regulations that should be reviewed under rational basis scrutiny and upheld because they are rationally related to a legitimate government purpose. Indeed, the business activities undertaken by the precious metals dealers in *Liberty Coins* were substantially like those of auctioneers—auctioneers merely deal with a broader range of items for sale. Rational basis review is appropriate because the auctioneering regulations neither burden a fundamental right, nor create a suspect classification, but "merely constitute[] a regulatory scheme meant to protect the safety and welfare of the public through the regulation of professional conduct." *Liberty Coins*, 748 F.3d at 693.

The State has a legitimate government purpose in promoting the integrity of competitive auctions, protecting sellers and consumers from unqualified auctioneers, and preventing fraudulent or deceptive practices in auctions conducted in the State. Indeed, it has been the

14

public policy of the State since 1967 to regulate the auctioneering profession and to require auctioneers to be licensed. Potential risks that auctions pose include misrepresentations made to sellers during the course of executing a listing contract, misrepresentations made to the audience regarding the nature or quality of the item being auctioned, and shill bidding in which the auctioneer employs a shill to drive up the price of the auction, *see* Black's Law Dictionary (11th ed. 2019) (defining "by-bidder" a.k.a. "shill" as "[a]t an auction, a person engaged by the seller to bid on property for the sole purpose of stimulating bidding by potential genuine buyers, thereby inflating the price while being secured from risk by a secret understanding with the seller that he or she need not make good on bids").

It was reasonable for the legislature of Tennessee to believe that a licensing requirement for auctioneers would achieve the State's legitimate government purpose. *See Liberty Coins*, 748 F.3d at 694-95. It was likewise reasonable for the legislature to believe that requiring auctioneers to complete a reasonable number of hours of instruction on the basic fundamentals of auctioneering and to serve briefly under a licensed auctioneer would achieve the State's legitimate government purpose. *Id.* It was also reasonable for the legislature to believe that online auctions pose the same risks and should be regulated in the same manner as oral or written auctions. *Id.* Finally, it was reasonable for the legislature to distinguish between so-called extended-time auctions, which are auctions, and timed listings, which are not. (*See, e.g.,* Amended Compl. ¶¶ 140 (quoting Mr. Allen as saying "the difference is an extended time auction is absolutely and unequivocally just like a live auction and a fixed time is not") & 151 (quoting Mr. Allen as saying "in an online soft close auction you are mimicking the exact behavior of an auctioneer")). *See also* Op. Tenn. Att'y Gen. 06-053, at 4 (Mar. 27, 2006) (A timed listing "does not culminate in the acceptance of the highest or most favorable bid in the

15

traditional sense, but rather in the highest bid that has been registered within a specified period.") Unlike timed listings, so-called extended-time auctions, like traditional auctions, pose the risk that auctioneers will misrepresent the nature or quality of an item or employ shills to encourage additional bidding to keep the auction going indefinitely.

For these reasons, the State's statutes regulating the auctioneering profession, including the amendments made pursuant to PC 471, constitute a rational method for achieving the State's legitimate interest in promoting the integrity of competitive auctions, protecting sellers and consumers from unqualified auctioneers, and preventing fraudulent or deceptive practices in auctions conducted in the State. Accordingly, this Court should uphold the State's reasonable regulatory scheme under the rational basis scrutiny required by *Liberty Coins*.

As in *Liberty Coins*, Tennessee's auctioneering regulations "proscribe[] business conduct and economic activity, not speech." 748 F.3d at 697. An auction is first and foremost "a sales transaction," PC 471, § 4(2), which is business conduct and economic activity that falls squarely within the State's authority to regulate, without offending the First Amendment, *see Liberty Coins*, 748 F.3d at 697. Just as Ohio has authority to regulate sales of precious metals without offending the First Amendment, so too does Tennessee have authority to regulate auction sales without offending the First Amendment. The State's regulation of auctioneers' transactions with sellers likewise falls within the State's authority to regulate business conduct and economic activity, without offending the First Amendment. For instance, auctioneers "offer[] and execute[] a listing contract, sale, purchase, or exchange of goods" in exchange "for a fee, commission, or any other valuable consideration, or with the intention or expectation of receiving a fee, commission, or any other valuable consideration." PC 471, § 4(9). Again, this is "business conduct and economic activity, not speech." *Liberty Coins*, 748 F.3d at 697.

