IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

WILL MCLEMORE, et al.,                    )
                                          )
         Plaintiffs,                      )
                                          )    No. 3:19-cv-00530
v.                                        )
                                          )    JUDGE RICHARDSON
ROXANA GUMUCIO, et al.,                   )
                                          )
         Defendants.                      )

## MEMORANDUM OPINION

Pending before the Court is Defendants' Motion to Dismiss. (Doc. No. 52, "Motion"). Via

the Motion, Defendants seek dismissal of Plaintiffs' Amended Complaint, arguing that "this Court

lacks subject matter jurisdiction over the Amended Complaint and the Amended Complaint fails

to state a claim upon which relief can be granted." (Doc. No. 52 at 1). The Court has considered

the Motion and its accompanying Memorandum of Law (Doc. No. 53), Plaintiffs' response in

opposition to the Motion, (Doc. No. 54, "Response"), Defendants' reply to the Response, (Doc.

No. 56), and the supplemental authority provided by Plaintiffs. (Doc. Nos. 70, 71).  For the reasons

discussed below, Defendants' Motion will be **DENIED in part and GRANTED in part**.

## BACKGROUND[1]

*I. Factual Background*

In 1967, Tennessee created the Tennessee Auction Commission ("the Commission") with

the goal of regulating the profession of auctioneering. (Doc. No. 50 at ¶ 54). In 2006, as e-

commerce began to emerge, Tennessee amended its auctioneering regulatory statutes and created

---

[1] The following facts are alleged in the Amended Complaint and accepted as true for purposes of the Motion to
Dismiss.

1

an exemption from the regulatory scheme for "fixed price or timed listings that allow bidding on an Internet website but that does not constitute a simulcast of a live auction." (*Id.* at ¶ 65 (citing Tenn. Code Ann. § 62-19-103(9)).

In 2016, the Commission proposed a rule that would have excluded extended-time auctions (*i.e.*, auctions whereby the ending time can be extended based on bidding activity) from such exemption. (*Id.* at ¶ 86). Tennessee's Joint Government Operations Committee rejected the proposed rule that would have licensed online auctions. (*Id.* at ¶ 95). In 2017, the Tennessee General Assembly considered a bill that would have required extended-time, but not fixed-time,[2] online auctions to be licensed. (*Id.* at ¶ 96). After that bill failed, the issue was again raised in 2018. (*Id.* at ¶¶ 104, 105). The 2018 bill was amended to create a Task Force to study the question of online auction regulation. (*Id.* at ¶ 114). The Task Force analyzed three years of complaint data which revealed very few complaints for online auctions in general (11 overall in three years) and even fewer for extended-time auctions—three overall and none in 2018. (*Id.* at ¶¶ 155-57). The Task Force then recommended, among other things, that "electronic" exchanges be added to the definition of an auction and further recommended that the term "timed listing" be defined, for purposes of the above-referenced exemption, as "offering goods for sale with a fixed ending time and date which does not extend based on bidding activity." (*Id.* at ¶¶ 158-160).

Consistent with this recommendation, a bill was introduced to amend Tennessee's statutes (codified at Tenn. Stat. Ann. § 62-19-101 *et seq.*) regulating auctions and the licensing requirements for those who conduct "auctions." (*Id.* at ¶ 162); 2019 Tenn. Pub. Ch. 471 (hereinafter "PC 471"). Specifically, as recommended by the Task Force, Section 4(2) of the bill

---

[2] A "fixed-time" auction is one planned so that the bidding necessarily ends at a specific time, with no possibility of the bidding time being extended

Case 3:19-cv-00530   Document 83   Filed 12/04/20   Page 2 of 44 PageID #: 1383

effectively amends the definition of "auction" contained at Tenn. Code Ann. § 62-19-101(2) to include "electronic" exchanges. (*Id*. at ¶ 181).[3] Also, Section 5(a)(1) of the bill essentially restated existing law (set forth in Tenn. Code Ann. § 62-19-102(a)(1)) in providing that it is unlawful for any person to "[a]ct as, advertise as, or represent to be an auctioneer without holding a valid license issued by the commission." (*Id*. at ¶ 185).[4] In addition, Section 4(12) of the bill further narrowed the exemption (*i.e.*, the exemption from otherwise applicable licensing requirements) for so-called "timed listings" that allow bidding on an Internet website; specifically, Section 4(12) carved out from this exemption extended-time auctions. (*Id*. at ¶ 187).

In addition, Section 6 of the bill effectively restated the exemptions (listed in in Tenn. Code. Ann. § 62-19-103) to the applicability of the entire statutory scheme (including, necessarily, its licensing requirements) set forth in Tenn. Code Ann. § 62-19-101 *et seq.* (*Id*. at ¶ 186).[5] Some exemptions are based on the kind of auction involved, while others were based on the identity of the party conducting the auction. These exemptions include, among others, "[a]n auction conducted by or under the direction of a governmental entity"; "[a]n auction conducted on behalf of a political party, church, or charitable corporation or association"; "[a]n auction conducted for the sale of livestock"; "an auction for the sale of tobacco"; "[a]ny fixed price or timed listings that allow bidding on an Internet website, but do not constitute a simulcast of a live auction"; "[a]n in person or simulcast auction whose primary business activity is selling nonrepairable or salvage

---

[3] The bill did so by deleting the old definition of "auction" and replacing it with a new definition identical to the old definition except that it inserted "oral, written, or electronic" where "oral or written" had been.

[4] The bill did so by replacing the existing version of Tenn. Code. Ann. § 62-19-102(a)(1), which was substantially identical to the bill's version except that it had referred not just to "auctioneer[s]," but also to "apprentice auctioneer[s] or firm[s]"—terms essentially phased out of the statutory lexicon via various sections of the bill, including Sections 7 and 15.

[5] The bill did so by substituting a new list of exemptions in place of the existing list of exemptions set forth in Tenn. Code. Ann. § 62-19-103, which was very similar (though not precisely identical) to the bill's list.

vehicles in this state"; and "[a]n individual who generates less than twenty-five thousand dollars ($25,000) in revenue a calendar year from the sale of property in online auctions." (*Id*.). As noted, these exemptions apply to the entire statutory scheme, meaning that they apply to the new general requirement that persons conducting extended-time auctions be licensed.

On May 24, 2019, Tennessee Governor Bill Lee signed PC 471 into law. (*Id*. at ¶ 179). The law was to go into effect on July 1, 2019. (*Id*. at ¶ 180).

Plaintiff McLemore Auctions Company, LLC ("McLemore Auction"), is a Tennessee limited liability company with a physical location in Nashville, Tennessee. (*Id*. at ¶ 7). Plaintiff Will McLemore is the president of McLemore Auction. (*Id*. at ¶ 6). McLemore Auction has operated, and plans to continue to operate, online extended-time auctions of real estate and personal property in Tennessee. (*Id*. at ¶¶ 22 & 29). McLemore Auction employs one full-time employee, Will McLemore, and four independent contractors—Blake Kimball, Wilson Land, Jamie Boyd, and Dwayne Smith—who act as McLemore's auction managers. (*Id*. at ¶ 23). Kimball and Boyd do not hold any license under Tennessee's auctioneer laws, and McLemore relies on these unlicensed auction managers to conduct the auctions on McLemore Auction's website. (*Id*. at ¶¶ 24, 28). McLemore Auction uses exclusively the extended-time auction format, whereby (as noted above) the time of the auction closing can be extended based on bidding activity. (*Id*. at ¶ 32). McLemore Auction generates, and anticipates that it will continue to generate, more than $25,000 in sales revenue per calendar year from the sale of goods or real estate through online auctions. (*Id*. at ¶ 53).

Plaintiff Purple Wave, Inc., is a privately held corporation, incorporated in Delaware and physically located in Manhattan, Kansas. (*Id*. at ¶ 9). Plaintiff Adam McKee is the president and CEO of Purple Wave. (*Id*. at ¶ 207). Via its website, Purple Wave conducts auctions of agricultural

and construction equipment as well as industrial, fleet, and government assets. (*Id*. at ¶ 209). Purple Wave's website uses an extended-time auction format and had 95 bidders in Tennessee in 2019, and had 12 buyers in Tennessee in 2019. (*Id*. at ¶¶ 226-27). No person employed by Purple Wave holds any license issued by the Tennessee Auctioneer Commission. (*Id*. at ¶ 216).

Plaintiff Interstate Auction Association (IAA) is an unincorporated association with members who are dedicated to online auctioneer freedom. (*Id*. at ¶ 10). It was organized by McLemore as a direct response to the proposed amendment; it is made up primarily of online auctioneers, both licensed and unlicensed. (*Id*.). Kimball, Land, and Boyd are members of the IAA. (*Id*. at ¶¶ 292-94).

## II. Procedural Background

On June 26, 2019, Plaintiffs filed a Complaint in this Court, asserting that the provisions of the amended statute that require licensure for extended-time online auctions violate their rights to free speech under the First Amendment and Fourteenth Amendment of the United States Constitution and Article I, Section 19 of the Tennessee Constitution; burden interstate commerce in violation of the Commerce Clause of the United States Constitution; and violate the Privileges or Immunities Clause of the United States Constitution. (*See* Doc. No. 4). On June 27, 2019 (four days prior to the law's effective date), Plaintiffs filed a Motion for Temporary Restraining Order and a Preliminary Injunction, which requested the Court to enjoin the State from enforcing its licensure regime on online websites. (Doc. No. 3). On June 28, 2019, the Court entered a temporary restraining order ("TRO") that enjoined the State from applying Tennessee's auctioneering laws and licenses to "electronic" exchanges, or online auction websites, or against Plaintiffs. (Doc. No. 14). On July 10, 2019, the Court held a hearing on Plaintiffs' motion for preliminary injunction. Thereafter, the Court granted Plaintiffs' motion for preliminary injunction, finding that Plaintiffs

were likely to succeed on the merits of their Dormant Commerce Clause claim, and that the other applicable preliminary injunction factors weighed in favor of granting Plaintiffs' requested relief. *See McLemore v. Gumucio*, No. 3:19-cv-00530, 2019 WL 3305131, at *13 (M.D. Tenn. July 23, 2019). Thus, the Court enjoined the State "from applying Tennessee's auctioneering laws and licenses to 'electronic' exchanges, or online auction websites, or against Plaintiffs pending further order of the Court." *Id*.

On November 20, 2019, Plaintiffs filed an Amended Complaint, asserting the same claims asserted in the Complaint but adding further factual allegations. On December 4, 2019, Defendants filed the instant Motion. In the Motion, Defendants argue that this Court lacks subject matter jurisdiction over the Amended Complaint and that the Amended Complaint fails to state a claim upon which relief can be granted.

The Court will explore Defendants' arguments in turn.

## LEGAL STANDARD

### I. *Rule 12(b)(1)*

When subject-matter jurisdiction is challenged pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure, the plaintiff has the burden of proving jurisdiction. *Moir v. Greater Cleveland Reg'l Transit Auth*., 895 F.2d 266, 269 (6th Cir. 1990) (citing *Rogers v. Stratton Industries, Inc.*, 798 F.2d 913, 915 (6th Cir. 1986)). Federal Rule of Civil Procedure 12(b)(1) motions to dismiss based upon subject matter jurisdiction generally come in two varieties: (1) a facial attack on subject matter jurisdiction; and (2) a factual attack on subject matter jurisdiction. *See Ohio Nat'l Life Ins. Co. v. United States*, 922 F.2d 320, 325 (6th Cir. 1990) (identifying the two types of 12(b)(1) motions to dismiss). Facial attacks on subject matter jurisdiction "merely question the sufficiency of the pleading." *Id*. A facial attack on subject matter jurisdiction is

6

reviewed under the same standard as a 12(b)(6) motion to dismiss. *Id*. In a factual attack on subject matter jurisdiction, a court "must . . . weigh the conflicting evidence to arrive at the factual predicate that subject matter jurisdiction exists or does not exist." *Id*. Here, Defendants challenge the sufficiency of the pleadings and do not contest the facts, so their attack is a facial attack.

