IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| WILL MCLEMORE, et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) No. 3:19-cv-00530 |
| v. | ) |
| | ) JUDGE RICHARDSON |
| ROXANA GUMUCIO, et al., | ) |
| | ) |
| Defendants. | ) |

## <u>MEMORANDUM OPINION</u>

Pending before the Court is Defendants' Motion for Summary Judgment (Doc. No. 88, "Defendants' Motion"), supported by an accompanying brief (Doc. No. 88-1). Plaintiffs filed a response (Doc. No. 106), and Defendants filed a reply (Doc. No. 110). Also pending before the Court is Plaintiffs' Motion for Summary Judgment (Doc. No. 90 "Plaintiffs' Motion"), supported by an accompanying brief (Doc. No. 91). Defendants filed a response (Doc. No. 107), and Plaintiffs filed a reply (Doc. No. 111). Also pending before the Court is Plaintiffs' Motion to Exclude Defendants' Expert Witness Justin Ochs (Doc. No. 89, "Motion to Exclude").

For the reasons stated below, Defendants' Motion will be denied, Plaintiffs' Motion will be granted, and Plaintiffs' Motion to Exclude will be denied as moot.

In 1967, Tennessee created the Tennessee Auction Commission ("the Commission") with the goal of regulating the profession of auctioneering. (Doc. No. 50 at ¶ 54). In 2006, as e-commerce began to emerge, Tennessee amended its auctioneering regulatory statutes and created an exemption from the regulatory scheme for "fixed price or timed listings that allow bidding on an Internet website but that does not constitute a simulcast of a live auction." (*Id.* at ¶ 65 (citing Tenn. Code Ann. § 62-19-103(9)). In 2016, the Commission proposed a rule that would have excluded online extended-time auctions (*i.e.*, auctions whereby the ending time can be extended based on bidding activity)[2] from such exemption. (*Id.* at ¶ 86). But on December 15, 2016, before this proposed rule became effective, Tennessee's Joint Committee for Government Operations pulled it out for specific review and ultimately rejected it. (*Id.* at ¶¶ 87, 95). In 2017, the Tennessee General Assembly again considered a bill that would have required extended-time, but not fixed-time,[3] online auctions to be licensed. (*Id.* at ¶ 96). After that bill failed, the issue was raised again in 2018. (*Id.* at ¶¶ 104, 105). The 2018 bill was amended to create a Task Force to study the issue of online-auction regulation. (Doc. No. 114 at ¶ 205). The Task Force analyzed three years of complaint data, which revealed very few complaints for online auctions in general (11 overall in three years) and even fewer for extended-time auctions—three overall and none in 2018. (*Id.* at ¶¶

---

[1] The facts in this section are taken from Plaintiffs' Response to Defendants' Statement of Undisputed Material Facts (Doc. No. 106), Defendants' Response to Plaintiffs' Statement of Undisputed Material Facts (Doc. No. 114), and statements in the Verified Amended Complaint (Doc. No. 50). *See ACLU v. Grayson Cty.*, 591 F.3d 837, 844 n.2 (6th Cir. 2010) ("A verified complaint" carries the same weight as would an affidavit for the purposes of summary judgment.") (citing *El Bey v. Roop*, 530 F.3d 407, 414 (6th Cir. 2008); *Smith v. Campbell*, 250 F.3d 1032, 1036 (6th Cir. 2001); *Williams v. Browman*, 981 F.2d 901, 905 (6th Cir. 1992)). The facts recited in this section are not in dispute.

[2] Unless specifically excluded from the exemption, extended-time auctions would fit within the exemption to the extent that an extended-time auction is deemed a "timed listing."

[3] A "fixed-time" auction is one planned so that the bidding necessarily ends at a specific time, with no possibility of the bidding time being extended.

205-207, 211). The Task Force then recommended, among other things, that "electronic" exchanges be added to the definition of an auction (so that "electronic" (*i.e.*, online) auctions may be regulated) and further recommended that the term "timed listing" be defined, for purposes of the above-referenced exemption, as "offering goods for sale with a fixed ending time and date which does not extend based on bidding activity." (Doc. No. 50 at ¶¶ 158-160).

Thereafter, a bill was introduced to amend Tennessee's statutes (codified at Tenn. Code Ann. § 62-19-101 *et seq.*) regulating auctions and the licensing requirements for those who conduct "auctions." (*Id*. at ¶ 162); 2019 Tenn. Pub. Ch. 471 (hereinafter "PC 471"). Specifically, as recommended by the Task Force, Section 4(2) of the bill effectively amends the definition of "auction" contained at Tenn. Code Ann. § 62-19-101(2) to include "electronic" exchanges. (*Id*. at ¶ 181).[4] Also, Section 5(a)(1) of the bill essentially restated existing law (set forth in Tenn. Code Ann. § 62-19-102(a)(1)) in providing that it is unlawful for any person to "[a]ct as, advertise as, or represent to be an auctioneer without holding a valid license issued by the commission." (*Id*. at ¶ 185).[5] In addition, Section 4(12) of the bill further narrowed the exemption (*i.e.*, the exemption from otherwise applicable licensing requirements) for so-called "timed listings" that allow bidding on an Internet website; specifically, Section 4(12) carved out from this exemption extended-time auctions. (*Id*. at ¶ 187).

In addition, Section 6 of the bill effectively restated the exemptions (listed in in Tenn. Code. Ann. § 62-19-103) to the applicability of the entire statutory scheme (including, necessarily,

---

[4] The bill did so by deleting the old definition of "auction" and replacing it with a new definition identical to the old definition except that it inserted "oral, written, or electronic" where "oral or written" had been.

[5] The bill did so by replacing the existing version of Tenn. Code. Ann. § 62-19-102(a)(1), which was substantially identical to the bill's version except that it had referred not just to "auctioneer[s]," but also to "apprentice auctioneer[s] or firm[s]"—terms essentially phased out of the statutory lexicon via various sections of the bill, including Sections 7 and 15.

its licensing requirements) set forth in Tenn. Code Ann. § 62-19-101 *et seq.* (*Id*. at ¶ 186).[6] Some exemptions are based on the kind of auction involved, while others were based on the identity of the party conducting the auction. These exemptions include, among others, "[a]n auction conducted by or under the direction of a governmental entity"; "[a]n auction conducted on behalf of a political party, church, or charitable corporation or association"; "[a]n auction conducted for the sale of livestock"; "an auction for the sale of tobacco"; "[a]ny fixed price or timed listings that allow bidding on an Internet website, but do not constitute a simulcast of a live auction"; "[a]n in person or simulcast auction whose primary business activity is selling nonrepairable or salvage vehicles in this state"; and "[a]n individual who generates less than twenty-five thousand dollars ($25,000) in revenue a calendar year from the sale of property in online auctions." (*Id*.). As noted, these exemptions apply to the entire statutory scheme, meaning that they apply to the new general requirement that persons conducting extended-time auctions be licensed.

On May 24, 2019, Tennessee Governor Bill Lee signed PC 471 into law. (*Id.* at ¶ 179). The law was to go into effect on July 1, 2019. (*Id*. at ¶ 180).