Plaintiffs attempt to frame their claims as free speech claims by focusing on language in the definition of auction referring to an "exchange between the auctioneer and the audience." PC 471, § 4(2). But the auctioneer's exchange with the audience is for the purpose of completing a sales transaction. This is economic activity, not speech, just like the offer and acceptance in a traditional contract. Moreover, the statutory definition of auction included language about an exchange between the auctioneer and the audience before PC 471 was enacted. PC 471 merely added the term "electronic." But a sales transaction completed by electronic means is not speech any more than a sales transaction completed by oral or written means. Plaintiffs' transactions do not become speech merely because they are conducted online, rather than in person. If this Court finds that PC 471 violates the First Amendment because auction is defined as a sales transaction conducted by an exchange between the auctioneer and the audience, then the entire statutory scheme would violate the First Amendment and the auctioneering profession would be unregulatable. This would be an untenable result, given that auctioneers are licensed and regulated in most states. *See* 7 Am. Jur. 2d *Auctions and Auctioneers* § 3 (2019) ("[M]ost states have enacted statutes requiring the licensing of persons who conduct an auction business.").

Plaintiffs Will McLemore and McLemore Auction Company also complain that they are prohibited from stating on their website that they will pay rebates for referrals. But the State does not simply prohibit auctioneers from saying that they will pay rebates for referrals; rather, the State prohibits auctioneers from paying rebates for referrals. *See* Tenn. Comp. R. & Regs. 0160-01-.02. Again, this is a conduct regulation, not a speech restriction.

Similarly, Plaintiffs' claims do not become free speech claims merely because unlicensed auctioneers are prohibited from "advertis[ing] as" or "represent[ing] to be an auctioneer." PC 471, § 5(a)(1). The prohibition does not burden commercial speech rights of unlicensed

auctioneers because such auctioneers do not have a constitutional right to advertise or operate an unlicensed business that is not in compliance with the reasonable requirements of Tennessee law. *Liberty Coins*, 748 F.3d at 697. The State may prohibit unlicensed auctioneers from advertising as auctioneers just as it may prohibit unlicensed lawyers from advertising that they provide legal services. Again, this is not a new prohibition. Unlicensed auctioneers were prohibited from advertising as or representing to be auctioneers before PC 471 was enacted.

The exemptions from the auctioneer licensing requirements further demonstrate that the State is regulating business conduct and economic activity rather than speech. Most of the activities that are exempted from the licensing requirements are auctions conducted by persons who are not in the business of auctioneering, such as persons acting under court order; trustees; governmental entities; political parties, churches, and charities; the Tennessee Department of Agriculture and the University of Tennessee; and individuals who earn less than $25,000 annually from online auctions. *See* PC 471, § 6. And most of the exemptions predate the enactment of PC 471. Like the Ohio statute at issue in *Liberty Coins*, the statutory exemptions from Tennessee's auctioneer licensing requirement demonstrate that the State is seeking to regulate only those who regularly engage in the business of auctioneering, rather than those who conduct auctions infrequently and informally.

2.    **At Most, the State's Regulation of the Auctioneering Profession Imposes Only Incidental Burdens on Speech, Which Are Permissible Under the First Amendment.**

The *Liberty Coins* Court rejected the plaintiffs' attempt to couch their claims as free speech claims and applied rational basis scrutiny to uphold the state's regulation of business conduct and economic activity. But, even if this Court accepts Plaintiffs' characterization of their claims as free speech claims, the State's regulations should be upheld as valid professional