II. *Rule 12(b)(6)*

For purposes of a motion to dismiss brought pursuant to Rule 12(b)(6), the Court must view all the factual allegations in the complaint as true. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). To survive a motion to dismiss brought pursuant to Rule 12(b)(6), a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. *Id*. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id*. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice. *Id*. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief. *Id*. at 679. A legal conclusion, including one couched as a factual allegation, need not be accepted as true on a motion to dismiss, nor are mere recitations of the elements of a cause of action sufficient. *Id*. at 678; *Fritz v. Charter Twp. of Comstock*, 592 F.3d 718, 722 (6th Cir. 2010); *Abriq v. Hall*, 295 F. Supp. 3d 874, 877 (M.D. Tenn. 2018). Moreover, factual allegations that are merely *consistent* with the defendant's liability do not satisfy the claimant's burden, as mere consistency does not establish *plausibility* of entitlement to relief even if it supports the *possibility* of relief. *Iqbal*, 556 U.S. at 678.

In determining whether a complaint is sufficient under the standards of *Iqbal* and its predecessor and complementary case, *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), it may

7

be appropriate to "begin [the] analysis by identifying the allegations in the complaint that are not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 680. Identifying and setting aside such allegations is crucial, because they simply do not count toward the plaintiff's goal of showing plausibility of entitlement to relief. As suggested above, such allegations include "bare assertions," formulaic recitation of the elements, and "conclusory" or "bald" allegations. *Id*. at 681. The question is whether the remaining allegations—factual allegations, *i.e.*, allegations of factual matter—plausibly suggest an entitlement to relief. *Id*. If not, the pleading fails to meet the standard of Fed. R. Civ. P. 8 and thus must be dismissed pursuant to Rule 12(b)(6). *Id*. at 683.

## ANALYSIS

### I. *Standing*

Defendants argue that this Court should dismiss Plaintiffs' claims for lack of standing pursuant to Rule 12(b)(1). (Doc. No. 53 at 1, 23-25). "A motion to dismiss for lack of Article III standing challenges the subject-matter jurisdiction of a federal court and, accordingly, is properly brought under Fed. R. Civ. P. 12(b)(1)." *SM Kids, LLC v. Google, LLC*, 963 F.3d 206, 210 (2d Cir. 2020).

Federal courts are courts of limited jurisdiction. *Doe v. Byrd*, No. 1:18-cv-00084, 2020 WL 1285428, at *3 (M.D. Tenn. Mar. 18, 2020) ("*Byrd*"). Article III of the Constitution limits the judicial power of the United States to resolution of "cases" and "controversies," and Article III standing enforces the Constitution's case-or-controversy requirement. *Nemes v. Bensinger*, ---F. Supp. 3d.---, No. 3:20-CV-407-CRS, 2020 WL 3402345, at *7 (W.D. Ky. June 18, 2020) (citing *Hein v. Freedom From Religion Found., Inc.*, 551 U.S. 587, 597-98 (2007)). In essence, the standing doctrine prompts courts to inquire whether the plaintiff has alleged such a personal stake in the outcome of the controversy as to warrant his invocation of federal-court jurisdiction and to

8

justify exercise of the court's remedial powers on his behalf. *Id.* (citing *McKay v. Federspiel*, 823 F.3d 862, 866-67 (6th Cir. 2016)). Because standing is an essential component of federal subject-matter jurisdiction, the lack of standing can be raised at any time by a party or by the court. *Miller v. Hughs*, ---F. Supp. 3d---, 1:19-CV-1071-LY, 2020 WL 4187911, at *4 (W.D. Tex. July 10, 2020).

Thus, standing is a threshold issue in every federal case. *Ficarelli v. Champion Petfoods USA, Inc.*, No. 3:18-cv-00361, 2018 WL 6832075, at *4 (M.D. Tenn. Dec. 28, 2018). The party invoking the court's jurisdiction bears the burden of establishing the elements of standing. *Nelson v. Warner*, ---F.Supp.3d---, No. 3:19-0898, 2020 WL 4004224, at *2 (S.D.W. Va. July 15, 2020); *PHI Air Medical, LLC v. Tenn. Dep't of Labor and Workforce Dev.*, No. 3:18-cv-0347, 2018 WL 6727111, at *3 (M.D. Tenn. Dec. 21, 2018). Where a case is at the pleading stage, the plaintiff must clearly allege facts demonstrating each element of standing. *See Ficarelli*, 2018 WL 6832075, at *4; *Déjà Vu of Nashville, Inc. v. Metro. Gov't of Nashville*, 360 F. Supp. 3d 714, 724 (M.D. Tenn. 2019).

To satisfy Article III's standing requirements, a plaintiff must show: (1) he or she has suffered an "injury-in-fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. *Byrd*, 2020 WL 1285428, at *2. The Supreme Court has emphasized that the requirement that an injury-in-fact be "concrete and particularized" encompasses two distinct requirements. *Ficarelli*, 2018 WL 6832075, at * 4 (citing *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1548 (2016)). For an injury to be "particularized," it must affect the plaintiff in a personal and individual way. *Id.* To be "concrete," an injury must be de facto; that is, it must actually exist. *Id.*

"Unless an alleged injury satisfies both requirements, it cannot give rise to standing under Article III." *Id*.

Although Defendants assert throughout their Motion that Plaintiffs' Amended Complaint in its entirety should be dismissed for lack of standing, Defendants are really challenging only certain Plaintiffs' standing to bring certain claims. Specifically, Defendants argue that because Will McLemore is a licensed Tennessee auctioneer, "he and his company, Plaintiff McLemore Auction Company, are thus authorized to conduct auctions in Tennessee" and therefore do not violate PC 471. (Doc. No. 53 at 24). McLemore claims that he and his company will be harmed because "they will be required to hire licensed auctioneers to replace their unlicensed employees and independent contractors," however, Defendants argue that this injury does not stem from any alleged violation of McLemore, or his company's, free speech rights. (*Id*.). Thus, Defendants assert that "the free speech claims of Plaintiffs Will McLemore and McLemore Auction Company should be dismissed for lack of standing" because "McLemore and his company have [] failed to allege any injury to themselves that is fairly traceable to the challenged conduct of the defendants and that is likely to be redressed by a favorable decision." (*Id*.).

Additionally, Defendants argue that the requirements of PC 471 do not apply to Plaintiffs Aaron McKee and Purple Wave, Inc., because they do not conduct any auctions that originate from within Tennessee. (*Id*.). Thus, Defendants assert that Plaintiffs Aaron McKee and Purple Wave, Inc., do not have standing to challenge the statute on any grounds, and both of these Plaintiffs should both be dismissed for lack of standing. (*Id*.).

In Response, Plaintiffs argue that even under Defendant's own logic, standing still exists in this case for every Plaintiff, because Defendants "overlook" the "one plaintiff rule." (Doc. No. 54 at 3). Thus, Plaintiffs argue that even assuming (which it contests) that McLemore and his

company's free speech rights are not injured by PC 471, the IAA includes unlicensed members

who Defendants concede do suffer an injury. As Plaintiffs explain it:

> the IAA includes members who meet even [Defendants'] flawed standard. By the state's reasoning, McLemore is not injured because he already had an auction license, and thus is not injured by including online auctions. (Doc. No. 53 at 24). That logic acknowledges that imposing the licensing requirement on unlicensed people is an injury. That should end things. Will's auction' managers, Blake and Jamie, do not have licenses, but would need one. ([Doc. No. 50] at ¶ 24). PC 471 already caused another manger, Wilson, to get license[d]. (*Id.* at ¶ 269A). All 3 are members of the IAA, a plaintiff. (*Id.* at ¶ 206). Will is not asserting their injuries. The IAA is. It has organization standing to assert the injuries of its members. *See Hunt v. Was. State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977) (associations can sue on behalf of members). This, in turn, confers standing on all plaintiffs under the "one plaintiff rule," which the state overlooks. *See Rumsfeld v. Forum for Academic & Institutional Rights, Inc.*, 547 U.S. 47, 52 n.2 (2006) (One party with standing is sufficient to satisfy Article III); *Texas v. United States*, 809 F.3d 134, 151 (5th Cir. 2015) (same); *Liberty Legal Found. v. Nat'l Democratic Party of the USA, Inc.*, 875 F. Supp. 2d 791, 800 (W.D. Tenn. 2012). The state implicitly concedes the Complaint is sufficient.

(*Id.* at 3).

In Reply, Defendants indeed concede that "Plaintiff IAA appear to have sufficiently alleged

standing." (Doc. No. 56 at 5). Despite this concession, Defendants stick to their proverbial guns

and assert that "the claims of the other named Plaintiffs must be dismissed for lack of standing"

because "IAA's standing may not be imputed to the other named Plaintiffs." (*Id.* (citing *Liberty*

*Legal Found.*, 875 F. Supp. 2d at 800)).

This Court recently addressed the "one plaintiff rule" in a case involving challenges to

certain Tennessee election laws. *See Memphis A. Phillip Randolph Inst. v. Hargett*, ---F. Supp. 3d-

--, No. 3:20-CV-00374, 2020 WL 5412126, at *11 (M.D. Tenn. Sept. 9, 2020). In *Hargett*, the

Court explained:

> "For a legal dispute to qualify as a genuine case or controversy, at least one plaintiff must have standing to sue." *Nelson*, ––– F. Supp. 3d at ––––, 2020 WL 4004224, at *2 (citing *Dep't of Commerce v. New York*, ––– U.S. ––––, 139 S. Ct. 2551, 2565, 204 L.Ed.2d 978 (2019)); *People First of Alabama v. Merrill*, ––– F.

Supp. 3d ——, ——, 2020 WL 3207824, at *6 (N.D. Ala. June 15, 2020) (explaining that if there is one plaintiff who has demonstrated standing to assert the implicated rights as his own, the court need not consider whether the other individual and corporate plaintiffs have standing to maintain the suit). When one party has standing to bring a claim, the identical claims brought by other parties to the same lawsuit are justiciable. *See Northeast Ohio Coal. for the Homeless v. Husted*, 837 F.3d 612, 623 (6th Cir. 2016).

*Id.* Thus, the Court may proceed to the merits of a claim as long as one plaintiff has standing to bring that claim.

As noted, Defendants cite *Liberty Legal Foundation* for the proposition that "IAA's standing may not be imputed to other named Plaintiffs." (Doc. No. 56 at 6 (citing *Liberty Legal Found.*, 875 F. Supp. 2d at 791)). The Court agrees with the proposition that one plaintiff's standing may not be imputed to other plaintiffs, however, Defendants misconstrue the significance of this proposition. In *Liberty Legal Foundation*, the Court explained

> As an initial matter, Plaintiffs posit that "[b]ecause Plaintiff Dummett has standing, all other Plaintiffs in the instant case, including Liberty Legal Foundation, also have standing." The Court finds that Plaintiffs' theory actually misstates the law. The Supreme Court has held that "the presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement." [*Rumsfeld*, 547 U.S. at 52 n.2] Therefore, Plaintiffs must allege specific facts to show that at least one named Plaintiff has standing to bring these claims. One Plaintiff's standing, however, is not imputed to other named Plaintiffs who lack standing.