Plaintiff McLemore Auctions Company, LLC ("McLemore Auction"), is a Tennessee limited liability company with a physical location in Nashville, Tennessee. (Doc. No. 106 at ¶ 1). Plaintiff Will McLemore is the president of McLemore Auction. (*Id*. at ¶ 2). McLemore and McLemore Auction contract with owners of tangible personal property to sell that property at auction through the website www.mclemoreauction.com (*Id*. at ¶ 5). McLemore and McLemore Auction rely on independent contractors who do not hold Tennessee auctioneer licenses to conduct auctions through the McLemore Auction website. (*Id*. at ¶ 6). McLemore Auction uses exclusively

---

[6] The bill did so by substituting a new list of exemptions in place of the existing list of exemptions set forth in Tenn. Code. Ann. § 62-19-103, which was very similar (though not precisely identical) to the bill's list.

the extended-time auction format, whereby (as noted above) the time of the auction closing can be extended based on bidding activity. (*Id*. at ¶ 7).

Plaintiff Purple Wave, Inc., is a privately held corporation, incorporated in Delaware and physically located in Manhattan, Kansas. (*Id*. at ¶ 8). Plaintiff Adam McKee is the president and CEO of Purple Wave. (*Id*. at ¶ 12). McKee and Purple Wave contract with owners of tangible personal property to sell that property at auction through the website www.purplewave.com ("Purple Wave's website"). (*Id*. at ¶ 19). Purple Wave's website uses an extended-time auction format. (*Id*. at ¶ 9). No person employed by Purple Wave holds any license issued by the Tennessee Auctioneer Commission. (*Id*. at ¶ 16).

Plaintiff Interstate Auction Association (IAA) is an unincorporated association with members who are dedicated to online auctioneer freedom. (*Id*. at ¶ 5). It was organized by McLemore as a direct response to the proposed amendment; it is made up primarily of online auctioneers, both licensed and unlicensed. (*Id*.).

## II. Procedural Background

On June 26, 2019, Plaintiffs filed a Complaint in this Court, asserting that the provisions of the amended statute that require licensure for extended-time online auctions violate their rights to free speech under the First Amendment and Fourteenth Amendment of the United States Constitution and Article I, Section 19 of the Tennessee Constitution; burden interstate commerce in violation of the Commerce Clause of the United States Constitution; and violate the Privileges or Immunities Clause of the United States Constitution. (*See* Doc. No. 4). On June 27, 2019 (four days prior to the law's effective date), Plaintiffs filed a Motion for [a] Temporary Restraining Order and a Preliminary Injunction, which requested the Court to enjoin the State from enforcing its licensure regime with respect to online websites. (Doc. No. 3). On June 28, 2019, the Court

entered a temporary restraining order ("TRO") that enjoined the State from applying Tennessee's auctioneering laws and licenses to "electronic" exchanges, or online auction websites, or against Plaintiffs. (Doc. No. 14). On July 10, 2019, the Court held a hearing on Plaintiffs' motion for preliminary injunction. Thereafter, the Court granted Plaintiffs' motion for preliminary injunction, finding that Plaintiffs were likely to succeed on the merits of their Dormant Commerce Clause claim, and that the other applicable preliminary injunction factors weighed in favor of granting Plaintiffs' requested relief. *See McLemore v. Gumucio*, No. 3:19-cv-00530, 2019 WL 3305131, at *13 (M.D. Tenn. July 23, 2019). Thus, the Court enjoined the State "from applying Tennessee's auctioneering laws and licenses to 'electronic' exchanges, or online auction websites, or against Plaintiffs pending further order of the Court." *Id*.

On November 20, 2019, Plaintiffs filed an Amended Complaint, asserting the same claims asserted in the Complaint but adding further factual allegations. (Doc. No. 50). On December 4, 2019, Defendants filed a motion to dismiss pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). (Doc. No. 52). The Court granted Defendant's motion to dismiss in part, dismissing Plaintiffs' Privileges and Immunities claim pursuant to Rule 12(b)(6) but denying the motion to dismiss as to Plaintiffs' claims alleging violations of each of the following: the First Amendment; Article I, Section 19 of the Tennessee Constitution; and the Dormant Commerce Clause. *See McLemore v. Gumucio*, No. 3:19-CV-00530, 2020 WL 7129023, at *1 (M.D. Tenn. Dec. 4, 2020). As noted above, the parties' cross-motions for summary judgment are now pending before the Court.

## LEGAL STANDARD

Summary judgment is appropriate where there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). "By its very terms,

this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). In other words, even if genuine, a factual dispute that is irrelevant or unnecessary under applicable law is of no value in defeating a motion for summary judgment. *See id.* at 248. On the other hand, "summary judgment will not lie if the dispute about a material fact is 'genuine[.]'" *Id.*

A fact is "material" within the meaning of Rule 56(c) "if its proof or disproof might affect the outcome of the suit under the governing substantive law." *Anderson*, 477 U.S. at 248. A genuine dispute of material fact exists if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Harris v. Klare*, 902 F.3d 630, 634-35 (6th Cir. 2018). The party bringing the summary judgment motion has the initial burden of identifying portions of the record that demonstrate the absence of a genuine dispute over material facts. *Pittman v. Experian Information Solutions, Inc.*, 901 F.3d 619, 627-28 (6th Cir. 2018). If the summary judgment movant meets that burden, then in response the non-moving party must set forth specific facts showing that there is a genuine issue for trial. *Id*. at 628.

A party asserting that a fact cannot be or genuinely is disputed—*i.e.*, a party seeking summary judgment and a party opposing summary judgment, respectively—must support the assertion by citing to materials in the record, including, but not limited to, depositions, documents, affidavits or declarations. Fed. R. Civ. P. 56(c)(1)(A). In reviewing a motion for summary judgment, this court must view the evidence in the light most favorable to the nonmoving party. *Tlapanco v. Elges*, 969 F.3d 638, 647 (6th Cir. 2020) (quoting *Anderson*, 477 U.S. at 248). Likewise, the court should view the facts and draw all reasonable inferences in favor of the non-

moving party. *Pittman*, 901 F.3d at 628. Credibility judgments and weighing of evidence are improper. *Hostettler v. College of Wooster*, 895 F.3d 844, 852 (6th Cir. 2018). As noted above, where there is a genuine dispute as to any material fact, summary judgment is not appropriate. *Id*. The court determines whether sufficient evidence has been presented to make the issue of fact a proper jury question. *Id*. The mere existence of a scintilla of evidence in support of the nonmoving party's position will be insufficient to survive summary judgment; rather, there must be evidence upon which the jury could reasonably find for the nonmoving party. *Rodgers v. Banks*, 344 F.3d 587, 595 (6th Cir. 2003).