18

regulations that impose only incidental burdens on speech, which is a level of scrutiny that mirrors the rational basis test. For example, in *Ohralik*, the Supreme Court upheld an Ohio State Bar Association prohibition on lawyers' in-person solicitation of remunerative employment. The Court found that in-person solicitation was "a business transaction in which speech was an essential but subordinate component." *Ohralik*, 426 U.S. at 457. "While this does not remove the speech from the protection of the First Amendment, . . . it lowers the level of appropriate judicial scrutiny." *Id.* The Court determined that "[a] lawyer's procurement of remunerative employment is a subject only marginally affected with First Amendment concerns," which "falls within the State's proper sphere of economic and professional regulation." *Id.* at 459. Accordingly, the lawyer's conduct was "subject to regulation in furtherance of important state interests." *Id.* The Court found that the State had a strong interest in protecting consumers, regulating commercial transactions, and maintaining standards among the licensed professions. *Id.* at 460. The Court held that it was "not unreasonable for the State to presume that in-person solicitation by lawyers more often than not will be injurious to the person solicited," *id.* at 466, and therefore it was "not unreasonable, or violative of the Constitution, for [the] State to respond with what in effect is a prophylactic rule," *id.* at 467.

Here, as in *Ohralik*, an auction is "a business transaction in which speech [is] an essential but subordinate component." *Id.* at 457. And auctioneering, if it implicates free speech at all, is "a subject only marginally affected with First Amendment concerns," which "falls within the State's proper sphere of economic and professional regulation." *Id.* at 459. The auctioneering profession is therefore "subject to regulation in furtherance of important state interests." *Id.* The State has a strong interest in promoting the integrity of competitive auctions, protecting sellers and consumers from unqualified auctioneers, and preventing fraudulent or deceptive practices in

19

auctions conducted in the State. *Id.* at 466. And, as argued above, the measures taken by the State to advance this interest were reasonable. *Id.* Accordingly, as in *Ohralik*, the State's regulations do not violate the First Amendment.

Similarly, in *Hines v. Alldredge*, 783 F.3d 197 (5th Cir. 2015), *cert. denied*, 136 S.Ct. 534 (2015) ("*Hines I*"), the Fifth Circuit upheld a Texas statute that prohibited the practice of veterinary medicine unless the veterinarian had recently examined the animal or visited the premises on which the animal was kept. A veterinarian who gave veterinary advice online challenged the prohibition under the First Amendment. The Court determined that the statute did not "regulate the content of any speech, require veterinarians to deliver any particular message, or restrict what can be said once a veterinary-client-patient relationship is established." *Id.* at 201. The Court noted that "States have broad power to establish standards for licensing practitioners and regulating the practice of professions." *Id.* (quoting *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 108, (1992) (quoting *Goldfarb v. Va. State Bar*, 421 U.S. 773, 792 (1975)) (internal quotation marks omitted). The Court held that "Texas's requirement that veterinarians physically examine an animal or the animal's premises before treating it (or otherwise practicing veterinary medicine) falls squarely within this long-established authority, and does not offend the First Amendment." *Id.* (citing *Ohralik*, 436 U.S. at 456). The Court determined that "the fact that this rule may have some impact on the veterinarian's speech" did not "dictate a different result," because "[t]he Supreme Court has long held that the First Amendment does not prevent restrictions directed at commerce or conduct from imposing incidental burdens on speech." *Id.* (quoting *Sorrell*, 131 S.Ct. at 2664) (internal quotation marks omitted). The Court explained that "[p]ursuant to this principle, there is a robust line of doctrine concluding that state regulation of the practice of a profession, even though that regulation may

20

have an incidental impact on speech, does not violate the Constitution." *Id.* The Court noted that "[w]hether Hines's First Amendment rights are even implicated by this regulation is far from certain," but concluded that "surely, if this restriction on the veterinarian's medical practice is within its scope, it is but incidental to the constraint, and denies the veterinarian no due First Amendment right." *Id.* at 202.

In a subsequent suit brought by Dr. Hines, the U.S. District for the Southern District of Texas found that the intervening *NIFLA* decision did not compel a different result.