*Liberty Legal Found.*, 875 F. Supp. 2d at 799-800. In sum, as explained in *Liberty Legal Foundation*, Defendants are correct that the presence of one plaintiff with standing to bring a claim does not result in standing for all plaintiffs to assert that claim. But this does not matter. The presence of someone with standing to assert a claim is enough for a court to proceed to the merits of a claim, even though one or more other plaintiffs may not have standing to assert that claim. And, contrary to Defendants' assertion, the lack of standing for the other plaintiffs does not mean that their claims should be dismissed; rather, as indicated above, "when one party has standing to bring a claim, the identical claims brought by other parties to the same lawsuit are justiciable." *See*

12

*Northeast Ohio Coal. for the Homeless*, 837 F.3d at 623. That is to say, in this circuit at least, where one plaintiff has standing, the identical claims brought by the plaintiffs that do not have standing may proceed—even though they are not deemed to have imputed the one plaintiff's standing. In short, the notion of imputation of standing has nothing to do with it; the other plaintiffs may proceed irrespective of whether they have *any* standing of their own, imputed or otherwise.

In *Priorities USA v. Benson*, 448 F. Supp. 3d 755 (E.D. Mich. 2020), the court explained that the "reasoning behind this principle is preservation of judicial resources." *Id.* at 761-62. In that case, the court proceeded to the merits of the case after determining that one party had standing, even though another party's standing was debatable, because "a complete analysis [of the standing issue of the remaining plaintiffs] would expend valuable time and resources, but would have no effect on the significant and immediate issues presented in this litigation." *Id.* The Court will do the same here. The Court finds, and Defendants concede, that at least one plaintiff— the IAA—has standing to assert each of the claims brought in this lawsuit.

An organization may assert standing "on its own behalf, on behalf of its members or both." *Capital Area Immigrants' Rights Coalition v. Trump*, ---F. Supp. 3d---, 2020 WL 3542481, at *6 (D.D.C. June 30, 2020) (quoting *Equal Rights Ctr. v. Post Props., Inc.*, 633 F.3d 1136, 1138 (D.C. Cir. 2011)). Thus, an organization can assert standing in one or both of two ways: (1) on its own behalf because it has suffered a palpable injury as a result of the defendants' actions ("organizational standing"); and (2) as a representative of its members who would have standing to sue individually ("associational standing"). *Shelby Cty. Advocates for Valid Elections v. Hargett*, No. 2:18-cv-02706, 2019 WL 4394754, at *5 (W.D. Tenn. Sept. 13, 2019). The Court herein focuses on associational standing.

13

To establish associational standing (to bring suit on behalf of its members), an association must demonstrate that: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit. *Daunt v. Benson*, 956 F.3d 396, 417 (6th Cir. 2020); *Greater Birmingham Ministries v. Sec'y of State for Alabama*, 966 F.3d 1202, 1219-20 (11th Cir. 2020); *Ohio Valley Envtl. Coal. v. Bluestone Coal Corp.*, No. CV 1:19-00576, 2020 WL 4284804, at *4 (S.D.W. Va. July 27, 2020).

To show that at least one of its members would otherwise have standing to sue, an organizational plaintiff must show (1) that one of its members has an injury that is concrete and particularized and actual or imminent; (2) that the injury is fairly traceable to the challenged action of the Defendants; and (3) a likelihood that the injury will be redressed by a favorable decision. *Byrd*, 2020 WL 1285428, at *5.

All requisites necessary to provide associational standing for IAA are met in this case. McLemore's employees—Blake and Jamie—are both members of the IAA. (Doc. No. 50 at ¶ 294). Both are unlicensed and PC 471 would require both to have a license to continue operating online auctions, which Plaintiffs allege is a violation of the Dormant Commerce Clause, the First Amendment, and the Privileges and Immunities Clause. Thus, Plaintiffs have alleged (and Defendants concede) that Blake and Jamie have suffered an injury that is fairly traceable to PC 471. Further, if the Court were to declare PC 471 unconstitutional, this ruling would favorably redress Blake and Jamie's injury. Thus, Blake and Jamie both have standing in their own right.

Moreover, the organizational purpose of the IAA, among other things, is to protect the constitutional right to earn a living as an auctioneer. (*Id*. at ¶ 205). And because Plaintiffs seek only declaratory and injunctive relief, the individual members of the IAA (including Blake and

Jamie) are not required to participate herein. Accordingly, the IAA has standing to assert each claim, the Court may accordingly proceed to the merits, and the other plaintiffs may remain in the case as well.

II. *Rule 12(b)(6) Challenge – Dormant Commerce Clause*

Defendants argue that Plaintiffs' Dormant Commerce claim (denominated "Claim Two" in the Amended Complaint) should be dismissed because (according to Defendants) Plaintiffs have failed to allege a claim upon which relief can be granted.

The Commerce Clause provides the United State Congress a vehicle with which to regulate aspects of interstate commerce. *See* U.S. Const. art. I, § 8, cl. 3. Congress has the authority to regulate the channels and instrumentalities of interstate commerce as well as economic activities that have a substantial effect on interstate commerce. *See, e.g., Hodel v. Virginia Surface Min. & Reclamation Ass'n, Inc.*, 452 U.S. 264, 275-77 (1981); *Perez v. United States*, 402 U.S. 146, 150-52 (1971). The Tenth Amendment to the United States Constitution states that all powers not granted to the United States, nor prohibited to the states, are reserved to the states or the people; it thus acts as a limitation on Congressional power. *See* U.S. Const. amend. X; *S. Pac. Co. v. Arizona ex rel. Sullivan*, 325 U.S. 761, 767 (1945) ("[I]n the absence of conflicting legislation by Congress, there is a residuum of power in the state to make laws governing matters of local concern which nevertheless in some measure affect interstate commerce or even, to some extent, regulate it.").

Nevertheless, a state or local law may be held unconstitutional if it places an undue burden on interstate commerce. *See C & A Carbone, Inc. v. Town of Clarkstown*, 511 U.S. 383, 390 (1994). Courts have long held that the Commerce Clause "limits the power of the [s]tates to erect barriers against interstate trade." *Dennis v. Higgins*, 498 U.S. 439, 446 (1991) (quoting *Lewis v. BT Inv. Managers, Inc.*, 447 U.S. 27, 35 (1980)). The doctrine analyzed below, the Dormant Commerce

15

Clause (also known as the "negative" Commerce Clause), has been inferred by the Supreme Court to represent the negative implications—the above-referenced negating (or at least limitation) of states' power—of the Commerce Clause. *See, e.g., Wickard v. Filburn*, 317 U.S. 111, 123–24 (1942). The doctrine has its critics, but it remains good law. As the Supreme Court noted last year in a case involving a different Tennessee law:

> In recent years, some Members of the Court have authored vigorous and thoughtful critiques of this interpretation. But the proposition that the Commerce Clause by its own force restricts state protectionism is deeply rooted in our case law. And without the dormant Commerce Clause, we would be left with a constitutional scheme that those who framed and ratified the Constitution would surely find surprising.
>
> That is so because removing state trade barriers was a principal reason for the adoption of the Constitution.

*Tennessee Wine & Spirits Retailers Ass'n v. Thomas*, 139 S. Ct. 2449, 2460 (2019) (citations omitted).

The Sixth Circuit has adopted a two-step analysis to evaluate challenges based on the Dormant Commerce Clause. *Am. Beverage Ass'n v. Snyder*, 735 F.3d 362, 370-71 (6th Cir. 2013) (citing *Int'l Dairy Foods Ass'n v. Boggs*, 622 F.3d 628, 644 (6th Cir. 2010)). First, the court must determine whether the state regulation is *per se* invalid. *Int'l Dairy Foods Ass'n*, 622 F.3d at 645. "[A] state regulation is 'virtually *per se* invalid' if it is *either* extraterritorial or discriminatory in effect." *Id*. A state statute is discriminatory if it "directly regulates or discriminates against interstate commerce, or [whether] its effect is to favor in-state economic interests over out-of-state interests." *Snyder*, 735 F.3d at 370-71 (quoting *Int'l Dairy Foods Ass'n*, 622 F.3d at 644) (brackets in original). "A [state regulation] can discriminate against out-of-state interests in three different ways: (a) facially, (b) purposefully, or (c) in practical effect." *Id*. (quoting *Int'l Dairy Foods Ass'n*, 622 F.3d at 648). The plaintiff bears the initial burden of proof to show that the state regulation is

16

discriminatory. *Id*. "If the plaintiff satisfies its burden, then 'a discriminatory law is virtually *per se* invalid and will survive only if it advances a legitimate local purpose that cannot be adequately served by reasonable nondiscriminatory alternatives.'"[6] *Id*. (citation omitted).

A statute is a *per se* violation the Dormant Commerce Clause alternatively, as indicated above, if it constitutes a direct regulation of interstate conduct (*i.e.*, controls extraterritorial conduct). *See Int'l Dairy Foods Ass'n*, 622 F.3d at 645. This is because "a statute that directly controls commerce occurring wholly outside the boundaries of a State exceeds the inherent limits of the enacting State's authority." *Healy v. Beer Inst., Inc.*, 491 U.S. 324, 336 (1989). "Most critical to this inquiry is the issue of 'whether the practical effect of the regulation is to control conduct beyond the boundaries of the State.'" *Int'l Dairy Foods Ass'n*, 622 F.3d at 645 (quoting *Healy*, 491 U.S. at 337). "Circuits outside the Sixth Circuit have recognized that, '[b]ecause the [I]nternet does not recognize geographic boundaries, it is difficult, if not impossible, for a state to regulate Internet activities without project[ing] its legislation into other States.'" *Backpage.com, LLC v. Cooper*, 939 F. Supp. 2d 805, 841 (M.D. Tenn. 2013) (quoting *Am. Booksellers Found. v. Dean*, 342 F.3d 96, 103 (2d Cir. 2003)). If a "statute has an impermissible extraterritorial effect, [a court has] no need to consider whether the state has some legitimate local purpose or whether there is a reasonable nondiscriminatory alternative." *Snyder*, 735 F.3d at 376.[7]

---

[6] Here, the law is not discriminatory to out-of-state actors, as it requires in-state auctioneers, to the same extent as out-of-state auctioneers, to obtain a license before conducting an extended-time online auction.

[7] It bears mentioning what it means to say that a statute (or other regulation) has an "impermissible extraterritorial effect." The Sixth Circuit has indicated that it means that the regulation regulates extraterritorial conduct occurring wholly outside of the state. *See Int'l Dairy Foods Ass'n*, 622 F.3d at 645 (describing). It also bears mentioning that there does not appear to be such thing as an "extraterritorial effect" that is permissible under the Dormant Commerce Clause; an "extraterritorial effect" is always impermissible under the Dormant Commerce Clause. Thus, the word "impermissible" in the phrase "impermissible extraterritorial effect" appears to be superfluous in this context. The upshot is that the issue in this context is whether there is an extraterritorial effect, and not whether there is an extraterritorial effect that is impermissible rather than permissible.

17

Second, "[w]hen a state regulation is neither extraterritorial nor discriminates against out-of-state actors, it may still violate the Commerce Clause if its burden on interstate commerce is 'clearly excessive in relation to the putative local benefits.'" *Id.* (quoting *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970)) Under this balancing test (known as the *Pike* balancing test):

> If a legitimate local purpose is found, then the question becomes one of degree. And the extent of the burden that will be tolerated will of course depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities.