"The standard of review for cross-motions for summary judgment does not differ from the standard applied when a motion is filed by only one party to the litigation." *New Century Found. v. Robertson*, 400 F. Supp. 3d 684, 689 (M.D. Tenn. 2019) (citing *Ferro Corp. v. Cookson Group, PLC*, 585 F.3d 946, 949 (6th Cir. 2009). "[S]ummary judgment in favor of either party is not proper if disputes remain as to material facts. Rather, the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Id.* (quoting *Taft Broad. Co. v. United States*, 929 F.2d 240, 248 (6th Cir. 1991)). In addition, "if the moving party will bear the burden of persuasion at trial, then that party must support its motion with credible evidence that would entitle it to a directed verdict if not controverted at trial." *Timmer v. Michigan Dep't of Commerce*, 104 F.3d 833, 843 (6th Cir. 1997) (citing *Celotex Corp.*, 477 U.S. at 322-23); *see also Ely v. Dearborn Heights School Dist. No. 7*, 150 F. Supp. 3d 842, 849-50 (E.D. Mich. 2015) (explaining that if the moving party bears the burden of proof at trial that party "must satisfy both the initial burden of production on the summary judgment motion—by showing that no genuine dispute exists as to any material fact—and the ultimate burden of persuasion on the claim—by showing that it would be entitled to

a directed verdict at trial." (citing William W. Schwarzer, et al., *The Analysis and Decision of Summary Judgment Motions*, 139 F.R.D. 441, 477–78 (1992))).

ANALYSIS

## I. Dormant Commerce Clause

In Plaintiffs' Memorandum of Law in support of their Motion, Plaintiffs assert that

> This Court should [ ] grant summary judgment on the Commerce Clause claim (Claim Two) per the logic of the preliminary injunction (Doc. 29; see Fed. R. Civ. P. 56, 65.02.) The Court's prior rulings have now twice rejected the state's argument that PC 471 does not regulate extraterritorially. (Doc. 29 at 19; Doc. 83 at 18-30.) This question "hinges on . . . statutory interpretation" (Doc. 83 at 21) that does not change at the summary judgment stage. Because an extraterritorial law is per se unconstitutional (Doc. 29 at 19 n.9; Doc. 83 at 17 n.7), there are no facts to consider in a balancing analysis.

(Doc. No. 91 at 23-24). Indeed, the Court has twice interpreted PC 471 and found that PC 471 has an extraterritorial effect that is a *per se* violation of the Dormant Commerce Clause. The Court explained its reasoning in resolving Defendants' Motion to Dismiss as follows:[7]

> Defendants argue that Plaintiffs' Dormant Commerce claim (denominated "Claim Two" in the Amended Complaint) should be dismissed because (according to Defendants) Plaintiffs have failed to allege a claim upon which relief can be granted.
>
> The Commerce Clause provides the United State Congress a vehicle with which to regulate aspects of interstate commerce. *See* U.S. Const. art. I, § 8, cl. 3. Congress has the authority to regulate the channels and instrumentalities of interstate commerce as well as economic activities that have a substantial effect on interstate commerce. *See, e.g., Hodel v. Virginia Surface Min. & Reclamation Ass'n, Inc.*, 452 U.S. 264, 275-77 (1981); *Perez v. United States*, 402 U.S. 146, 150-52 (1971). The Tenth Amendment to the United States Constitution states that all powers not granted to the United States, nor prohibited to the states, are reserved to the states or the people; it thus acts as a limitation on Congressional power. *See*

---

[7] The Court notes that the footnotes in the quoted passage (footnotes 8 through 18 of this opinion) are from this Court's prior opinion and are not new to this opinion. Moreover, the footnote numbers in this opinion do not correspond with the footnote's number in the quoted opinion.

The Court also notes that some brackets (bracketed material) in the quoted passage is original to the quoted passage, and some is being added for purposes of the instant opinion. Generally, bracketed material found in quotation marks within the quoted passage is original to the quoted passage, while all other bracketed material has been added for purposes of this opinion.

U.S. Const. amend. X; *S. Pac. Co. v. Arizona ex rel. Sullivan*, 325 U.S. 761, 767 (1945) ("[I]n the absence of conflicting legislation by Congress, there is a residuum of power in the state to make laws governing matters of local concern which nevertheless in some measure affect interstate commerce or even, to some extent, regulate it.").

Nevertheless, a state or local law may be held unconstitutional if it places an undue burden on interstate commerce. *See C & A Carbone, Inc. v. Town of Clarkstown*, 511 U.S. 383, 390 (1994). Courts have long held that the Commerce Clause "limits the power of the [s]tates to erect barriers against interstate trade." *Dennis v. Higgins*, 498 U.S. 439, 446 (1991) (quoting *Lewis v. BT Inv. Managers, Inc.*, 447 U.S. 27, 35 (1980)). The doctrine analyzed below, the Dormant Commerce Clause (also known as the "negative" Commerce Clause), has been inferred by the Supreme Court to represent the negative implications—the above-referenced negating (or at least limitation) of states' power—of the Commerce Clause. *See, e.g., Wickard v. Filburn*, 317 U.S. 111, 123–24 (1942). The doctrine has its critics, but it remains good law. As the Supreme Court noted last year in a case involving a different Tennessee law:

> In recent years, some Members of the Court have authored vigorous and thoughtful critiques of this interpretation. But the proposition that the Commerce Clause by its own force restricts state protectionism is deeply rooted in our case law. And without the dormant Commerce Clause, we would be left with a constitutional scheme that those who framed and ratified the Constitution would surely find surprising.
>
> That is so because removing state trade barriers was a principal reason for the adoption of the Constitution.

*Tennessee Wine & Spirits Retailers Ass'n v. Thomas*, 139 S. Ct. 2449, 2460 (2019) (citations omitted).

The Sixth Circuit has adopted a two-step analysis to evaluate challenges based on the Dormant Commerce Clause. *Am. Beverage Ass'n v. Snyder*, 735 F.3d 362, 370-71 (6th Cir. 2013) (citing *Int'l Dairy Foods Ass'n v. Boggs*, 622 F.3d 628, 644 (6th Cir. 2010)). First, the court must determine whether the state regulation is *per se* invalid. *Int'l Dairy Foods Ass'n*, 622 F.3d at 645. "[A] state regulation is 'virtually *per se* invalid' if it is *either* extraterritorial or discriminatory in effect." *Id*. A state statute is discriminatory if it "directly regulates or discriminates against interstate commerce, or [whether] its effect is to favor in-state economic interests over out-of-state interests." *Snyder*, 735 F.3d at 370-71 (quoting *Int'l Dairy Foods Ass'n*, 622 F.3d at 644) (brackets in original). "A [state regulation] can discriminate against out-of-state interests in three different ways: (a) facially, (b) purposefully, or (c) in practical effect." *Id*. (quoting *Int'l Dairy Foods Ass'n*, 622 F.3d at 648). The plaintiff bears the initial burden of proof to show that the state regulation is

discriminatory. *Id*. "If the plaintiff satisfies its burden, then 'a discriminatory law is virtually *per se* invalid and will survive only if it advances a legitimate local purpose that cannot be adequately served by reasonable nondiscriminatory alternatives.'"[8] *Id*. (citation omitted).