> As *NIFLA* did not concern a content-neutral regulation of speech, the Supreme Court did not consider the standard applicable to such regulations. In addition, *NIFLA* did not modify the mode of analysis on which the Fifth Circuit relied to determine that the Texas statute is content-neutral. And *NIFLA* confirmed that states may regulate professional conduct in a manner that incidentally burdens speech.

*Hines v. Quillivan*, 395 F.Supp.3d 857, 866 (S.D. Tex. 2019) ("*Hines II*").

Here, as in the *Hines* cases, the State's regulatory scheme for auctioneers does not regulate the content of any speech or require auctioneers to deliver any particular message. *See Hines I*, 783 F.3d at 201. Once a license is obtained, an auctioneer is permitted to conduct auctions in this State, including auctions conducted by means of electronic exchange between the auctioneer and the audience, and is no longer prohibited from "act[ing] as, advertis[ing] as, or represent[ing] to be an auctioneer." PC 471, § 5(a)(1). The regulatory scheme falls squarely within the State's "broad power to establish standards for licensing practitioners and regulating the practice of professions" and does not offend the First Amendment. *Hines I*, 783 F.3d at 201 (quoting *Gade*, 505 U.S. at 108 (quoting *Goldfarb*, 421 U.S. at 792)) (internal quotation marks omitted). If the regulations have any impact on speech, the impact is merely incidental to the practice of the profession and denies the auctioneer no due First Amendment right. *See id.* at

21

202.  Moreover, the prohibition against "act[ing] as, advertis[ing] as, or represent[ing] to be an auctioneer" without a license, PC 471, § 5(a)(1), is not an impermissible speech restriction because unlicensed auctioneers do not have a constitutional right to advertise or operate an unlicensed business that is not in compliance with the reasonable requirements of Tennessee law, *see Liberty Coins*, 748 F.3d at 697.  For these reasons, Plaintiffs have failed to state free speech claims upon which relief can be granted.

> **C.      Plaintiffs Fail to State a Claim Upon Which Relief Can Be Granted Under the Privileges and Immunities Clause.**

The Fourteenth Amendment Provides that "[n]o State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States."  U.S. Const., Amend. XIV, § 1.  "The Privileges and Immunities Clause has been largely dormant since the *Slaughter-House Cases*, 83 U.S. (16 Wall) 36, 21 L.Ed. 394 (1872), restricted its coverage to 'very limited rights of national citizenship' and held that clause did not protect an individual's right to pursue an economic livelihood against his own state."  *Craigmiles v. Giles*, 312 F.3d 220, 229 (6th Cir. 2002).  Plaintiffs do not allege that the State has denied them any rights of national citizenship. Plaintiffs' claim that the internet is the modern equivalent of the nation's seaports and navigable waters is not supported by any precedent.  Moreover, the State has not denied Plaintiffs access to the internet; the State has merely regulated auctions conducted in the State.  Tellingly, Plaintiffs base their Privileges and Immunities Clause claims on the mere possibility that one member of the Supreme Court will someday convince a majority to overturn existing precedent.  (*See* Amended Compl. n.1).  The remote possibility that the Supreme Court will someday overturn existing precedent is insufficient to state a claim upon which relief can be granted.  Plaintiffs' Privileges and Immunities Clause claims should therefore be dismissed.

## II. PLAINTIFFS' CLAIMS BASED ON PURPORTED VIOLATIONS OF THE TENNESSEE CONSTITUTION ARE BARRED BY THE ELEVENTH AMENDMENT AND SHOULD THEREFORE BE DISMISSED.