*Id.* (citing *Pike*, 397 U.S. at 142).

As discussed above, this Court previously granted Plaintiff's motion for a preliminary injunction and thus preliminarily enjoined enforcement of PC 471, based partly on the finding that Plaintiffs' were likely to succeed on the merits of their Dormant Commerce Clause claim. In litigating the motion for preliminary injunction, the respective sides offered (as they also do here) very different interpretations of the scope of PC 471's geographical reach. Plaintiffs interpret the statute broadly, arguing that the statutory language regarding the licensing of online auctioneers contains no qualifications or geographical limitations. Thus, as before, Plaintiffs assert that PC 471 imposes a licensing requirement on any auctioneer who conducts online extended-time auctions in which a Tennessee resident may bid—[8]which, in the context of online auctions, apparently is

---

[8] Plaintiffs thus seem to assume that enforcement of PC 471's licensing requirement to auctioneers who conduct extended online auctions would be limited to auctioneers who conduct auctions in which a Tennessee resident bids. One may wonder why Plaintiffs would concede a geographic limitation in this sense, since (1) Plaintiffs' general argument is that PC 471 embodies no geographic limitations whatsoever, and, consistent with Plaintiffs' general argument (2) it is readily apparent that nothing in the text of PC 471 would limit its licensing requirement to auctions in which a Tennessee resident bids. Perhaps this is because Plaintiffs assume that even without any textual geographic limitations, PC 471 is not something state enforcement officials would seek to enforce against auctioneers who could not be deemed to conduct auctions in Tennessee *unless* the auctions had at least one Tennessee bidder. In other words, perhaps Plaintiffs assume that, however zealous state enforcement officials might be, they would not seek to enforce the licensing requirement against auctioneers whose auctions lack contacts with Tennessee beyond the mere fact that the Internet is accessible in Tennessee; in these circumstances, Plaintiffs imply, these officials would at least require the presence of a Tennessee bidder in an auctioneer's online extended auctions before requiring the auctioneer to be licensed. The Court understands why Plaintiffs would make this assumption about how, as a practical matter, the

18

virtually every auction. *Id*. at *4. By contrast, as before, Defendants interpret the statute narrowly, arguing that PC 471 imposes a licensing requirement only on auctioneers who conduct extended-time online auctions while physically located in Tennessee. In its analysis on the motion for a preliminary injunction, noting that the likelihood of success of Plaintiffs' Dormant Commerce Clause claim turned on the statutory interpretation of PC 471, the Court first interpreted the statute. *Id*.

The Court considered the parties' arguments and held as follows:

> As noted above, under Tennessee law, when statutory language is unambiguous the Court should derive legislative intent from the plain and ordinary meaning of the statutory language. *Freeman*, 27 S.W.3d at 911. The statute states that "it is unlawful for a person to [a]ct as, advertise as, or represent to be an auctioneer without holding a valid license issued by the commission." Tenn. Code Ann. § 62-19-102(a)(1). This statutory licensing requirement by its terms contains no qualifications, no geographical limitations, and no explanation of what it means to "act as, advertise as, or represent to be an auctioneer" in the context of online auctions, and the Court declines to write such an explanation or qualification into the statutory language where it simply does not exist. *See United States v. M/V Big Sam*, 693 F.2d 451, 455 (5th Cir. 1982) ("[I]t is simply not part of our function as judges to re-write, in the guise of statutory construction, unambiguous statutory language in order to cure what to us seems to be statutory deficiencies."). Further, the State has not identified any legislative history to support its purported interpretation of the statute as including "in this state." *Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 108 (1980) ("Absent a clearly expressed legislative intention to the contrary, that language must ordinarily be regarded as conclusive."). In short, the Court will not geographically limit the licensure requirement to online auctioneers and auctions "in this state [Tennessee]."

> Even if the Court were inclined to read into the statute this geographical limitation, it would not necessarily entail what the State, in an effort to surmount the Dormant Commerce Clause challenge, is claiming it would entail. That is, if inserted as the State would have it, "in this state" would not carry the limited meaning suggested by the State. The Court finds that the phrase "act[ing] as, advertis[ing] as, or represent[ing] to be an [online] auctioneer [in this state]" does not necessarily and unambiguously exclude such acting, advertising, or representing by a person not physically present in the State. *See Wallace*, 546

---

licensing requirement likely would be enforced in this context, but it bears mentioning that there is actually nothing in the statute that would limit enforcement to auctions *actually* involving Tennessee bidders, as opposed to auctions merely *accessible* to *potential* bidders in Tennessee.

S.W.3d at 53 (statutory language will be considered "ambiguous when it is subject to differing interpretations which yield contrary results."). For example, in the Court's view, if an auctioneer is physically present in Alaska and initiates an extended-time online auction from there, he might reasonably be construed as representing himself to be an auctioneer "in" Tennessee, given that his website would reach Tennessee residents. Thus, arguably per the statute's language (supplemented with "in this state"), this hypothetical auctioneer would be required to be licensed as an auctioneer by the State of Tennessee or face civil penalties.

At the hearing, the State was not clear, and in fact equivocated, on the meaning of "in this state" in the context of the online auctions. The Court asked the State: "[I]f people that are quote not in this state end quote are exempted from this licensure requirement, who qualifies as not being quote in this state? So for example . . . if you're [] based [in] Mississippi, are you necessarily not quote in this state automatically or does it depend on whether you reach out to Tennessee consumers? Does it depend on whether you consummate sales transactions with Tennessee consumers? How do we define what is quote not in this state." (Tr. 57:5-17) (emphasis added). Conceding that the "Internet makes it trickier", the State responded: "With an auction conducted in Tennessee, generally I think that's *probably* going to be yes, the auctioneer, the business, that is conducting the auction is located in Tennessee." (Tr. 58:8-11).

The Court then asked "[S]o for online, does that mean . . . if you're . . . [a] Mississippi auctioneer and . . . you're traveling and you spend the night in Memphis and you click a couple buttons as part of your auctioning, does that make you in state in connection with that auction business?" The State responded: "It does not *seem* that it would. Certainly, the Dormant Commerce Clause has protections. Substantial nexus is required. Merely passing through Tennessee *probably* wouldn't be sufficient. If the auctioneering business is located in Mississippi, that's *probably* Mississippi's jurisdiction to regulate or not regulate." (Tr. 58:25-57:6) (emphasis added). Despite the State's guesswork as to what the statutory language would mean if supplemented with "in this state," the State did not point to any case law, language from elsewhere in the statutory scheme, or indeed anything else to support its strict construction of the phrase in this context. Nor did the State provide any legislative history that clarified that the licensing requirement would affect only auctioneers physically located in Tennessee. *See Wallace*, 546 S.W.3d at 53 ("When . . . a statute is ambiguous" a court should consider external sources to ascertain legislative intent, including "the broader statutory scheme, the history and purpose of the legislation, public policy, historical facts preceding or contemporaneous with the enactment of the statute, and legislative history."). By urging the Court to read the licensing statute (as supplemented with "in this state") as limiting online extended-time auctioneer licensing only to auctioneers physically present in Tennessee, the State puts the Court in the position of having to draw a line that is not really there. *See M/V Big Sam*, 693 F.2d at 455; s*ee also Backpage.com*, 939 F. Supp. 2d at 844 ("[A] legislature must make the narrow geographic scope of its law explicit to stay within the confines of the Dormant

Commerce Clause when regulating Internet activity."). In short, for purposes of the instant motion, the Court can say that its likely final interpretation will be that the licensing statute, with or without the inclusion of "in this state," applies to at least a substantial amount of out-of-state conduct.

Accordingly, the Court will adopt the Plaintiffs' suggested interpretation of the statutory language and finds that because the statute contains no qualifications or geographical limitations, the new law likely imposes a licensing requirement on any auctioneer who conducts online extended-time auctions, from wherever the auctioneer may be located, in which a Tennessee resident may potentially bid.

*Id.* at *6-7.

After adopting a broad interpretation of the statute, the Court found that PC 471 would likely regulate conduct occurring wholly outside of Tennessee (*i.e.*, extraterritorial conduct), and was therefore was likely a *per se* violation of the Dormant Commerce Clause. The Court explained:

the law as written and interpreted by the Court requires a Tennessee license whenever anyone "[a]ct[s] as, advertise[s] as, or represent[s]" to be an auctioneer even if the auctioneer and the products being auctioned are "wholly outside of the State's borders." *Healy*, 491 U.S. at 336. In the context of online auctions, the mere existence of an online auction website results, in the most probable correct interpretation of the statutory language, in the auctioneer "represent[ing]" to be an online auctioneer in Tennessee because Tennessee residents will have access to the website even if the physical location of the auctioneer is outside of the state. Further, if a Tennessee resident wins (or even merely bids in) an online auction, the online auctioneer likely is properly deemed to be "act[ing]" as an auctioneer in Tennessee. Such likely interpretation would subject the auctioneer to regulation by Tennessee authorities that would be impermissible under the Commerce Clause. *See id.* at 337 ("[T]he Commerce Clause dictates that no State may force an out-of-state merchant to seek regulatory approval in one State before undertaking a transaction in another.") (citing *Brown–Forman*, 476 U.S. at 582); *Berman v. City of New York*, No. 09CV3017ENVCLP, 2012 WL 13041996, at *18 (E.D.N.Y. Oct. 3, 2012) ("[T]he in-state presence of one party to the transaction cannot be used as justification [for the state] to regulate the other party[.]") (citing *A.S. Goldmen & Co. v. N.J. Bureau of Sec.*, 163 F.3d 780, 782-83 (3d Cir. 1999)).

*Id.* at *8.

Accordingly, the viability of Plaintiffs' Dormant Commerce Clause claim hinges on a question of statutory interpretation—*i.e.*, whether PC 471 has an extraterritorial effect. In the Motion, Defendants take another stab at convincing this Court that PC 471 as drafted does not

have an extraterritorial effect. For the first time, Defendants point to a Tennessee Rule and Regulation 0160-08-.18 ("Rule 18") adopted by the Auctioneer Commission in 2001 that is titled "Electronic Media Auction License Requirement" and provides, "Any electronic media or computer-generated auction *originating from within Tennessee* shall conform to the requirements of Tennessee Code Annotated, Title 62, Chapter 19, et seq. (Auctioneer Licensing Law) and the Rules of the Tennessee Auctioneer Commission." (Doc. No. 53 at 7 (citing Rule 18)) (emphasis added). Defendants contend that "the addition of the word 'electronic' by PC 471 merely confirms this longstanding rule" and "explains what the Auctioneer Commission deems to be an auction 'in this State' and makes crystal clear that Tennessee's licensing requirement applies only to auctions 'originating from within Tennessee.'" (*Id*.).

In light of Rule 18, Defendants contend that "[c]onstruing the prohibition against '[a]ct[ing] as, advertis[ing] as, or represent[ing] to be an auctioneer without holding a valid license issued by the commission,' PC 471, § 5(a)(1), to apply extraterritorially is a forced reading that ignores that the Commission's authority is limited to issuing licenses that grant the privilege to conduct auctions only in this State." (*Id*. at 8). Thus, Defendants argue that the "statute thus prohibits acting as, advertising as, or representing to be a Tennessee auctioneer without the required license." (*Id*.). Accordingly, Defendants contend that "there is no threat of a commerce clause violation" because "[a]uctioneers located outside of Tennessee have no need of a Tennessee license, even if Tennessee residents can bid on items they offer online." (*Id*.).