A statute is a *per se* violation the Dormant Commerce Clause alternatively, as indicated above, if it constitutes a direct regulation of interstate conduct (*i.e.*, controls extraterritorial conduct). *See Int'l Dairy Foods Ass'n*, 622 F.3d at 645. This is because "a statute that directly controls commerce occurring wholly outside the boundaries of a State exceeds the inherent limits of the enacting State's authority." *Healy v. Beer Inst., Inc.*, 491 U.S. 324, 336 (1989). "Most critical to this inquiry is the issue of 'whether the practical effect of the regulation is to control conduct beyond the boundaries of the State.'" *Int'l Dairy Foods Ass'n*, 622 F.3d at 645 (quoting *Healy*, 491 U.S. at 337). "Circuits outside the Sixth Circuit have recognized that, '[b]ecause the [I]nternet does not recognize geographic boundaries, it is difficult, if not impossible, for a state to regulate Internet activities without project[ing] its legislation into other States.'" *Backpage.com, LLC v. Cooper*, 939 F. Supp. 2d. 805, 841 (M.D. Tenn. 2013) (quoting *Am. Booksellers Found. v. Dean*, 342 F.3d 96, 103 (2d Cir. 2003)). If a "statute has an impermissible extraterritorial effect, [a court has] no need to consider whether the state has some legitimate local purpose or whether there is a reasonable nondiscriminatory alternative." *Snyder*, 735 F.3d at 376.[9]

Second, "[w]hen a state regulation is neither extraterritorial nor discriminates against out-of-state actors, it may still violate the Commerce Clause if its burden on interstate commerce is 'clearly excessive in relation to the putative local benefits.'" *Id*. (quoting *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970)) Under this balancing test (known as the *Pike* balancing test):

> If a legitimate local purpose is found, then the question becomes one of degree. And the extent of the burden that will be tolerated will of course depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities.

---

[8] Here, the law is not discriminatory to out-of-state actors, as it requires in-state auctioneers, to the same extent as out-of-state auctioneers, to obtain a license before conducting an extended-time online auction.

[9] It bears mentioning what it means to say that a statute (or other regulation) has an "impermissible extraterritorial effect." The Sixth Circuit has indicated that it means that the regulation regulates extraterritorial conduct occurring wholly outside of the state. *See Int'l Dairy Foods Ass'n*, 622 F.3d at 645 (describing). It also bears mentioning that there does not appear to be such thing as an "extraterritorial effect" that is permissible under the Dormant Commerce Clause; an "extraterritorial effect" is always impermissible under the Dormant Commerce Clause. Thus, the word "impermissible" in the phrase "impermissible extraterritorial effect" appears to be superfluous in this context. The upshot is that the issue in this context is whether there is an extraterritorial effect, and not whether there is an extraterritorial effect that is impermissible rather than permissible.

*Id.* (citing *Pike*, 397 U.S. at 142).

As discussed above, this Court previously granted Plaintiff'[s'] motion for a preliminary injunction and thus preliminarily enjoined enforcement of PC 471, based partly on the finding that Plaintiffs' were likely to succeed on the merits of their Dormant Commerce Clause claim. In litigating the motion for preliminary injunction, the respective sides offered (as they also do here) very different interpretations of the scope of PC 471's geographical reach. Plaintiffs interpret the statute broadly, arguing that the statutory language regarding the licensing of online auctioneers contains no qualifications or geographical limitations. Thus, as before, Plaintiffs assert that PC 471 imposes a licensing requirement on any auctioneer who conducts online extended-time auctions in which a Tennessee resident may bid—[10]which, in the context of online auctions, apparently is virtually every auction. *Id.* at *4. By contrast, as before, Defendants interpret the statute narrowly, arguing that PC 471 imposes a licensing requirement only on auctioneers who conduct extended-time online auctions while physically located in Tennessee. In its analysis on the motion for a preliminary injunction, noting that the likelihood of success of Plaintiffs' Dormant Commerce Clause claim turned on the statutory interpretation of PC 471, the Court first interpreted the statute. *Id.*

The Court considered the parties' arguments and held as follows:

As noted above, under Tennessee law, when statutory language is unambiguous the Court should derive legislative intent from the plain and ordinary meaning of the statutory language. *Freeman*, 27 S.W.3d at 911. The statute states that "it is unlawful for a person to [a]ct as, advertise as, or represent to be an auctioneer without holding a valid license issued by the commission." Tenn. Code Ann. § 62-19-102(a)(1). This statutory licensing requirement by its terms contains no qualifications, no geographical limitations, and no explanation of what it means to "act as, advertise as, or represent to be an auctioneer" in the context of online auctions, and

---

[10] Plaintiffs thus seem to assume that enforcement of PC 471's licensing requirement to auctioneers who conduct extended online auctions would be limited to auctioneers who conduct auctions in which a Tennessee resident bids. One may wonder why Plaintiffs would concede a geographic limitation in this sense, since (1) Plaintiffs' general argument is that PC 471 embodies no geographic limitations whatsoever, and, consistent with Plaintiffs' general argument (2) it is readily apparent that nothing in the text of PC 471 would limit its licensing requirement to auctions in which a Tennessee resident bids. Perhaps this is because Plaintiffs assume that even without any textual geographic limitations, PC 471 is not something state enforcement officials would seek to enforce against auctioneers who could not be deemed to conduct auctions in Tennessee *unless* the auctions had at least one Tennessee bidder. In other words, perhaps Plaintiffs assume that, however zealous state enforcement officials might be, they would not seek to enforce the licensing requirement against auctioneers whose auctions lack contacts with Tennessee beyond the mere fact that the Internet is accessible in Tennessee; in these circumstances, Plaintiffs imply, these officials would at least require the presence of a Tennessee bidder in an auctioneer's online extended auctions before requiring the auctioneer to be licensed. The Court understands why Plaintiffs would make this assumption about how, as a practical matter, the licensing requirement likely would be enforced in this context, but it bears mentioning that there is actually nothing in the statute that would limit enforcement to auctions *actually* involving Tennessee bidders, as opposed to auctions merely *accessible* to *potential* bidders in Tennessee.

the Court declines to write such an explanation or qualification into the statutory language where it simply does not exist. *See United States v. M/V Big Sam*, 693 F.2d 451, 455 (5th Cir. 1982) ("[I]t is simply not part of our function as judges to re-write, in the guise of statutory construction, unambiguous statutory language in order to cure what to us seems to be statutory deficiencies."). Further, the State has not identified any legislative history to support its purported interpretation of the statute as including "in this state." *Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 108 (1980) ("Absent a clearly expressed legislative intention to the contrary, that language must ordinarily be regarded as conclusive."). In short, the Court will not geographically limit the licensure requirement to online auctioneers and auctions "in this state [Tennessee]."

Even if the Court were inclined to read into the statute this geographical limitation, it would not necessarily entail what the State, in an effort to surmount the Dormant Commerce Clause challenge, is claiming it would entail. That is, if inserted as the State would have it, "in this state" would not carry the limited meaning suggested by the State. The Court finds that the phrase "act[ing] as, advertis[ing] as, or represent[ing] to be an [online] auctioneer [in this state]" does not necessarily and unambiguously exclude such acting, advertising, or representing by a person not physically present in the State. *See Wallace*, 546 S.W.3d at 53 (statutory language will be considered "ambiguous when it is subject to differing interpretations which yield contrary results."). For example, in the Court's view, if an auctioneer is physically present in Alaska and initiates an extended-time online auction from there, he might reasonably be construed as representing himself to be an auctioneer "in" Tennessee, given that his website would reach Tennessee residents. Thus, arguably per the statute's language (supplemented with "in this state"), this hypothetical auctioneer would be required to be licensed as an auctioneer by the State of Tennessee or face civil penalties.