In addition to claims under federal law, Plaintiffs have sought relief for purported violations of the Tennessee Constitution. Article 1, § 19 of the Tennessee Constitution provides that "[t]he free communication of thoughts and opinions, is one of the invaluable rights of man, and every citizen may freely speak, write, and print on any subject, being responsible for the abuse of that liberty." Plaintiffs' Tennessee constitutional claims must be dismissed because the Eleventh Amendment precludes federal supplemental jurisdiction over state law claims against state officers sued in their official capacities, even for declaratory and injunctive relief. *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 124-25 (1984); *George-Khouri Family L.P. v. Ohio Dep't of Liquor Control*, 2005 WL 1285677, *2 (6th Cir. May 26, 2005) ("A federal court cannot take supplemental jurisdiction over claimed state law violations by state officers. Appellants concede that the Eleventh Amendment bars a federal court from enjoining the actions of state officials on the basis of state law.") (internal citation omitted). Thus, even if Plaintiffs had made valid claims under federal law, the Eleventh Amendment would still bar the exercise of supplemental jurisdiction over the state law claims against state officers.

## III. PLAINTIFFS' CLAIMS SHOULD BE DISMISSED BECAUSE THEY DO NOT HAVE STANDING.

Pursuant to Article III of the U.S. Constitution, the power of the judiciary extends only to cases and controversies. "Standing to sue is a doctrine rooted in the traditional understanding of a case or controversy." *Spokeo, Inc. v. Robins*, --- U.S. ---, 136 S.Ct. 1540, 1547 (2016). To establish Article III standing, a plaintiff must have "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Id.* "To establish injury in fact, a plaintiff must show that he or she

23

suffered an invasion of a legally protected interest that is concrete and particularized and actual or imminent, not conjectural or hypothetical." *Id.* at 1548 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)) (internal quotation marks omitted).

Plaintiff Will McLemore is a licensed Tennessee auctioneer. He and his company, Plaintiff McLemore Auction Company, are thus authorized to conduct auctions in Tennessee and to advertise as and represent themselves to be auctioneers in Tennessee. PC 471 did not change that. McLemore and his company have not suffered an invasion of an interest protected by the First Amendment, because the alleged speech restrictions do not apply to them. They allege that they will be injured because, under the changes made by PC 471, they will be required to hire licensed auctioneers to replace their unlicensed employees and independent contractors. But that is not an injury stemming from any alleged violation of these Plaintiffs' free speech rights. The alleged violation of their employees' and independent contractors' free speech rights does not confer standing on these Plaintiffs to challenge PC 471 or any other auctioneering regulation under the First Amendment. McLemore and his company have thus failed to allege any injury to themselves that is fairly traceable to the challenged conduct of the defendants and that is likely to be redressed by a favorable judicial decision. For these reasons, the free speech claims of Plaintiffs Will McLemore and McLemore Auction Company should be dismissed for lack of standing.

Plaintiffs Aaron McKee and Purple Wave, Inc., do not conduct any auctions that originate from within Tennessee. Accordingly, the requirements of PC 471 do not apply to them. Since McKee and Purple Wave are unaffected by the changes made by PC 471, they have not suffered any injury that is fairly traceable to the challenged conduct of the defendants and that is

24

likely to be redressed by a favorable judicial decision.  For these reasons, the claims of Plaintiffs McKee and Purple Wave should be dismissed for lack of standing.

## <u>CONCLUSION</u>

For the reasons set forth above, Defendants respectfully submit that the Amended Complaint should be dismissed.  Thus, the Court should grant Defendants' motion in its entirety.

Respectfully Submitted,

HERBERT H. SLATERY III
Attorney General and Reporter

_____s/R. Mitchell Porcello_____
R. MITCHELL PORCELLO (#25055)
Senior Assistant Attorney General
Attorney General's Office – Tax Division
P.O. Box 20207
Nashville, TN 37202-0207
(615) 532-2547 *telephone*
(615) 532-2571 *fax*
Mitch.Porcello@ag.tn.gov
*Counsel for Defendants*

25

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing Memorandum has been served on the

following via the court's electronic filing system on December 4, 2019:

Braden H. Boucek (braden@beacontn.org)
David L. Harbin (da.harbin@comcast.net)
Meggan S. DeWitt (Meggan@beaconTN.org)
Beacon Center of Tennessee
201 4th Ave. N.
Suite 1820
P O Box 198646
Nashville, TN 37219
(615) 383-6431
Fax: (615) 383-6432
*Counsel for Plaintiffs*

       s/R. Mitchell Porcello