When construing a Tennessee statute, the court must adhere to the rules of construction employed by the courts of Tennessee. *See First Choice Chiropractic, LLC v. DeWine*, 969 F.3d 675, 680 (6th Cir. 2020) (applying Ohio rules of statutory construction when interpreting Ohio statute that had been challenged on First Amendment grounds); *see also England v. Suzuki Motor*

*Corp.*, 521 F. Supp. 2d 707, 708 (E.D. Tenn. 2007) (applying Tennessee rules of statutory construction in interpreting a Tennessee statute). In construing statutes, Tennessee law provides that "the most basic principle of statutory construction is to ascertain and give effect to the legislative intent without unduly restricting or expanding a statute's coverage beyond its intended scope." *State v. Howard*, 504 S.W.3d 260, 269 (Tenn. 2016) (quoting *Owens v. State*, 908 S.W.2d 923, 926 (Tenn. 1995)). Courts are to avoid a construction that leads to absurd results. *Tennessean v. Metro. Gov't of Nashville*, 485 S.W.3d 857, 872 (Tenn. 2016) (citing *Lee Med., Inc. v. Beecher*, 312 S.W.3d 515, 527 (Tenn. 2010)).

"When statutory language is clear and unambiguous, we must apply its plain meaning in its normal and accepted use, without a forced interpretation that would extend the meaning of the language . . . ." *Carter v. Bell*, 279 S.W.3d 560, 564 (Tenn. 2009) (citation omitted). If a statute is ambiguous, the Court "'may reference the broader statutory scheme, the history of the legislation, or other sources' to determine the statute's meaning." *Frazier v. State*, 495 S.W.3d 246, 252 (Tenn. 2016) (citation omitted). A statute is ambiguous when "the parties derive different interpretations from the statutory language." *Howard*, 504 S.W.3d at 270 (quoting *Owens*, 908 S.W.2d at 926).

> However, this proposition does not mean that an ambiguity exists merely because the parties proffer different interpretations of a statute. A party cannot create an ambiguity by presenting a nonsensical or clearly erroneous interpretation of a statute. In other words, both interpretations must be reasonable in order for an ambiguity to exist.

*Frazier*, 495 S.W.3d at 252 (quoting *Powers v. State*, 343 S.W.3d 36, 50 n.20 (Tenn. 2011)) (internal quotation marks omitted); *see also Steppach v. Thomas*, 346 S.W.3d 488, 507 (Tenn. 2011) (explaining that ambiguity results when a statute is capable of conveying more than one meaning).

When examining legislative intent, "a court may look to an administrative regulation." *Najo Equip. Leading, LLC v. Comm. Of Revenue*, 477 S.W.3d 763, 769 (Tenn. 2015). "However, [] the administrative regulations [] are not controlling." *Id.* (citation omitted). Nevertheless, "'a state agency's interpretation of a statute that the agency is charged to enforce is entitled to great weight in determining legislative intent.'" *Id.* at 769-70 (quoting *Consumer Advocate Div. v. Greer,* 967 S.W.2d 759, 761 (Tenn. 1998)).

Here, as the Court found in its preliminary injunction order, PC 471 is an unambiguous statute; thus, Rule 18 does not even come to play in the Court's analysis.[9] The statute states that "it is unlawful for a person to [a]ct as, advertise as, or represent to be an auctioneer without holding a valid license issued by the commission." Tenn. Code Ann. § 62-19-102(a)(1). As the Court has previously noted, "[t]his statutory licensing requirement by its terms contains no qualifications, no geographical limitations, and no explanation of what it means to 'act as, advertise as, or represent to be an auctioneer' in the context of online auctions, and the Court declines to write such an explanation or qualification into the statutory language where it simply does not exist." *McLemore*, 2019 WL 3305131, at *7; *see also Eubanks v. Wilkinson*, 937 F.2d 1118, 1122 (6th Cir. 1991) ("courts do not rewrite statutes to create constitutionality"); *United States v. M/V Big Sam*, 693 F.2d 451, 455 (5th Cir. 1982) ("[I[t is simply not part of our function as judges to re-write, in the guise of statutory construction, unambiguous statutory language in order to cure what to us seems to be statutory deficiencies."). Additionally, to write such a geographical qualification in would

---

[9] Any reasoning relied on by the Court in its Memorandum Opinion on Plaintiffs' motion for a preliminary injunction in finding that PC 471 applies extraterritorially is also incorporated herein. *See McLemore*, 2019 WL 3305131, at *3-9. This incorporation by reference is appropriate because, among other things, the Court has seen nothing from Defendants to substantially undercut such reasoning.

"unduly restrict[]" the statute's coverage beyond its apparent intended scope,[10] which Tennessee courts have explained is inappropriate for a court do. *See Howard*, 504 S.W.3d at 269.

Defendants rely heavy on the presumption of constitutionality to which Tennessee statutes are entitled. (Doc. No. 53 at 8). But as the Court noted in its prior Memorandum Opinion, despite such presumption, "the Court cannot read a geographical scope into the statute when the statutory language is plainly devoid of any such geographical limitation." *McLemore*, 2019 WL 3305131, at *6 n.6; *see also Backpage.com*, 939 F. Supp. 2d at 842 (interpreting a Tennessee statute as having an extraterritorial effect because "[n]owhere in the language of the statute is there any limit on the statute's geographic scope that specifies what conduct, if any, must take place in Tennessee."). Defendants are asking the Court to read in a geographic limitation that simply is not there.

It may be convenient for Defendants to assert the existence of a geographical limitation at this time, in an effort to save PC 471. But one can easily imagine that State (perhaps under different executive branch leadership) changing its tune in the future; in the throes of enforcement zeal, the State someday could insist that there is no such geographical limitation. Suppose, for example, that future Tennessee authorities wished to bring a particular enforcement action against an individual who, conducting an online auction from Alaska, happened to complete sales to winning online bidders in Tennessee who later lodge complaints. Imagine further that the individual insists that PC 471 contains a geographic limitation that precludes such enforcement against her. It is readily conceivable that the State, seeking to vindicate the Tennessee alleged victims, would insist

---

[10] Although Defendants in their Motion deny that PC 471's intended scope is outside the borders of Tennessee, a review of the language of PC 471 (which is what the Court must do here, rather than rely on Defendants' assertions as to what the intended scope of PC 471 is) leads to a different conclusion.

25

that there is no geographic limitation. If so, it would be on firm ground (on this particular point); the individual simply could not point to any geographic limitation, just as the State cannot do so here.[11] Defendants should not be permitted to survive a Dormant Commerce Clause challenge on the basis of a purported geographical limitation in PC 471, and then have PC 471's enforcement tools at its disposal unhindered by any geographic limitation that a enforcement target could even discern in the statute (let alone determine the scope of).

Defendants also assert that the Court's interpretation of the statute is a "forced reading that ignores that the Commission's authority is limited to issuing licenses that grant the privilege to conduct auctions only in this State." (Doc. No. 53 at 8 (citing Tenn. Code Ann. § 62-19-112(a)). The statute Defendant cited for this proposition, Tenn. Code Ann. § 62-19-112(a), does not prescribe or even suggest any such limitation; in no way does it indicate that the Commission can issue licenses only with respect to auctions conducted in Tennessee. Even if the Court were to accept that the statute cited by Defendants did in fact limit such licensing authority to in-state activity, the scope of authority to regulate activity occurring "in this State" is blurred—and not manifestly limited geographically at all—when the regulated activity regulated occurs over the Internet. *See Backpage.com*, 939 F. Supp. 2d at 842 (declining to read the overall jurisdictional provisions of the state criminal code into a specific state criminal statute that criminalized conduct occurring on the Internet because of "the territorial issues unique to . . . the Internet"). As the Court explained in its prior Memorandum Opinion,

> In the context of online auctions, the mere existence of an online auction website results, in the most probable correct interpretation of the statutory language, in the auctioneer "represent[ing]" to be an online auctioneer in Tennessee because Tennessee residents will have access to the website even if the physical location of

---

[11] Fortunately for this hypothetical individual, it is precisely this lack of geographic limitation that should doom the applicable parts of PC 471 such that they could not be used against her in the first place.

the auctioneer is outside of the state. Further, if a Tennessee resident wins (or even merely bids in) an online auction, the online auctioneer likely is properly deemed to be "act[ing]" as an auctioneer in Tennessee. Such likely interpretation would subject the auctioneer to regulation by Tennessee authorities that would be impermissible under the Commerce Clause.

*McLemore*, 2019 WL 3305131, at *8 (citation omitted). Thus, PC 471's extraterritorial effect is not depleted by the fact that the Commission's authority is limited to regulating only in-state conduct.

Even if the Court were to find that PC 471 was ambiguous, thus enabling it to review PC 471's "broader statutory scheme, the history of the legislation, or other sources' to determine the statute's meaning," *Frazier*, 495 S.W.3d at 252, such an exercise would not alter the Court's conclusion that PC 471 has an extraterritorial effect. As discussed above, Defendants point to Rule 18, which states that "any electronic media or computer-generated auction originating from within Tennessee shall conform to the requirements of [Tennessee's Auction Licensing Law]." While acknowledging that the Commission's regulations are to be given "great weight in determining legislative intent," *Najo Equip. Leading*, 477 S.W.3d at 769, Rule 18 still does not solve PC 471's extraterritorial problems for several reasons. First, Rule 18 requires an online auction generating within Tennessee to be conducted by a Tennessee licensed auctioneer, but Rule 18 contains no express terms that limit the licensure requirement *only* to online auctions generating within the State. Thus, Rule 18 does not really stand for the proposition that Tennessee does not require those conducting online auctions from other states that reach Tennesseans to be licensed.

Additionally, the Court agrees with Plaintiffs' argument that Rule 18's is not helpful in determining whether PC 471 embodies any geographical imitations, because the latter regulates a much broader range of conduct than does the former. That is, PC 471 essentially regulates *all acting and holding oneself out as an auctioneer*, while Rule 18 regulates (via a licensure

requirement) only *acting* as an auctioneer—and only in the *limited sense* of conducting computer-generated auctions (that "originat[e] from within Tennessee"). What PC 471 regulates may *encompass* everything that Rule 18 regulates, but it regulates many things that Rule 18 does not regulate.[12] As Plaintiffs aptly state:

> Rule 18 would fundamentally alter how the state regulates online auctions under PC 471. Courts cannot force an interpretation that would alter the statute's application. *See Eastman Chem. Co. v. Johnson*, 151 S.W.3d 503, 507 (Tenn. 2004). PC 471 applies to those who are acting as, advertising as, or representing to be, an auctioneer. (Ex. 1 at § 5(a)(1)). That application does not align with Rule 18, which applies to computer-generated auctions "originating from within Tennessee." Whatever "generating" or "originating" means is entirely different from "acting, advertising and representing." The state regulates not only generation of computer auctions, but mere representation. When Aaron says he is a "true auction company" on his website, then he is acting, advertising and representing to be an auctioneer in Tennessee even if it later results in an online auction that "originates" from Kansas, or even if he never "generates" an auction at all. Any "representation" occurs in Tennessee independent of whether Aaron initiates an online auction that "originates" in Kansas, and that is what the state regulates per PC 471. PC 471 applies to acting, advertising, and representing, not "generating" and "originating." If the state does not require a license from Aaron, then it is no longer administering PC 471. "Generation" and "origination" might make for a better law, but that is not the law that he [sic] state wrote.