At the hearing, the State was not clear, and in fact equivocated, on the meaning of "in this state" in the context of the online auctions. The Court asked the State: "[I]f people that are quote not in this state end quote are exempted from this licensure requirement, who qualifies as not being quote in this state? So for example . . . if you're [] based [in] Mississippi, are you necessarily not quote in this state automatically or does it depend on whether you reach out to Tennessee consumers? Does it depend on whether you consummate sales transactions with Tennessee consumers? How do we define what is quote not in this state." (Tr. 57:5-17)

(emphasis added). Conceding that the "Internet makes it trickier", the State responded: "With an auction conducted in Tennessee, generally I think that's *probably* going to be yes, the auctioneer, the business, that is conducting the auction is located in Tennessee." (Tr. 58:8-11).

The Court then asked "[S]o for online, does that mean . . . if you're . . . [a] Mississippi auctioneer and . . . you're traveling and you spend the night in Memphis and you click a couple buttons as part of your auctioning, does that make you in state in connection with that auction business?" The State responded: "It does not *seem* that it would. Certainly, the Dormant Commerce Clause has protections. Substantial nexus is required. Merely passing through Tennessee *probably* wouldn't be sufficient. If the auctioneering business is located in Mississippi, that's *probably* Mississippi's jurisdiction to regulate or not regulate." (Tr. 58:25-57:6) (emphasis added). Despite the State's guesswork as to what the statutory language would mean if supplemented with "in this state," the State did not point to any case law, language from elsewhere in the statutory scheme, or indeed anything else to support its strict construction of the phrase in this context. Nor did the State provide any legislative history that clarified that the licensing requirement would affect only auctioneers physically located in Tennessee. *See Wallace*, 546 S.W.3d at 53 ("When . . . a statute is ambiguous" a court should consider external sources to ascertain legislative intent, including "the broader statutory scheme, the history and purpose of the legislation, public policy, historical facts preceding or contemporaneous with the enactment of the statute, and legislative history."). By urging the Court to read the licensing statute (as supplemented with "in this state") as limiting online extended-time auctioneer licensing only to auctioneers physically present in Tennessee, the State puts the Court in the position of having to draw a line that is not really there. *See M/V Big Sam*, 693 F.2d at 455; s*ee also Backpage.com*, 939 F. Supp. 2d at 844 ("[A] legislature must make the narrow geographic scope of its law explicit to stay within the confines of the Dormant Commerce Clause when regulating Internet activity."). In short, for purposes of the instant motion, the Court can say that its likely final interpretation will be that the licensing statute, with or without the inclusion of "in this state," applies to at least a substantial amount of out-of-state conduct.

Accordingly, the Court will adopt the Plaintiffs' suggested interpretation of the statutory language and finds that because the statute contains no qualifications or geographical limitations, the new law likely imposes a licensing requirement on any auctioneer who conducts online extended-time auctions, from wherever the

auctioneer may be located, in which a Tennessee resident may potentially bid.

*Id*. at *6-7.

After adopting a broad interpretation of the statute, the Court found that PC 471 would likely regulate conduct occurring wholly outside of Tennessee (*i.e.*, extraterritorial conduct), and [ ] therefore was likely a *per se* violation of the Dormant Commerce Clause. The Court explained:

> the law as written and interpreted by the Court requires a Tennessee license whenever anyone "[a]ct[s] as, advertise[s] as, or represent[s]" [himself or herself] be an auctioneer even if the auctioneer and the products being auctioned are "wholly outside of the State's borders." *Healy*, 491 U.S. at 336. In the context of online auctions, the mere existence of an online auction website results, in the most probable correct interpretation of the statutory language, in the auctioneer "represent[ing]" to be an online auctioneer in Tennessee because Tennessee residents will have access to the website even if the physical location of the auctioneer is outside of the state. Further, if a Tennessee resident wins (or even merely bids in) an online auction, the online auctioneer likely is properly deemed to be "act[ing]" as an auctioneer in Tennessee. Such likely interpretation would subject the auctioneer to regulation by Tennessee authorities that would be impermissible under the Commerce Clause. *See id.* at 337 ("[T]he Commerce Clause dictates that no State may force an out-of-state merchant to seek regulatory approval in one State before undertaking a transaction in another.") (citing *Brown–Forman*, 476 U.S. at 582); *Berman v. City of New York*, No. 09CV3017ENVCLP, 2012 WL 13041996, at *18 (E.D.N.Y. Oct. 3, 2012) ("[T]he in-state presence of one party to the transaction cannot be used as justification [for the state] to regulate the other party[.]") (citing *A.S. Goldmen & Co. v. N.J. Bureau of Sec.*, 163 F.3d 780, 782-83 (3d Cir. 1999)).

*Id*. at *8.

Accordingly, the viability of Plaintiffs' Dormant Commerce Clause claim hinges on a question of statutory interpretation—*i.e.*, whether PC 471 has an extraterritorial effect. In the Motion [to Dismiss], Defendants take another stab at convincing this Court that PC 471 as drafted does not have an extraterritorial effect. For the first time, Defendants point to a Tennessee Rule and Regulation 0160-08-.18 ("Rule 18") adopted by the Auctioneer Commission in 2001 that is titled "Electronic Media Auction License Requirement" and provides, "Any electronic media or computer-generated auction *originating from within Tennessee* shall conform to the requirements of Tennessee Code Annotated, Title 62, Chapter 19,

et seq. (Auctioneer Licensing Law) and the Rules of the Tennessee Auctioneer Commission." (Doc. No. 53 at 7 (citing Rule 18)) (emphasis added). Defendants contend that "the addition of the word 'electronic' by PC 471 merely confirms this longstanding rule" and "explains what the Auctioneer Commission deems to be an auction 'in this State' and makes crystal clear that Tennessee's licensing requirement applies only to auctions 'originating from within Tennessee.'" (*Id.*).

In light of Rule 18, Defendants contend that "[c]onstruing the prohibition against '[a]ct[ing] as, advertis[ing] as, or represent[ing] to be an auctioneer without holding a valid license issued by the commission,' PC 471, § 5(a)(1), to apply extraterritorially is a forced reading that ignores that the Commission's authority is limited to issuing licenses that grant the privilege to conduct auctions only in this State." (*Id.* at 8). Thus, Defendants argue that the "statute thus prohibits acting as, advertising as, or representing to be a Tennessee auctioneer without the required license." (*Id.*). Accordingly, Defendants contend that "there is no threat of a commerce clause violation" because "[a]uctioneers located outside of Tennessee have no need of a Tennessee license, even if Tennessee residents can bid on items they offer online." (*Id.*).