(Doc. No. 54 at 7-8). The Court would additionally put it this way: even if (contrary to the Court's belief expressed above) Rule 18 does limit the authority of Tennessee to require a Tennessee license for computer-generated auctions not "originating from within Tennessee," it plainly does not limit (or have anything at all to say about) the authority of Tennessee to regulate most kinds of "act[ing] as," or any kinds of advertis[ing] as, or represent[ing] to be" an auctioneer" outside of Tennessee. And even if Rule 18 did suggest such a limitation, any such suggestion

---

[12] For example, one can act as an auctioneer—conduct within the scope of PC 471—without ever conducting any computer-generated auctions, and thus be untouched by Rule 18. And someone certainly can represent himself or herself (truthfully or falsely) to be an auctioneer—conduct within the scope of PC 471—without ever conducting any computer-generated auctions.

would be entitled to little weight under the circumstances, in particular the timeline involved. Rule 18 was issued nearly 20 years ago, and thus it is manifestly not probative in interpreting a statute passed last year. Moreover, the discussions during the Task Force hearings that led up to the passage of PC 471[13] (at least the discussions mentioned in the Complaint, which is all the Court may consider at this point) suggest that the legislature was not discussing the amendments to PC 471 with an eye toward geographical boundaries. *See* (Doc. No. 50 at ¶ 141 ("the elephant in the room has always been online auctions, are we going to be a state that regulates online auctions. I think we should be.")); (*id.* at ¶ 138 ("we have got to either include online auctions or just get rid of the auction law. . . . an online auction is an auction just like any auction there is.")); (*id.* at ¶ 121 (stating that the Task Force was "still wrestling with this online in terms of trying to define what that is," and "if it extended by any length of time, one second on, then it becomes a live auction and comes under the licensing purview of the Commission.")). There was simply no discussion (at least based on the information the Court can consider at the motion to dismiss stage) of an intent to regulate only online auctions that "originated" in Tennessee.[14]

The Court is aware that under Tennessee law, courts must construe statutes in a way that "sustain[s] the statute and avoid[s] constitutional conflict if at all possible, and . . . indulge every presumption and . . . resolve every doubt in favor of the statute's constitutionality." *Howell v. State*, 151 S.W.3d 450, 470 (Tenn. 2004) (citation omitted).[15] But as indicated above, the Court

---

[13] As alleged in the Complaint, this Task Force was created by the Tennessee Legislature to study the question of online-auction regulation.

[14] The Court also does not find Rule 18 to be a reasonable interpretation of legislative intent as to the particular question presented here, because of the lack of defined meaning of the term "originating within Tennessee" in the context of online auctions.

[15] The "presumption against extraterritoriality" is a canon of statutory construction that limits the application of *federal* law on an international level and does not apply to construction of state law. *Kiobel v. Royal Dutch Petroleum Co.*,

cannot sustain the statute by conjuring up non-existent statutory language and limitations. So doing would not *resolve* doubt in favor of the statute's constitutionality; instead it would merely be *creating* doubt (as to the statute's unconstitutionality) that does not exist if one looks at the statute as written.

Accordingly, the Court's concludes that PC 471 has an extraterritorial effect. As this Court previously stated,

> [w]ittingly or unwittingly, Tennessee has projected its legislation into other states and directly regulated commerce therein. Perhaps the State could change the result via statutory amendments inserting express, specific geographical limitations, but it cannot change the results by insisting that the statute obviously contains geographic limitations that in fact manifestly are not there. Accordingly, the Court finds that the statue is likely an impermissible *per se* violation of the Dormant Commerce Clause.

*McLemore*, 2019 WL 3305131 at *9.[16] Thus, finding that Defendants' newly asserted argument regarding Rule 18 does not change the Court's prior decision regarding the extraterritorial scope of PC 471 (although in that decision, the Court found that the statute merely likely had an extraterritorial effect), the Court concludes that Plaintiff has properly pled a Dormant Commerce Clause violation, for the same reasons set out in the Court's prior Memorandum Opinion.

III. *Rule 12(b)(6) Challenge – First Amendment*

Defendants argue that Plaintiffs' First Amendment claim (included as part of what is denominated "Claim One" in the Amended Complaint) should be dismissed because (according to Defendants) Plaintiffs have failed to allege a claim upon which relief can be granted.

---

569 U.S. 108, 115 (2013); *Sheehan v. Ash*, 574 B.R. 585, 593 (N.D.W. Va. 2017), *aff'd*, 889 F.3d 171 (4th Cir. 2018) ("[A]lthough states are analogous to international sovereigns, the presumption against extraterritorial application remains a canon of construction confined to the international context[.]"). There is no indication that Tennessee courts indulge a presumption against extraterritorial application of its laws when construing Tennessee statutes.

[16] The Court's holding is not so broad as to entail that Tennessee could never regulate online auctions. However, for such regulations to comport with the Dormant Commerce Clause, they would need to include clear (and likely *express*) geographic limitations, which are simply missing from PC 471 as currently drafted.

"The First Amendment, applicable to states through the Fourteenth Amendment, protects freedom of speech from laws that would abridge it." *Int'l Outdoor, Inc. v. City of Troy, Mich*., 974 F.3d at 690, 697 (6th Cir. 2020).

Defendants first argue that the protections of the First Amendment are not implicated in these circumstances, because "[t]he State's regulatory and licensing scheme for auctioneers . . . regulates professional *conduct*, not speech." (Doc. No. 53 at 10) (emphasis added). Thus, Defendants argue that "this Court should apply rational basis scrutiny to uphold these statutes, because they are rationally related to a legitimate government purpose." (*Id*.). Next, Defendants argue that "even if this Court accepts Plaintiffs' characterization of their claim as free speech claims, the State's regulation should be upheld as a valid professional regulations that impose only incidental burdens on speech, which is a level of scrutiny that mirrors the rational basis test." (*Id*. at 19). Defendants argue that because the State has a rational basis for imposing the regulations, Plaintiffs' First Amendment claim should be dismissed pursuant to Rule 12(b)(6). (*Id*)

In response, Plaintiffs argue that the auctioneering regulations regulate speech, as opposed to mere conduct, because "the State implicated speech when it defined auctions based on what words a speaker says, and then exempted different speakers." (Doc. No. 54 at 13). Plaintiffs further argue that (i) the speech regulated by the regulations is not merely "incidental to conduct" as Defendants claim, "because all of the 'conduct' it regulates is speech"; (ii) because (according to Plaintiffs) the regulations are speaker-based and content-based, strict scrutiny applies; and (iii) strict scrutiny requires a level of evidence-based factual review that cannot be conducted on a Rule 12(b)(6) motion to dismiss. (*Id*. at 14-18). Alternatively, Plaintiffs assert that even if the Court finds the regulations not to be speaker and content-based, (i) "even a neutral regulation unrelated to the content of expression that incidentally burdens speech is still

subject to an intermediate form of scrutiny"; and (ii) intermediate scrutiny (like strict scrutiny) would requires the Court to make factual findings based on evidence, which cannot be done at the motion to dismiss stage. (*Id.* at 24).

### A. Does PC 471 regulate sheer conduct, conduct that incidentally burdens speech, or speech?

The Court must first determine whether PC 471 regulates speech at all. As Defendants point out, if PC 471 regulates mere conduct as opposed to speech, then the First Amendment is not implicated, and Plaintiffs' First Amendment claim will be subject to dismissal if PC 471 is supported by a rational basis.

In arguing that PC 471 does not regulate speech, Defendants rely heavily on *Liberty Coins, LLC v. Goodman*, 748 F.3d 682 (6th Cir. 2014). In *Liberty Coins*, the plaintiff challenged on First Amendment grounds a statute that prohibited a person from "holding himself out" as a precious metal dealer and "advertising" for sales without a license. *Id.* at 686. The district court denied Plaintiffs' motion for preliminary injunction, and Plaintiffs appealed. The Sixth Circuit affirmed and held that Plaintiffs were not likely to succeed on the merits of their First Amendment claim, because the statute regulated only conduct, and not speech. *Id.* The court defined the issue before the court as "whether the statute regulates commercial speech or simply regulates economic activity" and explained:

> Although at first glance, the [statute] appears analogous to [the statutes found to be in violation of the First Amendment in *Thompson v. W. States Med. Ctrs.*, 535 U.S. 357 (2002) and *Parker v. Commonwealth of Kentucky, Bd. of Dentistry*, 818 F.2d 504 (6th Cir. 1987)], those cases are inapposite in this context. In *Thompson*, pharmacists legally produced compounded drugs but could not advertise them to the public. The statute did not proscribe any conduct unless a pharmacist advertised the compounded drug. In *Parker*, dentists could legally perform specialized procedures for the public but were unable to hold themselves out as available to do so. In the instant case, Plaintiffs and others similarly situated are prohibited from functioning as businesses open to the public for the purchase of precious metals unless they obtain licenses. The [statute] regulates all precious metals businesses

32

operating in a manner that is open and accessible to the public. Precious metals dealers must obtain licenses and comply with the [statute's] reporting, retention, and record-keeping requirements, regardless of whether they advertise or post signage. In this case, the underlying conduct of the unlicensed precious metals dealer is prohibited, as distinguished from the cases cited by Plaintiffs.

The [statute] does not burden the commercial speech rights of unlicensed precious metals dealers because such dealers do not have a constitutional right to advertise or operate an unlicensed business that is not in compliance with the reasonable requirements of Ohio law. Such dealers cannot "hold themselves out" to the public without a license, regardless of whether they advertise. This case does not turn on advertising or solicitation, it turns on whether the business in question holds itself out to the public, which can occur by posting a sign, placing goods in an open window, simply conducting business in a manner that is visible to the public, or otherwise making its wares available to the public. This Court properly applies rational basis review in concluding that the statute does not violate Plaintiffs' First Amendment rights.

*Id*. at 697.

Defendants argue that "there is no meaningful difference between the statutes at issue in *Liberty Coins* and the statutes at issue in the instant case" because "the business activities undertaken by the precious metals dealers in *Liberty Coins* were substantially like those of auctioneers—auctioneers merely deal with a broader range of items for sale." (Doc. No. 53 at 14). Defendants contend that "an auction is first and foremost 'a sale transaction,' (PC 471 § 4(2)), which is business conduct and economic activity that falls squarely within the State's authority to regulate, without offending the First Amendment." (*Id*. at 16 (citing *Liberty Coins*, 748 F.3d at 697)). Defendants argue that while PC 471 may describe an auction as an "exchange between the auctioneer and the audience," PC 471, §4(2), the purpose of "the auctioneer's exchange with the audience" is to "complet[e] a sales transaction"; thus, the statutory definition describes "economic activity, not speech." (*Id*. at 17). Therefore, Defendants assert that "Tennessee's statutes regulating the auctioneering profession, including the amendments contained in PC 471, are valid business regulations that should be reviewed under rational basis scrutiny." (*Id*. at 14).

In Response, Plaintiffs assert that PC 471 regulates speech, not conduct, due to the way the State has defined auctions. (Doc. No. 54 at 14). Plaintiffs contend that "[t]he state's definition of auction functions as a speech restriction because it applies to a speaker based on *what* he or she says, *the effect of the words* on the listener, and *who* is speaking." (*Id.*).