When construing a Tennessee statute, the court must adhere to the rules of construction employed by the courts of Tennessee. *See First Choice Chiropractic, LLC v. DeWine*, 969 F.3d 675, 680 (6th Cir. 2020) (applying Ohio rules of statutory construction when interpreting Ohio statute that had been challenged on First Amendment grounds); *see also England v. Suzuki Motor Corp.*, 521 F. Supp. 2d 707, 708 (E.D. Tenn. 2007) (applying Tennessee rules of statutory construction in interpreting a Tennessee statute). In construing statutes, Tennessee law provides that "the most basic principle of statutory construction is to ascertain and give effect to the legislative intent without unduly restricting or expanding a statute's coverage beyond its intended scope." *State v. Howard*, 504 S.W.3d 260, 269 (Tenn. 2016) (quoting *Owens v. State*, 908 S.W.2d 923, 926 (Tenn. 1995)). Courts are to avoid a construction that leads to absurd results. *Tennessean v. Metro. Gov't of Nashville*, 485 S.W.3d 857, 872 (Tenn. 2016) (citing *Lee Med., Inc. v. Beecher*, 312 S.W.3d 515, 527 (Tenn. 2010)).

"When statutory language is clear and unambiguous, we must apply its plain meaning in its normal and accepted use, without a forced interpretation that would extend the meaning of the language . . . ." *Carter v. Bell*, 279 S.W.3d 560, 564 (Tenn. 2009) (citation omitted). If a statute is ambiguous, the Court "'may reference the broader statutory scheme, the history of the legislation, or other sources' to determine the statute's meaning." *Frazier v. State*, 495 S.W.3d 246, 252 (Tenn. 2016) (citation omitted). A statute is ambiguous when "the parties derive different interpretations from the statutory language." *Howard*, 504 S.W.3d at 270 (quoting *Owens*, 908 S.W.2d at 926).

However, this proposition does not mean that an ambiguity exists merely because the parties proffer different interpretations of a

statute. A party cannot create an ambiguity by presenting a nonsensical or clearly erroneous interpretation of a statute. In other words, both interpretations must be reasonable in order for an ambiguity to exist.

*Frazier*, 495 S.W.3d at 252 (quoting *Powers v. State*, 343 S.W.3d 36, 50 n.20 (Tenn. 2011)) (internal quotation marks omitted); *see also Steppach v. Thomas*, 346 S.W.3d 488, 507 (Tenn. 2011) (explaining that ambiguity results when a statute is capable of conveying more than one meaning).

When examining legislative intent, "a court may look to an administrative regulation." *Najo Equip. Leading, LLC v. Comm. Of Revenue*, 477 S.W.3d 763, 769 (Tenn. 2015). "However, [] the administrative regulations [] are not controlling." *Id*. (citation omitted). Nevertheless, "'a state agency's interpretation of a statute that the agency is charged to enforce is entitled to great weight in determining legislative intent.'" *Id*. at 769-70 (quoting *Consumer Advocate Div. v. Greer,* 967 S.W.2d 759, 761 (Tenn. 1998)).

Here, as the Court found in its preliminary injunction order, PC 471 is an unambiguous statute; thus, Rule 18 does not even come [in] to play in the Court's analysis.[11] The statute states that "it is unlawful for a person to [a]ct as, advertise as, or represent to be an auctioneer without holding a valid license issued by the commission." Tenn. Code Ann. § 62-19-102(a)(1). As the Court has previously noted, "[t]his statutory licensing requirement by its terms contains no qualifications, no geographical limitations, and no explanation of what it means to 'act as, advertise as, or represent to be an auctioneer' in the context of online auctions, and the Court declines to write such an explanation or qualification into the statutory language where it simply does not exist." *McLemore*, 2019 WL 3305131, at *7; *see also Eubanks v. Wilkinson*, 937 F.2d 1118, 1122 (6th Cir. 1991) ("courts do not rewrite statutes to create constitutionality"); *United States v. M/V Big Sam*, 693 F.2d 451, 455 (5th Cir. 1982) ("[I]t is simply not part of our function as judges to re-write, in the guise of statutory construction, unambiguous statutory language in order to cure what to us seems to be statutory deficiencies."). Additionally, to write such a geographical qualification in would "unduly restrict[]" the statute's coverage beyond its apparent intended scope,[12] which Tennessee courts have explained is inappropriate for a court do. *See Howard*, 504 S.W.3d at 269.

---

[11] Any reasoning relied on by the Court in its Memorandum Opinion on Plaintiffs' motion for a preliminary injunction in finding that PC 471 applies extraterritorially is also incorporated herein. *See McLemore*, 2019 WL 3305131, at *3-9. This incorporation by reference is appropriate because, among other things, the Court has seen nothing from Defendants to substantially undercut such reasoning.

[12] Although Defendants in their Motion [to Dismiss] deny that PC 471's intended scope is outside the borders of Tennessee, a review of the language of PC 471 (which is what the Court must do here, rather than rely on Defendants' assertions as to what the intended scope of PC 471 is) leads to a different conclusion.

Defendants rely heavy on the presumption of constitutionality to which Tennessee statutes are entitled. (Doc. No. 53 at 8). But as the Court noted in its prior Memorandum Opinion, despite such presumption, "the Court cannot read a geographical scope into the statute when the statutory language is plainly devoid of any such geographical limitation." *McLemore*, 2019 WL 3305131, at *6 n.6; *see also Backpage.com*, 939 F. Supp. 2d at 842 (interpreting a Tennessee statute as having an extraterritorial effect because "[n]owhere in the language of the statute is there any limit on the statute's geographic scope that specifies what conduct, if any, must take place in Tennessee."). Defendants are asking the Court to read in a geographic limitation that simply is not there.

It may be convenient for Defendants to assert the existence of a geographical limitation at this time, in an effort to save PC 471. But one can easily imagine that State (perhaps under different executive branch leadership) changing its tune in the future; in the throes of enforcement zeal, the State someday could insist that there is no such geographical limitation. Suppose, for example, that future Tennessee authorities wished to bring a particular enforcement action against an individual who, conducting an online auction from Alaska, happened to complete sales to winning online bidders in Tennessee who later lodge complaints. Imagine further that the individual insists that PC 471 contains a geographic limitation that precludes such enforcement against her. It is readily conceivable that the State, seeking to vindicate the Tennessee alleged victims, would insist that there is no geographic limitation. If so, it would be on firm ground (on this particular point); the individual simply could not point to any geographic limitation, just as the State cannot do so here.[13] Defendants should not be permitted to survive a Dormant Commerce Clause challenge on the basis of a purported geographical limitation in PC 471, and then have PC 471's enforcement tools at its disposal unhindered by any geographic limitation that a enforcement target could even discern in the statute (let alone determine the scope of).

Defendants also assert that the Court's interpretation of the statute is a "forced reading that ignores that the Commission's authority is limited to issuing licenses that grant the privilege to conduct auctions only in this State." (Doc. No. 53 at 8 (citing Tenn. Code Ann. § 62-19-112(a)). The statute Defendant cited for this proposition, Tenn. Code Ann. § 62-19-112(a), does not prescribe or even suggest any such limitation; in no way does it indicate that the Commission can issue licenses only with respect to auctions conducted in Tennessee. Even if the Court were to accept that the statute cited by Defendants did in fact limit such licensing authority to in-state activity , the scope of authority to regulate activity occurring "in this State" is blurred—and not manifestly limited geographically at all—when the regulated activity regulated occurs over the Internet. *See Backpage.com*, 939 F. Supp. 2d at 842 (declining to read the overall jurisdictional provisions of the state criminal code into a specific state criminal statute that

---

[13] Fortunately for this hypothetical individual, it is precisely this lack of geographic limitation that should doom the applicable parts of PC 471 such that they could not be used against her in the first place.

criminalized conduct occurring on the Internet because of "the territorial issues unique to . . . the Internet"). As the Court explained in its prior Memorandum Opinion,

> In the context of online auctions, the mere existence of an online auction website results, in the most probable correct interpretation of the statutory language, in the auctioneer "represent[ing]" to be an online auctioneer in Tennessee because Tennessee residents will have access to the website even if the physical location of the auctioneer is outside of the state. Further, if a Tennessee resident wins (or even merely bids in) an online auction, the online auctioneer likely is properly deemed to be "act[ing]" as an auctioneer in Tennessee. Such likely interpretation would subject the auctioneer to regulation by Tennessee authorities that would be impermissible under the Commerce Clause.