Plaintiffs argue that:

> The government regulates speech when the "conduct triggering coverage under the statute consists of communicating a message." *Holder v. Humanitarian Law Project*, 561 U.S. 1, 28 (2010); *see* Eugene Volokh, *Speech as Conduct*, 90 Cornell L. Rev. 1277, 1346 (2005) ("When the government restricts professionals from speaking to their clients, it's restricting speech, not conduct."). "An individual's right to speak is implicated when information he possesses is subject to restraints on the way in which the information might be used or disseminated." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 568 (2011) (internal quotations omitted). This includes even just the use, creation, and dissemination of data. *Id.* at 570. It also includes restraints on the sale of information. *Id.* at 567; *see also City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 756 n.5 (1988) ("the degree of First Amendment protection is not diminished merely because the . . . speech is sold rather than given away."). A restriction on how prices are communicated, rather than on the prices themselves, is a regulation of speech. *Expressions Hair Design v. Schneiderman*, 137 S. Ct. 1144, 1151 (2017). . . .

> The state defined auctions based on speech, not conduct. *See Holder*, 561 U.S. at 27-28 (where regulated "conduct" consists only [of] speaking, the First Amendment applies). An auction is defined as a sales transaction:

>> conducted by oral, written, or electronic *exchange* between an auctioneer and members of the audience *consisting of a series of invitations* by the auctioneer for offers to members of the audience *to purchase goods or real estate*, culminating in the *acceptance* by the auctioneer of the highest or most favorable offer made by a member of the participating audience.

> (Ex. 1 § 4(2)). Every italicized word implicates speech. Auctions must be conducted by communications: either an oral, written – and now, electronic – exchange. It is defined by content.

> The "exchange" is only regulated when it consists of a "series of invitations for offers" – also speech – to members of an audience to do something specific – "invit[ing]" them to purchase goods or real estate – which is still more speech. If the speaker was not "inviting" an offer, but was instead informing about a price (as on website like Amazon), then it would not be an auction. What the speaker says

34

determines whether the speech is an auction. Only invitations that mention "goods or real estate" are regulated. (*Id*.) Goods are defined to mean "chattels, merchandise, real or personal property, or commodities of any form that may lawfully be kept or offered for sale." (*Id*. at § 4(7)). Therefore, online auctions for intangible goods, or future interests, or commodities that could not be lawfully kept or sold, are not actually auctions, and that is based on what the speaker says. A black-market online auction on Silk Road would qualify if the subject was guns, but not drugs which cannot lawfully be kept or sold. The speaker could also discuss selling domain names (like Silk Road) because it is intangible property, but she could not discuss a placard with the domain's name. Moreover, to be an auction, the speech must elicit a result from a listener: generating a high bid. *See Boos v. Barry*, 485 U.S. 312, 321 (1988) (regulation "focuses on the content of the speech and the direct impact that speech has on its listeners."). In sum, the only "conduct triggering coverage under the statute consists of communicating a message" *see Holder*, 561 U.S. at 28. If online auctions were nothing but notification of the latest bid and encouragement of further bidding, then it would be exactly like the use, creation, and dissemination of data that the Court regarded as speech in *Sorrell*. Merely notifying the audience of the latest bid would be speech the same way as *Expressions Hair Design*.

(*Id*. at 15-16).[17]

---

[17] Plaintiffs additionally argue that Defendant's reliance on *Liberty Coins* is not appropriate, because "[t]he professional speech doctrine is dead" after the Supreme Court's ruling in *National Institute of Family & Life Advocates v. Becerra* ("*NIFLA*"), ⎯ U.S. ⎯⎯, 138 S. Ct. 2361, 2375, 201 L.Ed.2d 835 (2018). Plaintiffs contend that in NIFLA, "the Court rejected the notion that 'the State[] [has] unfettered power to reduce a group's First Amendment rights by simply imposing a licensing requirement.'" (*Id*. (citing NIFLA, 138 S. Ct. at 2373)). Thus, according to Plaintiffs, "it no longer matters that the regulation is 'first and foremost, a licensing statute,'" a fact vital to the decision in *Liberty Coins*, (*id*. (quoting *Liberty Coins*, 748 F.3d at 691)), and, therefore, "NIFLA, post-dating *Liberty Coins*, forecloses [Defendants'] primary argument." (*Id*.).

The Court agrees with Plaintiff that *NIFLA* is an instructive case here, but disagrees that *NIFLA* necessarily makes *Liberty Coins* bad law. In *NIFLA*, the Supreme Court held that occupational-licensing regulations are not exempt from First Amendment scrutiny. 138 S. Ct. at 2373. Specifically, the Court rejected the Third, Ninth, and Fourth Circuits' holdings that "'professional speech' as a separate category of speech that is subject to different rules." *Id*. at 2371 (citations omitted). While it did not "foreclose the possibility that some such reason exists" for treating professional speech differently, *id*. at 2375, the Court explained that "[s]peech is not unprotected merely because it is uttered by 'professionals.'" *Id*. at 2371–72. A professional speech exception, it warned, would "give[ ] the States unfettered power to reduce a group's First Amendment rights by simply imposing a licensing requirement." *Id*. at 2375.

Instead of recognizing a new category of unprotected speech, the Court adhered to the traditional conduct-versus-speech dichotomy. *See id*. at 2374–76 (explaining that "this Court's precedents have long drawn" the "line between speech and conduct"). "[P]rofessionals are no exception to th[e] rule" that states may enact "regulations of professional conduct that incidentally burden speech." *Id*. This truism is merely an application of the general principle that legislatures may "impos[e] incidental burdens on speech" by regulating "commerce or conduct." *Id*. (citation omitted). Applying that analysis, the Court held that the statute-at-issue's notice requirements were a content-based restriction on speech that failed to satisfy even lesser scrutiny for conduct regulations that incidentally burden speech. *See id*. at 2375–76.

Therefore, the question currently before the Court is whether Tennessee's online auctioneer licensing requirements regulate only non-expressive conduct, restrict speech only incidentally to their regulation of non-expressive professional conduct, or regulate sheer speech. *NIFLA*, 138 S. Ct. at 2372–73; *see also Doyle v. Hogan*, 411 F. Supp. 3d 337, 344 (D. Md. 2019) ("Determining the proper level of review [on a First Amendment claim] first requires distinguishing whether [the statute] regulates speech, conduct, or something in between.").

Here, the Court can easily dispose of one category inasmuch as PC 471 clearly regulates more than mere conduct. The Court agrees with Plaintiffs that the statute as written allows of no other conclusion, as it regulates auctions (*i.e.*, "conducted by oral, written, or electronic exchange between an auctioneer and members of the audience."), which at the very least means regulating conduct that incidentally involves speech. PC 471, § 5(a)(1). As conducting an auction necessarily involves speech, this case is distinguishable from *Liberty Coins*, in which the statute at issue "regulated all precious metals businesses operating in a manner that is open and accessible to the public . . . regardless of whether they advertise or post signage" (*i.e.*, engaged in speech); and thus was not a regulation of conduct incidental to speech. *Liberty Coins*, 748 F.3d at 697. In contrast, here, PC 471 regulates auctioneers who wish to engage in auctions (which necessarily involves speaking) by requiring a license to engage in such speech. Additionally, the PC 471 prohibits an individual from acting as, advertising as, or representing to be an auctioneer in Tennessee without

---

In *Liberty Coins*, the court denied the plaintiffs' First Amendment claim not on the basis that the statute did not violate the First Amendment simply because it fell into the category of a professional licensing statute, but because the statute regulated, in the court's view, conduct rather than speech. *NIFLA* reiterated that courts are to determine whether licensing regulations violate the First Amendment by regulating speech, rather than conduct, just as the Sixth Circuit did in *Liberty Coins*. Accordingly, *Liberty Coins* holding is not at odds with the holding in *NIFLA*.

a license. Advertising as and representing to be an auctioneer implicates speech, even if the regulation of speech is only incidental to a regulation of conduct (*i.e.*, a sales transaction).

Because PC 471 clearly prohibits an auctioneer from speaking without a license, at the very least some speech is implicated. Thus, the question becomes whether PC 471 is a regulation of conduct that incidentally burdens speech, or a content-based restriction on speech. However, that is a question that the Court does not have to answer at this juncture; even assuming *arguendo* that PC 471 regulated economic conduct that incidentally burdened speech—and not pure speech (*i.e.*, a content-based restriction of speech)— deserved lesser scrutiny than that afforded pure speech, Plaintiffs' claim would still survive a 12(b)(6) challenge.[18]

### B. Which level of scrutiny applies to PC 471?

As just suggested, the Court will assume for purposes of Defendants' Motion to Dismiss that PC 471 regulates conduct that incidentally burdens speech. The Court next must determine the level of scrutiny to apply.

The Sixth Circuit historically has applied intermediate scrutiny to regulations of conduct that incidentally burden speech. *See Richland Bookmart, Inc. v. Knox Cty., Tenn.*, 555 F.3d 512, 521 (6th Cir. 2009) ("Unlike content-based regulations that are subject to the 'most exacting scrutiny,' regulations 'unrelated to the content of speech are subject to an intermediate level of scrutiny.'" (quoting *Turner Broad. Sys. v. FCC*, 512 U.S. 622, 642 (1994))). And regulation of commercial speech likewise calls intermediate review—*i.e.*, the government may restrict or prohibit commercial speech that is neither misleading nor connected to unlawful activity if (and only if) the governmental interest in regulating the speech is substantial. *Central Hudson Gas &*

---

[18] The Court additionally believes that it would be better served determining this question with the assistance of a more developed factual record, which the Court simply cannot consider on Defendant's motion to dismiss.

*Electric Corp. v. Public Service*, 447 U.S. 557, 564 (1980). The restriction or prohibition must "directly advance the governmental interest asserted" and be "[no] more extensive than is necessary to serve that interest." *Id.* at 566.

However, the Supreme Court recently apparently narrowed the commercial-speech doctrine in the context of professionals in *NIFLA*, when it held that content-based restrictions on professional speech are generally subject to a heightened level of review—*i.e.*, strict scrutiny. *NIFLA*, 138 S. Ct. at 2376. And the Sixth Circuit, relying on *Reed v. Town of Gilbert*, 576 U.S. 155 (2015), recently took the position that content-based restrictions are subject to strict scrutiny, regardless of any commercial context:

> [T]he intermediate-scrutiny standard applicable to commercial speech under *Central Hudson*, 447 U.S. at 563, 100 S. Ct. 2343, applies only to a speech regulation that is content-neutral on its face. That is, a regulation of commercial speech that is not content-neutral is still subject to strict scrutiny under *Reed*.

*Int'l Outdoor*, 974 F.3d at 703.