*McLemore*, 2019 WL 3305131, at *8 (citation omitted). Thus, PC 471's extraterritorial effect is not depleted by the fact that the Commission's authority is limited to regulating only in-state conduct.

Even if the Court were to find that PC 471 was ambiguous, thus enabling it to review PC 471's "broader statutory scheme, the history of the legislation, or other sources' to determine the statute's meaning," *Frazier*, 495 S.W.3d at 252, such an exercise would not alter the Court's conclusion that PC 471 has an extraterritorial effect. As discussed above, Defendants point to Rule 18, which states that "any electronic media or computer-generated auction originating from within Tennessee shall conform to the requirements of [Tennessee's Auction Licensing Law]." While acknowledging that the Commission's regulations are to be given "great weight in determining legislative intent," *Najo Equip. Leading*, 477 S.W.3d at 769, Rule 18 still does not solve PC 471's extraterritorial problems for several reasons. First, Rule 18 requires an online auction generating within Tennessee to be conducted by a Tennessee licensed auctioneer, but Rule 18 contains no express terms that limit the licensure requirement *only* to online auctions generating within the State. Thus, Rule 18 does not really stand for the proposition that Tennessee does not require those conducting online auctions from other states that reach Tennesseans to be licensed.

Additionally, the Court agrees with Plaintiffs' argument that Rule 18's is not helpful in determining whether PC 471 embodies any geographical imitations, because the latter regulates a much broader range of conduct than does the former. That is, PC 471 essentially regulates *all acting and holding oneself out as an auctioneer*, while Rule 18 regulates (via a licensure requirement) only *acting* as an auctioneer—and only in the *limited sense* of conducting computer-generated auctions (that "originat[e] from within Tennessee"). What PC 471 regulates may

*encompass* everything that Rule 18 regulates, but it regulates many things that Rule 18 does not regulate.[14] As Plaintiffs aptly state:

> Rule 18 would fundamentally alter how the state regulates online auctions under PC 471. Courts cannot force an interpretation that would alter the statute's application. *See Eastman Chem. Co. v. Johnson*, 151 S.W.3d 503, 507 (Tenn. 2004). PC 471 applies to those who are acting as, advertising as, or representing to be, an auctioneer. (Ex. 1 at § 5(a)(1)). That application does not align with Rule 18, which applies to computer-generated auctions "originating from within Tennessee." Whatever "generating" or "originating" means is entirely different from "acting, advertising and representing." The state regulates not only generation of computer auctions, but mere representation. When Aaron says he is a "true auction company" on his website, then he is acting, advertising and representing to be an auctioneer in Tennessee even if it later results in an online auction that "originates" from Kansas, or even if he never "generates" an auction at all. Any "representation" occurs in Tennessee independent of whether Aaron initiates an online auction that "originates" in Kansas, and that is what the state regulates per PC 471. PC 471 applies to acting, advertising, and representing, not "generating" and "originating." If the state does not require a license from Aaron, then it is no longer administering PC 471. "Generation" and "origination" might make for a better law, but that is not the law that he [sic] state wrote.

(Doc. No. 54 at 7-8). The Court would additionally put it this way: even if (contrary to the Court's belief expressed above) Rule 18 does limit the authority of Tennessee to require a Tennessee license for computer-generated auctions not "originating from within Tennessee," it plainly does not limit (or have anything at all to say about) the authority of Tennessee to regulate most kinds of "act[ing] as," or any kinds of advertis[ing] as, or represent[ing] to be" an auctioneer" outside of Tennessee. And even if Rule 18 did suggest such a limitation, any such suggestion would be entitled to little weight under the circumstances, in particular the timeline involved. Rule 18 was issued nearly 20 years ago, and thus it is manifestly not probative in interpreting a statute passed last year. Moreover, the discussions during the Task Force hearings that led up to the passage of PC 471[15] (at least the discussions mentioned in the Complaint, which is all the Court may consider at this point) suggest that the legislature was not discussing the amendments to PC 471

---

[14] For example, one can act as an auctioneer—conduct within the scope of PC 471—without ever conducting any computer-generated auctions, and thus be untouched by Rule 18. And someone certainly can represent himself or herself (truthfully or falsely) to be an auctioneer—conduct within the scope of PC 471—without ever conducting any computer-generated auctions.

[15] As alleged in the Complaint, this Task Force was created by the Tennessee Legislature to study the question of online-auction regulation.

with an eye toward geographical boundaries. *See* (Doc. No. 50 at ¶ 141 ("the elephant in the room has always been online auctions, are we going to be a state that regulates online auctions. I think we should be.")); (*id.* at ¶ 138 ("we have got to either include online auctions or just get rid of the auction law. . . . an online auction is an auction just like any auction there is."); (*id.* at ¶ 121 (stating that the Task Force was "still wrestling with this online in terms of trying to define what that is," and "if it extended by any length of time, one second on, then it becomes a live auction and comes under the licensing purview of the Commission.")). There was simply no discussion (at least based on the information the Court can consider at the motion to dismiss stage) of an intent to regulate only online auctions that "originated" in Tennessee.[16]

The Court is aware that under Tennessee law, courts must construe statutes in a way that "sustain[s] the statute and avoid[s] constitutional conflict if at all possible, and . . . indulge every presumption and . . . resolve every doubt in favor of the statute's constitutionality." *Howell v. State*, 151 S.W.3d 450, 470 (Tenn. 2004) (citation omitted).[17] But as indicated above, the Court cannot sustain the statute by conjuring up non-existent statutory language and limitations. So doing would not *resolve* doubt in favor of the statute's constitutionality; instead it would merely be *creating* doubt (as to the statute's unconstitutionality) that does not exist if one looks at the statute as written.

Accordingly, the Court's concludes that PC 471 has an extraterritorial effect. As this Court previously stated,

> [w]ittingly or unwittingly, Tennessee has projected its legislation into other states and directly regulated commerce therein. Perhaps the State could change the result via statutory amendments inserting express, specific geographical limitations, but it cannot change the results by insisting that the statute obviously contains geographic limitations that in fact manifestly are not there. Accordingly, the Court finds that the statue is likely an impermissible *per se* violation of the Dormant Commerce Clause.

---

[16] The Court also does not find Rule 18 to be a reasonable interpretation of legislative intent as to the particular question presented here, because of the lack of defined meaning of the term "originating within Tennessee" in the context of online auctions.