On the other hand, the Court in *NIFLA* explained that a lower level of scrutiny should be applied to two kinds of content-neutral restrictions: (1) laws that require professionals to disclose "factual, noncontroversial information in their 'commercial speech.'"; and (2) regulations of professional conduct that incidentally burden speech. *Id.* at 2372-73. Although the Court in *NIFLA* did not specifically state what level of review—how much lower than strict scrutiny—applied to regulations of professional conduct that incidentally burden speech, the Court appeared to apply intermediate scrutiny. *See Vizaline, L.L.C. v. Tracy*, 949 F.3d 927, 932 (5th Cir. 2020) (explaining that the Court in *NIFLA* applied intermediate scrutiny to conduct regulations that incidentally burden speech and concluded that the regulation at issue was "not sufficiently drawn to achieve" any substantial state interest (quoting *NIFLA*, 138 S. Ct. at 2375-76)); *Am. Med. Ass'n v. Stenehjem*, 412 F. Supp. 3d 1134, 1149 (D.N.D. 2019) (discussing *NIFLA* and holding that

38

intermediate review was appropriate where the statute at issue regulated professional conduct that incidentally burdens speech); *Capital Associated Indus. v. Stein*, 922 F.3d 198, 209 (4th Cir. 2019) (discussing *NIFLA* and explaining that "[f]or laws with only an incidental impact on speech, intermediate scrutiny strikes the appropriate balance between the states' police powers and individual rights."). Thus, the Court concludes that, assuming *arguendo* that PC 471 regulates economic conduct incidental to speech—the best-case scenario for Defendant here—[19] intermediate scrutiny applies.[20]

Under intermediate review, the government must establish that the law furthers a substantial government interest and is sufficiently tailored to further that interest. *See NIFLA*, 138 S. Ct. at 2375. The Court cannot determine on Defendant's Motion brought pursuant to Rule 12(b)(6) whether PC 471 satisfies intermediate scrutiny, because such analysis will require a factual inquiry that they Court may not conduct at the motion to dismiss stage. *See Kiser v. Kamdar*, 831 F.3d 784, 788 (6th Cir. 2016) (finding that intermediate scrutiny applied to the plaintiff's First Amendment claim and explaining that the court could not conclude at the motion to dismiss stage whether the challenged regulation survived intermediate scrutiny). Consistent with the Court's limited function on a 12(b)(6) motion to dismiss, the Court is merely deciding that Plaintiffs' Amended Complaint includes factual allegations that at least plausibly suggest that PC

---

[19] The alternative, strict scrutiny, of course would just make it that much more difficult for Defendant to prevail on its Motion.

[20] The Court recognizes that this conclusion is debatable, as the Supreme Court did not specifically state what level of review was required. And at least one court has held that rational-basis review applies under these circumstances. *See Otto v. City of Boca Raton, Fla.*, 353 F. Supp. 3d 1237, 1248 (S.D. Fla. 2019) ("Regulations that do not affect protected speech, or only incidentally do so, are subject to rational basis review."). Further, the cases in which the Court relies upon are mere persuasive authority, and not binding on this Court. It is early in this case, and perhaps later in this lawsuit Defendants may convince the Court that rational-basis review applies under these circumstances. However, because the majority of courts have held that intermediate scrutiny applies, and the Court's own analysis of *NIFLA* supports that conclusion, the Court will apply intermediate scrutiny at the motion-to-dismiss stage.

39

471 fails intermediate scrutiny. Under *Iqbal* and *Twombly*, this is all that is required for the claim to survive Defendant's motion to dismiss. The ultimate merit of such claim remains to be determined, *see Brown v. Gov. of Dist. of Columbia*, 390 F. Supp. 3d at 114, 123 (D.D.C. 2019) ("Thus, courts typically do not reach the merits of a First Amendment challenge at the motion-to-dismiss stage." (citing *Boardley v. U.S. Dep't of the Interior*, 615 F.3d 508, 519–25 (D.C. Cir. 2010))). Accordingly, Defendants' Motion to Dismiss will be denied with respect to Plaintiffs' First Amendment claim.

IV. *Rule 12(b)(6) Challenge – Privileges and Immunities Clause*

Finally, Defendants argue that Plaintiffs' Privileges and Immunities claim (denominated "Claim Three" in the Amended Complaint) should be dismissed because (according to Defendants) Plaintiffs have failed to allege a claim upon which relief can be granted.

The Privileges and Immunities Clause states: "The Citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several States." U.S. Const., Art. IV, Section 2. The *Slaughter-House Case*s, 83 U.S. 36 (1872), limit application of the Privileges and Immunities Clause to rights "which ow[e] their existence to the Federal government, its National character, its Constitution, or its laws." *Id*. at 79.

Defendants argue that Plaintiffs do not allege that Defendants have denied them any rights of national citizenship and that Plaintiffs' claim that the Internet is the modern equivalent of the nation's seaports and navigable waters is not supported by any precedent. (Doc. No. 53 at 22). Defendants further argue that in any event, Plaintiffs do not allege that Defendants denied them access to the Internet and that they (Defendants) have merely regulated auctions conducted in the State. (*Id*.).

In Response, Plaintiffs argue that "the internet is the modern equivalent of a seaport or navigable waterway, analogous to the right to use seaports and navigable waterways protected under the Clause." (Doc. No. 54 at 25). Plaintiffs also suggest that the Court reserve ruling on the Privileges and Immunities claim "until the ultimate merits stage to see if the challenged license is unconstitutional on other grounds" even on rational basis. (*Id*.).

In Reply, Defendants assert that there is no precedent indicating that this Court should reserve its ruling on the Privileges and Immunities claim until the merits stage. (Doc. No. 56 at 6).

Here, Plaintiffs provide no authority, and the Court can find none, to support their argument that the Internet is analogous to a navigable water for purposes of a Privileges and Immunities clause analysis. Indeed, in one sense, Plaintiffs may be trying to have it both ways: essentially arguing (persuasively) for purposes of their Dormant Commerce Clause claim that the Internet is geographically boundless (unfixed) and accessible everywhere, while arguing for purposes of their Privileges and Immunities claim that the Internet has a character similar to the nation's seaports and navigable waterways—which of course are geographically fixed, accessible only to someone physically present where they exist in within this nation. Accordingly, Plaintiffs do not plausibly allege a violation of any rights "which owe their existence to the Federal government, its National character, its Constitution, or its laws" recognized as such under Supreme Court precedent. *Slaughter-House Case*s, 83 U.S. at 79. Therefore, the Court will dismiss Plaintiffs' Privileges and Immunities claim, and will not accept Plaintiffs' invitation to reserve ruling on such claim until a later date.

V. *Eleventh Amendment*

Finally, Defendants argue that Plaintiffs' claim alleging that PC 471 violates Article 1, § 19 of the Tennessee Constitution (part of Claim One) "must be dismissed because the Eleventh

41

Amendment precludes federal supplemental jurisdiction over state law claims against state officers sued in their official capacities, even for declaratory and injunctive relief." (Doc. No. 53 at 23 (citing *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 124-25 (1984))).

In response, Plaintiffs argue that "[t]his Court may entertain state law claims when they arise out of the same set of facts because it has supplemental jurisdiction by statute." (Doc. No. 54 at 24 (citing 28 U.S.C. § 1367(a); *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715 (1966))). Plaintiffs argue that Defendants' reliance on *Pennhurst* is erroneous, because "*Pennhurst* limits claims for retroactive relief, not a prospective injunction," and because "*Pennhurst* was decided prior to the enactment of § 1367, which codified the case law surrounding 'supplemental jurisdiction' and gave express Congressional approval to the bringing of state court claims." (*Id.*).

The Eleventh Amendment provides immunity from federal suit to states and to "arms of the State." *Ernst v. Rising*, 427 F.3d 351, 358 (6th Cir. 2005) (citation omitted). Eleventh Amendment immunity extends to state officials sued in their official capacity, "because a suit against a state official in his official capacity is not a suit against the official but rather a suit against the official's office and as such is no different than a suit against the state itself." *Smith v. DeWine*, ---F. Supp. 3d.---, 2020 WL 4436362, at *8 (S.D. Ohio Aug. 3, 2020) (citation omitted). There are three exceptions to this general rule: (1) where a state has waived its immunity and consents to be sued in federal court, *see Kimel v. Florida Bd. of Regents*, 528 U.S. 62, 73 (2000); *Pennhurst State Sch.*, 465 U.S. at 99; (2) where Congress validly abrogates sovereign immunity through its enforcement powers pursuant to the Fourteenth Amendment to the United States Constitution, *see Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 57-73 (1982); and (3) where a plaintiff sues state officials in their official capacities seeking only prospective injunctive relief for a continuing violation of federal law, *see Ex Parte Young,* 209 U.S. 123, 159-60 (1908).

42

Here, Plaintiffs assert state constitutional law claims against state officials in their official capacity. Accordingly, the doctrine of *Ex Parte Young* does not apply to defeat Defendants' Eleventh Amendment immunity, because, such doctrine does not apply to a state official's violation of state law, to which Eleventh Amendment immunity applies. *See Pennhurst State Sch*., 465 U.S. at 106; *see also Ohioans Against Corp. Bailouts, LLC v. LaRose*, 417 F. Supp. 3d 962, 975–76 (S.D. Ohio 2019) ("A claim that a state official violates state law in carrying out his or her official duties is a claim against the state, which is barred by the Eleventh Amendment, depriving a federal court of jurisdiction to hear the matter."); *Ernst*, 427 F.3d at 368 ("[T]he states' constitutional immunity from suit prohibits all state-law claims filed against a [s]tate in federal court, whether those claims are monetary or injunctive in nature."). "This conclusion applies even if . . . supplemental jurisdiction otherwise exists." *Smith*, 2020 WL 4436362, at *8 (quoting *Otte v. Kasich*, 709 F. App'x 779, 782 (6th Cir. 2017)).

Perhaps realizing this, Plaintiffs assert in their Response that Tennessee consented to constitutional claims (such as this one) in federal court when, by statutory enactment, Tennessee authorized suits "brought regarding the legality or constitutionality of a governmental action." (Doc. No. 54 at 25 (citing Tenn. Code Ann. § 1-3-121)). The statute cited by Plaintiffs provides in full:

> Notwithstanding any law to the contrary, a cause of action shall exist under this chapter for any affected person who seeks declaratory or injunctive relief in any action brought regarding the legality or constitutionality of a governmental action. A cause of action shall not exist under this chapter to seek damages.

Tenn. Code Ann. § 1-3-121.

The Court does not find that this is an explicit waiver of Tennessee's sovereign immunity in *federal* court. "Waivers of immunity must be construed strictly in favor of the sovereign, . . . and not enlarge[d] . . . beyond what the language requires. *Ruckelshaus v. Sierra Club*, 463 U.S.

680, 685 (1983) (internal quotation marks and citations omitted). Here, Tennessee's pronouncement of a cause of action for alleged constitutional violations does not specifically state that it is waiving its sovereign immunity to suit in federal court, as opposed to state court. *See Coll. Sav. Bank v. Florida Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 676 (1999) ("[A] State does not consent to suit in federal court merely by consenting to suit in the courts of its own creation."). Further, the Sixth Circuit found many years ago that the Tennessee legislature, by virtue of Tenn. Code. Ann. § 20–13–102(a), has retained the sovereign immunity of the State of Tennessee for lawsuits brought against it in federal court. *See Berndt v. State*, 796 F.2d 879, 881 (6th Cir. 1986). Nothing in Tenn. Code Ann. § 1-3-121 suggests that it was intended to trump the State's general retention of sovereign immunity to suit in federal court provided by Tenn. Code Ann. § 1-3-121.

Accordingly, the Court concludes that sovereign immunity prevents Plaintiffs from pursing its Tennessee constitutional claim in this Court. Thus, Plaintiffs' claim alleging a violation of Article 1, § 19 of the Tennessee Constitution will be dismissed.

## CONCLUSION

For the above-stated reasons, Defendants' Motion to Dismiss (Doc. No. 52) is **GRANTED** in part and **DENIED** in part. Plaintiffs' claims brought pursuant to the Privileges and Immunities Clause and pursuant to Article 1, § 19 of the Tennessee Constitution will be dismissed. Plaintiffs' Dormant Commerce Clause and First Amendment claims will survive.

An appropriate order will be entered.

*Eli Richardson*

ELI RICHARDSON
UNITED STATES DISTRICT JUDGE