[17] The "presumption against extraterritoriality" is a canon of statutory construction that limits the application of *federal* law on an international level and does not apply to construction of state law. *Kiobel v. Royal Dutch Petroleum Co.*, 569 U.S. 108, 115 (2013); *Sheehan v. Ash*, 574 B.R. 585, 593 (N.D.W. Va. 2017), *aff'd*, 889 F.3d 171 (4th Cir. 2018) ("[A]lthough states are analogous to international sovereigns, the presumption against extraterritorial application remains a canon of construction confined to the international context[.]"). There is no indication that Tennessee courts indulge a presumption against extraterritorial application of its laws when construing Tennessee statutes.

*McLemore*, 2019 WL 3305131 at *9.[18] Thus, finding that Defendants' newly asserted argument regarding Rule 18 does not change the Court's prior decision regarding the extraterritorial scope of PC 471 (although in that decision, the Court found that the statute merely likely had an extraterritorial effect), the Court concludes that Plaintiff has properly pled a Dormant Commerce Clause violation, for the same reasons set out in the Court's prior Memorandum Opinion.

*McLemore*, 2020 WL 7129023, at *7-15.

Nothing in Plaintiffs' or Defendants' Motions (where the arguments made in regard to the dormant-commerce-clause analysis are virtually the same as the arguments before the Court at the motion-to-dismiss stage) change the Court's analysis. Moreover, none of the facts the Court relied on are in dispute in this lawsuit. In the Court's prior two opinions, the Court was ruling on, respectively, a motion for preliminary injunction and a motion to dismiss. Regarding the merits, the issues on those motions were, respectively, whether it was *likely* that PC 471 ultimately would (properly) be found to violate the Dormant Commerce Clause and whether Plaintiff's allegations (accepted as true) *plausibly suggested* that PC 471 violated the Dormant Commerce. So this is the first occasion the Court has had to decide whether PC 471, as drafted, *actually* violates the Dormant Commerce Clause. And the Court decides that it does because in the Court's view (consistent with its intimations in its two prior opinions), when properly construed, it unambiguously has an extraterritorial effect. Accordingly, the Court accepts Plaintiffs' invitation to adopt here (in a less qualified manner) its reasoning from its prior opinions. That is to say, in summary,

> The Court's role in construing statutory language is "to ascertain and give effect to the legislative intent without unduly restricting or expanding a statute's coverage beyond its intended scope." *Owens v. State,* 908 S.W.2d 923, 926 (Tenn. 1995). When the language within the four corners of the statute is unambiguous, the legislative intent must be derived from the statute's face and courts must follow the natural and ordinary meaning of the statute.

---

[18] The Court's holding is not so broad as to entail that Tennessee could never regulate online auctions. However, for such regulations to comport with the Dormant Commerce Clause, they would need to include clear (and likely *express*) geographic limitations, which are simply missing from PC 471 as currently drafted.

*Corum v. Holston Health & Rehab. Ctr.*, 104 S.W.3d 451, 454 (Tenn. 2003) (some internal quotation marks omitted). Here, ascertaining legislative intent as required, the Court finds that the language from the four corners of PC 471—considering its natural and ordinary meaning—unambiguously indicates an intent for PC 471 to have extraterritorial effect. And the Court must effectuate the intent thus indicated, irrespective of whether there are particular legislators who (if they thought about the issue) may not have intended extraterritorial effect or whether the legislature as a whole *would have* rejected extraterritorial effect had it been more intentional about considering the topic. The Tennessee General Assembly left us the particular language contained in PC 471, and the Court construes it as unambiguously dictating extraterritorial effect. The Court will not ignore this in a misguided and inappropriate effort to bail out what it views as imprudent drafting that rendered the statute constitutionally infirm.

The Court thus will grant Plaintiffs' Motion as to Plaintiffs' Dormant Commerce Clause claim and correspondingly deny Defendants' Motion as to that claim.[19]

## II. First Amendment and Article I, Section 19 of the Tennessee Constitution

Because the Court will grant Plaintiffs' summary judgment on their Dormant Commerce Clause claim, the Court will refrain from ruling on Plaintiffs' First Amendment and Article I, Section 19 of the Tennessee Constitution claims, so as to save scarce judicial resources and to

---

[19] It is worth noting that between the Court's ruling on Defendants' Motion to Dismiss and this Order, the Sixth Circuit had occasion to address a "rare[]" Dormant Commerce Clause case involving the extraterritoriality doctrine. *Online Merchants Guild v. Cameron*, 995 F.3d 540, 553 (6th Cir. 2021). There, the Sixth Circuit explained that "[t]he extraterritoriality doctrine is a powerful but precise instrument—invalidating state laws as per se unconstitutional in the narrow instances where a state expressly or inevitably exceeds its authority and seeks to control wholly out-of-state commerce, but otherwise inapplicable[.]" *Id*. at 559. Considering the particular language that comprises it (and the restrictive language that is omitted from it), PC 471 falls into the "narrow instance[] where a state expressly," or at least "inevitably" (in light of the inevitable proper construction of the statute), "exceeds its authority and seeks to control wholly out-of-state commerce" *Id*. That is not to say that the Tennessee General Assembly, or any particular members of it, *intended* to exceed their authority. But it is to say—in what actually matters here—that legislative intent, as divined by the Court from what it construes as the unambiguous language of PC 471 (especially when considered in light of what was *excluded* from such language), was for extraterritorial application of PC 471. And thus the Court is constrained to conclude that the State exceeded its authority.

avoid deciding unnecessary constitutional questions. *See Doe #1 v. Lee*, 518 F. Supp. 3d 1157, 1219 (M.D. Tenn. 2021) (Richardson, J.) (granting the plaintiff summary judgment on his Ex Post Facto Clause claim and refraining from ruling on the plaintiff's additional constitutional claims); *see also United States v. Elkins*, 300 F.3d 638, 647 (6th Cir. 2002) ("Courts should avoid [deciding] unnecessary constitutional questions.") (citing *Spector Motor Serv., Inc. v. McLaughlin*, 323 U.S. 101, 105 (1944)).

## CONCLUSION

For the above-stated reasons, Plaintiffs' Motion (Doc. No. 90) will be GRANTED to the extent Plaintiffs challenge PC 471 on Dormant Commerce Clause grounds, and the Court will refrain from ruling on Plaintiffs' challenge to PC 471 on First Amendment and Article I, Section 19 of the Tennessee Constitution grounds. Additionally for the above stated reasons, Defendants' Motion (Doc. No. 88) will be DENIED, and Plaintiffs' Motion to Exclude Defendants' Expert Witness (Doc. No. 89) will be DENIED as moot.

As discussed herein, the Court finds that summary judgment is appropriate in the form of some kind of permanent injunctive relief related to PC 471. However, the Court currently is unclear (and Plaintiffs have not made clear their view) regarding what the precise scope of that relief should be. Accordingly, on or before April 6, 2022, Plaintiffs shall advise the Court of the scope of relief that they seek and the legal basis for receiving it in light of the Court's holding herein. Defendants shall file a response as to their views on the scope of the relief (understanding that Defendants preserve all objections to the Court's holding herein and the notion that any relief should be awarded to Plaintiffs) on or before April 20, 2022.

An appropriate order will be entered.

_Eli Richardson_
ELI RICHARDSON
UNITED STATES DISTRICT JUDGE